No. 5:13-cv-233-C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

_____

ROSENDO RODRIGUEZ, III

*Petitioner,*

v.

WILLIAM STEPHENS,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
140th Judicial District of Lubbock County

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

**SETH KRETZER**                    **CARLO D'ANGELO**
SBN: 24043764                       SBN: 24052664

The Lyric Center                    100 East Ferguson; Suite 1210
440 Louisiana Street; Suite 200     Tyler, Texas 75702

Houston, TX 77002
(713) 775-3050 (office)             (903) 595-6776 (Office)
(713) 224-2815 (fax)                (903) 407-4119 (fax)
*email: seth@kretzerfirm.com*       *e-mail: carlo@dangelolegal.com*

Court-Appointed Attorneys for Petitioner, Rosendo Rodriguez, III

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

TO THE HONORABLE 140TH DISTRICT COURT:

NOW COMES, **ROSENDO RODRIGUEZ, III**, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice.  This application follows his conviction and death sentence in the 140th Judicial District Court of Lubbock County, cause number 2005-410,654 styled *State v. Rosendo Rodriguez III*.

Rodriguez is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in 2005-410,654 styled *State v. Rosendo Rodriguez III*.

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, ROSENDO
RODRIGUEZ, certifies that the following listed persons have an interest in the
outcome of this case. These representations are made in order that this court may
evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Rosendo Rodriguez, III | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center<br>440 Louisiana Street<br>Suite 200<br>Houston, TX 77002<br>(713) 775-3050 (direct)<br>(713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Carlo D'Angelo | 100 East Ferguson<br>Suite 1210<br>Tyler, TX 75702 | Appointed attorney for current federal habeas |
| Mr. Richard L. Wardroup and Mr. Frederick M. Stangl | P.O. Box 879<br>Lubbock, TX 79408<br><br>1217 Avenue K<br>Lubbock, TX 79401 | Trial Counsel |
| Mr. J.K. "Rusty" Wall | P.O. Box 50123<br>Midland, TX 79710<br>(432) 688-4399 | Counsel for Direct Appeal |
| Mr. Paul Mansur | Texas Defender Services<br>P.O. Box 1300<br>Denver City, TX 79323 | State Writ Lawyer |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| | | |
| **Respondent** | | |
| Mr. Matthew D. Powell | Lubbock County Courthouse P.O. Box 10536 Lubbock, TX 79408 | Lubbock County District Attorney |
| Mr. Darren Tray Payne, | | Asst. District Attorney |
| **Judges** | | |
| Honorable Jim B. Darnell | Judge Presiding, 140th Judicial District Court Lubbock County Courthouse 904 Broadway, Suite 349 Lubbock, TX 79401 | Trial Judge and State Habeas Judge |
| | | |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"Trial RR" refers to reporter's record from the state trial court, "Writ RR" refers to the reporter's record from the writ hearing in the 140th District Court. "CR" refers to clerk's record from state trial court.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

### RODRIGUEZ'S AEDPA DEADLINE

Rodriguez's direct appeal to the Court of Criminal Appeals (CCA) was decided on March 16, 2011.  *Rodriguez v. State,* 2011 WL 1196871.

The Texas Court of Criminal Appeals denied habeas relief on May 8, 2013. *Ex parte Rodriguez*, 2013 WL 1920737 (Tex. Crim. App. May 8, 2013).

Rodriguez's state writ was filed on July 2, 2010.  The state writ was pending until May 8, 2013, when the CCA ruled.  *Ex parte Rodriguez*, 2013 WL 1920737. Rodriguez's AEDPA deadline is therefore May 8, 2014.  28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

In its initial October 28 scheduling order, this Court ordered that, "Rodriguez shall file his original petition for writ of habeas corpus in the form required by local rules prior to the end of the limitations period set forth in 28 U.S.C. § 2244(d).

### EXHAUSTION

With the exception of the *Trevino* issues raised herein, Rodriguez states that all of the federal constitutional claims alleged below have been exhausted in proceedings before the Texas courts.

## Issues Presented

- Was Petitioner denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death?

- Was Petitioner's confession freely, knowingly, and intelligently given in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 9 & 10, of the Texas Constitution; and Article 38.22 of the Texas Code of Criminal Procedure?

- Was Petitioner's confession not voluntary in violation of the Fourteenth Amendment to the United States Constitution; Article I, Sections 9 & 10, of the Texas Constitution; and Article 38.22 of the Texas Constitution?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his first attorney, Albert Rodriguez, agreed to allow Petitioner to confess without first investigating the State's case against him?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when

his trial and direct appeal counsel failed to raise issues relating to the suppression of his confession at trial and on appeal?

- Was Petitioner denied a fair trial and a fair and impartial jury when the jury at his trial learned of and considered facts not presented at trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution; the Confrontation Clause of the Sixth Amendment to the United States Constitution; and Article I, Section 10, of the Texas Constitution?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial and direct appeal counsel failed to investigate the jury misconduct claims?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to challenge or otherwise object properly to autopsy photos of the fetus?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his direct appeal counsel failed to raise an issue on appeal relating to

7

improperly admitted and irrelevant evidence consisting of autopsy photos of the fetus?

- Should Petitioner's convictions for capital murder be set aside in their entirety because he was convicted of two counts of capital murder, one of which the State has conceded there is legally insufficient evidence to support the conviction; therefore, the jury convicted Petitioner of two counts of capital murder, one of which was constitutionally invalid, rendering both convictions unreliable in violation of the heightened reliability requirement in death penalty cases as guaranteed by the Due Process clause of the Fourteenth Amendment, the right to a fair trial provisions of the Sixth Amendment, and the requirements of the Eighth Amendment to the United States Constitution?

- Should Petitioner's death sentence be set aside and he should be afforded a new sentencing hearing because he was convicted of two counts of capital murder, one of which the State has conceded there is legally insufficient evidence to support the conviction; therefore, the jury assessed punishment based upon one invalid capital murder conviction, which rendered the punishment hearing unreliable in violation of the heightened reliability requirement in death penalty cases as guaranteed by the Due Process clause of the Fourteenth Amendment, the right to a fair trial provisions of the Sixth

Amendment, and the requirements of the Eighth Amendment to the United States Constitution?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his direct appeal counsel failed to raise issues on appeal relating to the unreliability of his conviction and sentence?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to investigate and to cross-examine or otherwise challenge properly the evidence that Summer Baldwin was still alive when she was placed in the suitcase?

- Should Petitioner's death sentence be set aside because the Texas mitigation special issue given in his case failed to assign a burden of proof in violation of Petitioner's rights to due process under the Fourteenth Amendment and to reliability of the death sentence and freedom from arbitrariness and capriciousness in capital sentencing as guaranteed by the Eighth Amendment?

- Should Petitioner's death sentence be set aside because the Texas mitigation special issue given in his case failed to adequately define what is meant by mitigation or mitigating evidence and the terms used created a reasonable

possibility that the jury would construe mitigating evidence narrowly such that it would not give full consideration and effect to all of Petitioner's mitigating evidence in violation of the Eighth Amendment to the United States Constitution?

- Is Petitioner's right to a meaningful direct appeal frustrated because the Court of Criminal Appeals' refusal to allow review of the mitigation special issue and this refusal violates Petitioner's rights to due process under the Fourteenth Amendment, to reliability of the death sentence as guaranteed by the Eighth Amendment, and to a fair trial secured by the various provisions of the Sixth Amendment.  ?

- Were Petitioner's rights to a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and by Article I, Section 10, of the Texas Constitution violated when the trial court refused to allow him meaningful *voir dire*?

- Were Petitioner's rights to due process as guaranteed by the Fourteenth Amendment to the United States Constitution, and by Article I, Section 19, of the Texas Constitution violated when the trial court refused to allow him meaningful *voir dire*?

- Were Petitioner's rights to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and

by Article I, Section 10, of the Texas Constitution violated when the trial court refused to allow him meaningful *voir dire*?

- Were Petitioner's rights not to be subject to cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendment to the United States Constitution, and by Article I, Section 13, of the Texas Constitution violated when the trial court refused to allow him meaningful *voir dire*?

- Was Petitioner denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial and direct appeal counsel failed to properly raise the *voir dire* issues?

- Was trial counsels' failure to challenge whether Petitioner, as opposed to the garbage truck trash compactor, was the source of Baldwin's 50-plus blunt force injuries ineffective assistance of counsel in violation Petitioner's Sixth Amendment right to counsel and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

- Should the equitable relief available under *Martinez* for procedurally defaulted claims that result from inadequate representation at the initial State court post-conviction stage be extended to petitioners like Petitioner, whose post- conviction counsel filed the appropriate post-

conviction ineffective assistance of counsel claim, but then failed to do anything else of consequence to press those claims.

- Is the refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was: 1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator; and 2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.

- Did the trial Court violate the Eighth and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e).

- Did the Trial Court violate the Fourth and Fourteenth Amendments to the United States Constitution by denying Petitioner's Motion to Suppress evidence obtained in violation of the Right to Financial Privacy Act, 12 U.S.C. § 3401.

## PROCEDURAL HISTORY

**A.     Procedural History in State Court**

By an indictment filed on the 25th day of October 2005, Rodriguez was charged in trial court cause number 2005 410854 with one count of capital murder with alternative theories. (C.R. Vol. 1 p. 3).  The indictment alleged that Rodriguez intentionally or knowingly caused the death of Summer Baldwin while Rodriguez was in the course of committing or attempting to commit aggravated sexual assault.  In the alternative, the indictment alleged that Rodriguez intentionally or knowingly caused the death of Summer Baldwin, and by doing so, Rodriguez intentionally and knowingly caused the death of an unborn child during the same criminal transaction. After the jury was seated, Rodriguez entered a plea of "not guilty" to the charges.  On March 28, 2009, Rodriguez was convicted of the offense of capital murder. (CR: Vol. 2 p. 558-560). The jury answered special issues such that a death sentence was imposed on April 10, 2008. *Id*. at 566-567.

The testimony in the trial on the merits began on March 24, 2008. The jury answered "Yes" to Special Issue No. 1 and answered "No" to Special Issue No .2. In accordance with the previous verdict of guilty and answers to the special issues, the trial court entered a judgment and assessed Rodriguez's punishment at death.

On June 19, 2008, Rodriguez timely filed a Motion for New Trial that was subsequently denied by the court. Appeal to this Court is automatic. See Tex. Code Crim. Proc. Ann. art. § 37.07 2(g) (Vernon Supp. 2001).

The Texas Court of Criminal Appeals denied habeas relief on May 8, 2013. *Ex parte Rodriguez*, 2013 WL 1920737 (Tex. Crim. App. 2013).

Rodriguez's state writ was filed on July 2, 2010.  The state writ was pending until May 8, 2013, when the CCA ruled.  *Ex parte Rodriguez*, 2013 WL 1920737.

**B.     Procedural History in Federal Court**

On October 10, 2013, Rodriguez filed a motion for appointment of counsel. (Doc. No. 1). On October 28, this Court appointed Seth Kretzer as lead counsel and Carlo D'Angelo as co-counsel.  (Doc. No. 3).

## STATEMENT OF FACTS

On September 13, 2005, Summer Baldwin's body was discovered inside a new Protégé-brand suitcase at the Lubbock City Landfill. 33R. 155. Baldwin, a drug-addicted prostitute, lived in Lubbock, Texas. 32R. 200. At the time of her death, Baldwin was ten weeks pregnant, although few knew of the pregnancy and there were no outward signs that she was pregnant. 34R. 6, 20-21.

On Sunday, September 11, 2005, Margie Estrada, another prostitute, saw Baldwin during the late evening hours at a 7-Eleven store across from the

14

convention-center area Holiday Inn in downtown Lubbock. 32R. 205. Baldwin was seated in the passenger's seat of a new, red four-door pick-up truck driven by a Hispanic male, later identified as Petitioner Rosendo Rodriguez. 32R. 212. Baldwin walked over and entered Estrada's truck. 32R. 214. She told Estrada that the man in the red truck was her "client" and that they had been together using drugs. 32R. 214. Baldwin then left and returned to the red truck. 32R. 216.

Rosendo Rodriguez was in Lubbock for training as a part of his duties as a member of the United States Marine Corps Reserve. 34R. 7. Rodriguez checked into the convention center Holiday Inn on Friday, September 9, 2005, arriving in a new, red four-door pick-up truck, which he had rented from Enterprise. 32R. 232, 300.

Chris Rodriguez, Rodriguez's friend and former fraternity brother at Texas Tech University, learned that Rodriguez was in Lubbock and called Rodriguez on Saturday, September 10, 2005. 32R. 147. On Sunday evening, September 11th, Rodriguez met with Chris, Chris' girlfriend, and some others at Chris' apartment. 32R. 151. Rodriguez told everyone that he served in Iraq, described killing a young Iraqi child, and having sex with various Iraqi "girls," including prostitutes. 32R. 153. However, Rodriguez never served in Iraq. 32R. 187.

Chris and Rosendo Rodriguez left for the movie, which was showing around 10:30pm, but discovered that it was sold out. 32R. 150. They then decided to go to

a bar where both consumed several drinks and Rodriguez continued to discuss his experiences in Iraq. 32R. 156. Rodriguez drove Chris home sometime around 12:45 a.m. 32R. 162. Holiday Inn room-key records show that Rodriguez entered his room several times during the following hours: around 1:50 a.m., 3:00 a.m., 3:45 a.m., and 7:30 a.m. 33R. 209-10.

Lubbock police determined that the Protégé-brand suitcase which Baldwin's body was found was purchased with Rodriguez's debit card at a nearby Walmart, along some latex gloves, on September 12th at approximately 3:30 a.m. 33R. 159. A store surveillance video showed a man matching Rodriguez' description purchasing a suitcase at the Wal-Mart. 33R. 160.

Rodriguez later stated that he first met Baldwin on Saturday evening, September 10th, around 10:00 p.m. 34R. 7. He said that he was driving down a dark street when he saw Baldwin walking in the same direction that he was driving. 34R. 7. He noticed that she was crying, so he pulled over. 34R. 7. After letting her get cleaned up at his hotel room, he drove her home. He claimed that he did not know that Baldwin was a prostitute. 34R. 22.

He picked Baldwin up again on late Sunday night or early Monday morning. Rodriguez claimed that they had consensual vaginal and anal intercourse while she laid on her back. 34R. 9. He stated that he used a condom during intercourse. 34R. 10. After intercourse, Rodriguez claimed that he and Baldwin began to fight when

16

she lit a crack pipe and he did not approve. 34R. 10-11. He asserted that Baldwin then tried to attack him with a knife. 34R. 23. Rodriguez maintained that he never hit or threw Baldwin against a wall but instead placed her in a chokehold until she lost consciousness. 34R. 21. He claimed that the fight happened near the bathroom door, not the bed, where Baldwin's blood was found. 34R. 12.

Rodriguez thought it would be futile to try to revive Baldwin with CPR because she had no pulse and had blood in her mouth. 34R. 13. He admitted that he purchased the suitcase and that he stuffed Baldwin's body into it; he then took the suitcase containing Baldwin's body to a dumpster and threw it in. 34R. 18. He stated that he then went back to the Holiday Inn, slept for a while, and later ate. 34R. 17-18. Rodriguez kept the knives that Baldwin had in her possession—Rodriguez's attorney later turned over the pocketknives to the police, one of which contained Baldwin's fingerprint. 34R. 14.

Rodriguez called Chris on Monday to see about getting together, but Chris was working and could not meet Rodriguez, so they made plans for Wednesday evening. 32R. 164. While talking on the phone, Rodriguez and Chris recalled their activities of the previous night and laughed about having too much to drink. 32R. 164-65. Chris attempted to contact Rodriguez on Wednesday but Rodriguez never answered his phone. 32R. 165. Instead of meeting with Chris, Rodriguez checked

out of the Holiday Inn, returned the rented truck, and took a bus home to San Antonio. 35R. 140.

Once home, Rodriguez searched Internet news stories on Baldwin's death, searched for his own name on at least one of the news sites, and also searched online singles websites for young women. 35R. 141-164. On Tuesday, September 13, 2005, Baldwin's severely abused body was discovered folded up inside a new Protégé-brand suitcase at the Lubbock City Landfill. 33R. 155. Baldwin's wallet, with no money in it, was found in a trash dumpster on September 14, 2005. 32R. 98.

On September 15th, Lubbock detectives searched the room in which Rodriguez had stayed at the Holiday Inn. 33R. 164-66. They found a dried pool of Baldwin's blood on the carpet next to the bed farthest from the door and blood spatter on the box springs and mattress. 34R. 30. Walmart bags, a Protégé suitcase registration card, a condom wrapper, and two sets of latex rubber gloves were found in a trash container in the hallway down from the room. 33R. 19. Rodriguez could not be excluded as the donor of the DNA on the latex gloves. 34R. 143.

Rodriguez was arrested on September 15th. RR. 33R. 167. He had no apparent injuries other than some scratch marks on his left arm. 33R. 176. He chose not to speak with officers at that time. 34R. 21.

**GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW IN TEXAS**

The following is an overview of capital punishment law in Texas. This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty. To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder. For instance, kidnaping and then killing a person is a capital offense. So is killing two people, rather than one, which happened in the present case.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys. One of the lawyers is the lead attorney; the other is the second chair attorney. Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions. The reason for this is because the state and federal law requires all issues

19

raised on appeal to be first presented to the trial judge. Death penalty jurisprudence is thick with constitutional and statutory issues. All unsettled challenges to death penalty procedures must be raised. Failure to do so means that the issues are waived for direct appeal. Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many jurors exercise certain allowable rights not to serve; others cannot be found. On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel. Either side may ask for the jury to be shuffled at this point. Jurors will be seated randomly in numerical order. Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.  The judge may excuse some jurors but not others. At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.  After the juror leaves, each side is permitted to challenge for cause.  If granted, the juror is finally excused and deleted from the pool.  If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

21

There are two methods in Texas for permitting peremptory challenges.  For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied.  This is sometimes called the sequential method of selecting the jury.  The State goes first. If the State strikes the juror, the juror is gone.  If the State declines to strike the juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.  This form of jury selection was used in Sparks' trial.

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues.  The questions have varied over the years.  In Rodriguez's case, only two questions were asked: the future dangerousness question and the mitigation question.

The method of answering the special issues is complicated.  If the jurors unanimously answer both questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically.  If the jurors answer

*unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes. It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue. If this occurs, then the defendant is sentenced automatically to life in prison. There is no retrial. Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case. The result is always either a life sentence or a death sentence. Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence. Unanimity is required for a death sentence. A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor. Again, the answer is that the defendant receives an automatic life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA"). At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an

attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## ARGUMENT AND AUTHORITIES

### DETAILED ARGUMENTS

### A.    Standard of Review: AEDPA

This Court's review of a habeas petition is generally governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §§ 2241, *et seq.* Under the AEDPA, a federal court may grant a habeas petition on a claim that was adjudicated on the merits in a state court proceedings only if the state court's decision was "contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  A federal court may also grant habeas petition on the adjudication of a claim that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding. 28 U.S.C. § 2254(d)(2); *Pondexter v. Quarterman*, 537 F.3d 511, 519 (5th Cir. 2008).

The phrases "contrary to" and "unreasonable application of" federal law created two different categories in which a prisoner can obtain federal habeas relief on claims adjudicated on the merits in state court. *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002), citing *Williams v. Taylor*, 529 U.S. 362, 391 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to clearly established Federal law" if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's decisions or the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Id.*  A state court's decision is "an unreasonable application of clearly established Federal law" if the state court correctly identifies the governing law but applies it unreasonably to the facts of the Petitioner's case. *Id*. The inquiry into unreasonableness is an objective one and the application of clearly established Federal law must be incorrect and unreasonable to warrant federal habeas relief. *Id*.

To establish federal habeas relief on the ground that the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," a Petitioner must rebut by clear and convincing evidence the factual determinations by the state court even though

the state court's finding are presumptively correct and given deference by the federal court. *Dickson v. Quarterman*, 462 F.3d 470, 476-477 (5th Cir. 2006).

### B.   *Strickland*  Ineffective Assistance of Counsel Standard

Many of Petitioner's state habeas claims complain of his state trial and appeal counsel rendering ineffective assistance of counsel as guaranteed by the Sixth Amendment. Thus, "clearly established federal law" for most all of Petitioner's claims in the instant federal writ will concern the state court's decision contrary to or an unreasonable application of his right to effective assistance of counsel pursuant to the Sixth Amendment. *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) (holding that the standard governing claims of ineffective assistance of counsel established in *Strickland v. Washington* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States for the purpose of federal habeas review under 28 U.S.C. §2254(d)).

For Petitioner to establish a violation of his Sixth Amendment right to effective assistance of counsel, he must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) there was a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to

fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999); *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court").

Investigation is the hallmark of effective representation. *Strickland v. Washington*, 466 U.S. at 690-91.  As the Court explained:

> [S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; *and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a <u>duty</u> to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary*.

*Id*. (emphasis added).

Of course, an attorney's duty to investigate must be based on prevailing professional norms, and the duty does not simply evaporate because a client has requested that no investigation be done or demanded that the investigation be limited or conducted in a certain way or because the client or the family may be less than cooperative or forthcoming.  *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005); *Stankewitz v. Woodford*, 365 F.3d 706, 721-22 (9th Cir. 2004); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003).  Thus, the fact that there may be

barriers to investigating mitigation evidence in a capital case does not relieve trial counsel of the duty to investigate.

Not only must a defendant prove that trial counsel performed deficiently, he must also prove that the deficient performance prejudiced his defense. In demonstrating prejudice, a defendant must show more than that trial counsel's errors or omissions had some conceivable effect on the outcome. *Strickland v. Washington*, 466 U.S. at 693. However, the Court obviously had the overarching principles of fairness in mind when it eschewed the outcome-determinative test applied to newly discovered evidence. *Id*. at 693-94. Therefore, a defendant does not have to prove that the outcome *would have been different* absent the errors. *Id*.

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of the proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Id*. at 694.

Instead, the Court settled on the well-known standard for determining prejudice: "The defendant must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have

been different.  A reasonable probability is a probability *sufficient to undermine confidence* in the outcome."  *Id*. (emphasis added).

> As the Court expressed in unequivocal terms, reviewing courts must review the "totality of the evidence" when making this determination. *Id*. at 695-96.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*.

The Court concluded by stating that the standard should not be applied in a mechanistic manner; instead, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," which brought the Court's discussion full circle to its place of departure–the fundamental guarantee of a fair trial.  *Id*. at 696.

### GROUND FOR REVIEW ONE:

PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS TRIAL ATTORNEYS FAILED TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE THAT CALLED FOR A SENTENCE LESS THAN DEATH.

29

This claim was properly preserved for federal review. Petitioner raised the violation of federal constitutional rights in his State habeas writ (PRE 2 at 32). The trial court signed Findings of Fact and Conclusions of Law ("F&C") denying relief as to this claim (PRE 3 at 82). The Texas Court of Criminal Appeals ("CCA") agreed with the trial court's findings. *Ex Parte Rosendo Rodriguez, III*, 2013 WL 1920737 (May 8, 2013).

## A.    Deficient Performance of Trial Counsel

Although the State court record demonstrates that trial counsel investigated and presented mitigating evidence to the jury, there were nevertheless crucial failures by counsel in their investigation. As consequence of these shortcomings, trial counsel failed to develop and present an effective mitigation case.

Trial counsel had a wealth of information available to them that if thoroughly explored and developed, would have no doubt presented a powerful picture to the jury of Petitioner's abusive and his dysfunctional family history. Petitioner's father ("Rodriguez, Jr.") was a profoundly troubled man who often used violence and mental manipulation as means of controlling his children. Rodriguez, Jr. had a volatile personality which when coupled with alcohol sent him into fits of uncontrollable rage. He had very high expectations of his children and when they fell short of those expectations, he would show his displeasure with

them through violence. Rodriguez, Jr. was equally violent and abusive to his wife and would very often verbally belittle and chastise her in front of his children. Had the jury heard this evidence, there is a reasonable probability that at least one juror would have voted for life.

Defense counsel failed to develop and present a compelling mitigation case to the jury.   Despite the fact that defense counsel knew of Rodriguez, Jr.'s, addiction and mental illness issues, they failed to obtain his medical records. These records, which were subsequently obtained by State habeas counsel, contain ample evidence documenting the degree and severity of Rodriguez, Jr.'s mental illness and substance abuse history. As a consequence, defense counsel failed to present a full picture to the jury of just how Petitioner was impacted by his father's abuse.

At the punishment phase of the trial Rodriguez, Jr., testified that he had regrets about his conduct (RR 37/321).   He became a very bad alcoholic during the years that he was practicing law and that his alcohol use caused him to be violent at times toward his family. *Id.* Rodriguez, Jr. grossly minimized the number of violent outburst he'd had with Petitioner's mother during their marriage claiming it may have only happened two or three times (RR 37/321-22). He later elaborated that the violence included "some" choking and slapping and that Petitioner was present during these incidents (RR 37/323).   Although Rodriguez, Jr. admitted to being violent with his daughters, he again minimized his conduct claiming that he

31

slapped each of his daughters on two or three occasions (RR 37/322). He claimed that although he respected and revered his wife and daughters, he regretted his conduct  (RR 37/323). Rodriguez, Jr. acknowledged that his son witnessed these acts of violence (RR 37/323).

He recounted only one instance of violence toward Petitioner during his childhood (RR 37/323). This occurred with Petitioner was 15 or 16 years of age. *Id.*  Rodriguez, Jr. was not pleased about a girl Petitioner was dating and he slapped him after Petitioner for being disrespectful toward him. *Id.*

Amazingly, Rodriguez, Jr. told the jury that he did not think that he did anything to cause Petitioner to murder anyone (RR 37/325). He did, however, concede that he could not explain the psychological consequences of all the abuse Petitioner witnessed growing up. *Id.*

Petitioner's older sister, Sophia Rodriguez, described her father as a "very domineering, violent man" (RR 37/328). She added that her mother bore the brunt of her father's violent behavior. *Id.*  Sophia went into graphic detail about her earliest memories of this abuse.  She recalled being awakened when she was five or six years old to her mother screaming "Rosendo, no. Rosendo, no" (RR 37/329). Her younger sister Olivia began crying and she tried to comfort her. When Sophia went into her parents room to see what was wrong and her father screamed at her " Little Bitch, go to bed" (RR 37/329).

32

As was often the case during these episodes, her sister Olivia and Petitioner would be huddled in a corner while Rodriguez, Jr. screamed at his wife in a drunken fit of rage (RR 37/330).   Sophia recounted that she often witnessed Rodriguez, Jr. choke her mother and push her against the wall and hit her with his fists. *Id.*   In addition to physical abuse, he would also threaten and belittle her in front of the children. *Id.*   All the children were afraid for their mother growing up.

She disagreed with her father's contention that he only was violent with her mother on two or three occasions. Instead, Sophia recalled that it happened many times and that he was typically so intoxicated during these violent episodes and could not later recall what he did (RR 37/336-37).

Sophia recounted that when Petitioner cried, their father would often tell him that only "putas" (Spanish word for bitches) cried (RR 37/330-31).   Rodriguez, Jr., demanded that Petitioner side with him in these fights and not act like his sisters or his "stupid" mother. *Id.*   Sophia opined that Rodriguez, Jr., did not show respect for women (RR 37/331). Boys were more valued in the Rodriguez household and his daughters struggled to please him. She described her father as being a controlling man and that the children had to walk on eggshells around him because of his unpredictable mood swings (RR 37/333).

Petitioner's mother, Guadalupe Rodriguez, testified that although the family pictures offered into evidence depicted a happy family, this was not always the

case (RR 37/350). She recounted that she was the constant victim of violence at the hands of her husband (RR 37/351) (describing instances where Rodriguez, Jr., would punch her, slam her head against brick walls, grab her by her neck, throw her down and kick her). Although she did not want her children to witness this violence, they often did. *Id.* Rodriguez, Jr., had little respect for her and generally held women in very low esteem (RR 37/352). She believed that her children were affected by these near-daily violent episodes in the home. *Id.*

Defense counsel also called Rodriguez, Jr.'s former paralegal, Thelia Chaffin to testify during the punishment trial (RR 37/186). Chaffin testified that she was employed with Rodriguez, Jr., for 18 years and got to know his family very well during the '80's and '90's (RR 37/187-90). She described a loving and supportive family that did everything together (RR 37/190). She denied seeing any abuse in the Rodriguez home (RR 37/191).

Rodriguez, Jr.'s, sister, Anna Rodriguez, testified that Petitioner was a very outgoing, polite and charming young man who had a great deal of promise (RR 37/224-228). She did not mention any of the history of violence, alcoholism and abuse that went on in Petitioner's home.

Regrettably, trial defense team spent an inadequate amount of time preparing the above witnesses to testify. This is evident by the abundance of information that was left out at trial and only later discovered during the State habeas investigation.

The information later collected by Sate habeas counsel was both relevant and powerful mitigation evidence that could have been related to the jury.

### 1.    Trial Court F&C: Guadalupe Rodriguez

The trial court made a finding that that Lupe's hearing testimony was lacking in specific details and that she mentioned "fairly dramatic incidents that Olivia and Sophia made no mention of (PRE 3 at 60). The trial court also concluded that Lupe's testimony was not credible because she "failed to mention fairly dramatic incidents that  did not [sic] mention." *Id.*

The trial court, however, failed to consider the issue of whether trial counsel were deficient in failing to adequately investigate, develop and present Lupe's mitigation testimony to the jury. As a consequence, the trial court made no application of the facts of this case to the law in *Strickland*.

### 2.    State Habeas Evidence: Guadalupe Rodriguez

Petitioner's mother testified at the State habeas hearing that her marriage to Rodriguez, Jr., was abusive and described the turmoil it subjected her children to. The first time she recalled her husband being violent with her was when he was a student at Texas Tech Law School and she was three or four months pregnant with Olivia.  Rodriguez, Jr., took her to a party with another couple, Tony and Irma Chavez, and the Chavez's wanted to leave.  Lupe went to look for Rodriguez, Jr., at the bar, and saw him standing with another woman.  She motioned that it was

time to leave.  Rodriguez, Jr., gave her a look, full of anger in his eyes, that she had never seen before, and he grabbed her by the arm and escorted her out.  In the car on the way home, he started slapping and punching Lupe in the face and chest.  She put her arms around her stomach to protect her baby, but Rodriguez, Jr., slapped her hands out of the way.  When Lupe asked what she had done to make him mad, he told her, "Bitch, you embarrassed me."  This happened in 1976 (1SWH. 10-15).

When she was about seven months pregnant with Petitioner, she and Rodriguez, Jr., went to her parents' house.  She did not serve Rodriguez, Jr.'s food fast enough for him, and when they got home, he grabbed her and threw her on the bed.  He told her what a bad wife she was.  He then slapped and kicked her, and this included slaps to her back and stomach.  Lupe explained that she was attending to both Olivia and Sophia at the party, which was why she did not wait on Rodriguez, Jr. (1SWH. 15-16).

Lupe worked until about her seventh month of pregnancy with Petitioner.  She explained that Rodriguez, Jr., did not like her to work because he could not control who her friends were or who she talked to.  He also denigrated her, telling her she was not qualified or not smart enough.  This happened throughout Petitioner's childhood.  Lupe understood that her husband was telling her she was dumb.  Lupe explained that Rodriguez, Jr., believed that the woman's place was in

the home and kitchen. It was the man's role to make money and to control the house. He paid the bills and told Lupe how much money she could spend on things like groceries (1SWH. 16-19).

Lupe described what could set Rodriguez, Jr., off: "If I didn't pronounce a word right, if I didn't cook something a certain way, if I dressed a certain way, he said that I was flirting with other men." He would become very angry with her all of a sudden. When he became angry, he would hit her. This happened throughout Petitioner's childhood from the time he was born and persisted even after he had left for college (1SWH. 20-21). Lupe could anticipate the beatings by the way her husband looked at her. "He would get red in the face, his eyes would glaze over, and the veins in his neck would stick out." He would start verbally berating Lupe, and if she said anything, he would charge at her. Rodriguez, Jr., would leave bruises on Lupe's neck, stomach, back, and arms, but he usually was careful to avoid injuring her face. However, he sometimes made her bleed from her mouth. Lupe added that the bruising was another reason she did not work. Lupe explained that these beatings happened three or four times a week and were more prevalent when Rodriguez, Jr., had been drinking. Lupe knew if she fought back, the beatings would be worse, so she took it (1SWH. 21-23).

Lupe described a time when Petitioner tried to intervene to protect his mother. Rodriguez, Jr., and Lupe had been at a dance, and a man told him that he

needed to lose weight or someone would take Lupe from him. The man told Rodriguez, Jr., that he had a hot looking wife. Rodriguez, Jr., did not say anything to the man, but when he got home, he took Lupe into the backyard and slammed her against the wall. He started choking her. Olivia and Petitioner, who were in the house at the time, heard the commotion and came outside. Olivia pushed her father and told him to leave their mother alone. Rodriguez, Jr., threw Olivia to the side. Petitioner, who was about 13 years old or so, picked up a plastic baseball bat and hit Rodriguez, Jr., in the face with it. This shocked Jr., and he loosened his grip on Lupe, who was able to run away (1SWH. 24-26).

Lupe then talked about how Rodriguez, Jr., would discipline the children. He would line them up against the wall and yell at them and tell them things to humiliate them. He would call the girls "bitches" just like their mother. He would call Petitioner a sissy if he showed any emotion. He would tell Petitioner that he should not dare cry and that he should suck it up. Rodriguez, Jr., would slap Petitioner if he ever showed any emotion. Lupe explained that Petitioner would stare blankly straight ahead at these times. Lupe told him in private that he should think of something pleasant. Lupe explained that she tried to sit still when Rodriguez, Jr., was beating her and would tell herself that if she did nothing it would not last too long and she would survive. She explained that Rodriguez, Jr., slapped and hit the children as well, including Petitioner. Lupe believed that

38

Rodriguez, Jr., subjected Petitioner to physical punishment like this from the time he was two years old until he was 18. Rodriguez, Jr., would use his hand and a belt (1SWH. 26-28).

Petitioner would get into trouble for not answering his father right away, for not coming home on time, and for his grades. Grades were very important. Lupe hated report card day, because if the children had something less then straight A's, Rodriguez, Jr., would slap and hit them, and then he would turn on Lupe and blame her. Rodriguez, Jr., had very high expectations for all his children. At some point, Petitioner's school performance fell short of Rodriguez, Jr.'s expectations (1SWH. 26-30).

Rodriguez, Jr., kept an arsenal of weapons at the house. He stashed guns throughout the house, underneath beds, in closets, in the attic, in the children's bedrooms, in the living room, and so forth. Rodriguez, Jr., kept a loaded .357 Magnum under his pillow and a shotgun under the bed. One time, Rodriguez, Jr., held a gun to Lupe's head and told her to say hello to Jesus for him (1SWH. 30-31).

When Petitioner was 16 or 17 years old, Rodriguez, Jr., was in a car wreck. Lupe and Petitioner were in the car, and Rodriguez, Jr., hit a bull in the road. Petitioner flew into the windshield and hurt his head, and Lupe was also injured.

Rodriguez, Jr., would not let Petitioner and Lupe go to the doctor initially; he told them to suck it up (1SWH. 32-33).

Rodriguez, Jr.'s drinking got worse after he graduated from law school, and the violence increased.   He typically drank El Presidente brandy and two six packs of beer every day.   Lupe knew that Rodriguez, Jr., drank less when he ate a full meal, so she always tried to have dinner ready when Rodriguez, Jr., came home from work.   Rodriguez, Jr., expected the house to be clean, the children home, and dinner to be ready when he got home.   Sometimes, however, Rodriguez, Jr., would not come home right away because he would stay out drinking.   Sometimes, he would call Lupe at 2:00 or 3:00 in the morning and tell her to come get him.   Lupe explained that Rodriguez, Jr., was very pleasant to be around when he was not drinking, but if he had been drinking, he could become belligerent and violent. Rodriguez, Jr., quit drinking after the car accident (1SWH. 33-36, 115-16).

Lupe explained that Rodriguez, Jr., also controlled the household through money.   She would have to promise to keep the house cleaner or iron his shirts better to get something.   He gave the children money after beating their mother. Rodriguez, Jr. also controlled the way Lupe dressed and wore her makeup (1SWH. 37-38).   Lupe recalled a time when Rodriguez, Jr., criticized her for a new hairstyle.   He slugged her and told her she looked like a "nigger."   Petitioner was two or three years old and was in the car when this happened.   Lupe knew it was

about to get really bad, so she jumped out of the car and started running down the street. She called a friend to come pick her up. Lupe returned home the next day because she was afraid for the children and because she knew that Rodriguez, Jr., would have sobered up (1SWH. 39-40).

Lupe thought about divorcing her husband, but she knew that no attorney would represent her. She had no money to hire an attorney anyway. Once when Petitioner was around five years old, she left Rodriguez, Jr., taking the children with her. She went to a hotel, but Rodriguez, Jr., called all the hotels in town and found them. He called Lupe and told her she better get herself home and that there was no place she could hide from him (1SWH. 41).

Whenever Rodriguez, Jr., went out of town on business, the mood around the house would become more relaxed. She would fix food the children liked, and they pretended to have picnics in the living room (1SWH. 42-43). Lupe never told her family that Rodriguez, Jr., beat and abused her and the children. She wore clothes to hide her injuries. She told Rodriguez, Jr.'s sisters about the abuse a time or two, but they told her that Rodriguez, Jr., was under stress and that she should not do things to make it worse (1SWH. 43-44).

If Petitioner came to Lupe to feel safe, Rodriguez, Jr., would call him a mama's boy and call him a "sissy", a "pussy", or a "faggot." The abuse affected Petitioner. He was angry about it, but he was not allowed to show any emotion;

otherwise, Rodriguez, Jr., would call him "weak" or a "pussy." (1SWH. 44-45).

Lupe had no one to turn to. She became depressed from the hurt and pain, but

eventually, she grew accustomed to it. She contemplated suicide, but she did not

want her children to grow up without a mother (1SWH. 45). Lupe related another

incident in which her husband beat her. They were with Tony and Irma Chavez

and had just returned from a football game. Petitioner was around 14 years old. It

was late, and Olivia came and laid next to Lupe. Rodriguez, Jr., motioned with his

finger for Lupe to come over to him. He led her to a bedroom and grabbed her by

the throat. He told her he was sick of her flirting with the mariachi. He threw her

on the bed and started beating her (1SWH. 52-53).

Lupe talked about another incident in which her husband was drunk, and she

was driving. Rodriguez, Jr., had already started hitting and pinching Lupe's arm,

and she knew it was going to be one of those nights. She saw a policeman in the

rearview mirror, and she contemplated running the red light. She wanted to get

pulled over so the police would arrest her husband. The children were in the back

seat. Petitioner was around 12 years old. Rodriguez, Jr., saw what she was trying

to do, and he told her to put on the brakes. The policeman pulled up next to their

car, and Rodriguez, Jr., recognized him as one of his clients (1SWH. 53-55). Lupe

recalled another time in which she lied about her son when Rodriguez, Jr., asked a

question about him. Rodriguez, Jr., woke up one night and asked if Petitioner were

home.  Lupe told him he had been home for sometime, but he was still out.  Lupe explained that she knew if she told her husband the truth, he would blow up and possibly become violent with her and her son (1SWH. 141-43).  Lupe did not believe that her family could intervene.  She reached out for help from the police once, but the policeman, who knew Rodriguez, Jr., told Lupe that he would not do things like that (1SWH. 147).  There were several instances in which Rodriguez, Jr., was violent with her in front of his siblings.  She indicated that they knew what was going on as far as violence in the household (1SWH. 80-81).

Lupe talked about an incident that occurred after Sopfia's Quinceanera.  Lupe, Rodriguez, Jr., and Ana Maria Rodriguez returned to the house to find themselves locked out.  Rodriguez, Jr., flew into a rage, and he then turned on Ana Maria and grabbed her by the throat.  Lupe stepped between them, and Rodriguez, Jr., pushed her out of the way.  Petitioner was about 11 years old, and he witnessed this outburst (1SWH. 55-57).  Lupe also recounted another time in which Juan had to step between Rodriguez, Jr., and Lupe.

Lupe also recounted a time that the Rodriguez family travelled to Alice for a niece's college graduation.  They were staying at Becky and Israel Palacios' house.  Lupe's sister called to tell her that their mother had a stroke and to ask her to return to Wichita Falls.  Lupe told her that the other sisters would have to take care of it because they were at a family function.  Rodriguez, Jr., misinterpreted the event

and got mad at Lupe because he felt she was placing her family ahead of his.  He started yelling at her, and he was hitting and slapping her.  Sophia and Ana Maria Palacios came into the bedroom to calm Rodriguez, Jr., down, but he pushed Sophia out of the way.  Petitioner was sleeping in the living room while this commotion was going on.  He came into the room, crying, and he tried to get to his mother.  This made Rodriguez, Jr., angrier.  Eventually, Ana Maria called Juan, who had been the chief of police.  The situation escalated and got out of control, and Rodriguez, Jr., charged Lupe and went for her throat.  Israel and Juan grabbed him and escorted him outside.  Becky kicked Rodriguez, Jr., out of the house, so they took him to a hotel for the night (1SWH. 116-22).

Rodriguez, Jr., did not get mad at Olivia when she became pregnant.  She told him and braced herself because she believed he would hit her.  Instead, he embraced her and told her that they would help her with it.  Lupe was proud of Rodriguez, Jr., because it was not what she was expecting from him (1SWH. 108-11).

Lupe described threats Rodriguez, Jr., and the family received over the years from the criminal element in town.  Rodriguez, Jr., taught everyone in the family how to use a gun.  Lupe explained that it was scary to be out in Wichita Falls because of these threats (1SWH. 128-29).  Lupe elaborated that on one occasion they found their front door kicked in.  Petitioner was 11 or 12 years old.

Rodriguez, Jr., made the girls get back into the van with Lupe, while he and Petitioner armed themselves with guns and searched the house. After checking the house, Rodriguez, Jr., allowed the women to come in. Thereafter, they found a threatening message written in soap on the bathroom mirror (1SWH. 122-24).

Rodriguez, Jr., had clients who were police officers, and Lupe was always approached everywhere by clients. Some clients came over to the house on social visits, such as barbeques and so forth. Rodriguez, Jr., had a large criminal practice, and he represented some notorious drug dealers (1SWH. 86, 88-89, 90-91). The Rodriguez children were threatened in school because of matters in Rodriguez, Jr.'s practice. Olivia was threatened because she did not invite a girl to her Quinceanera, and Sophia had her new car keyed. After Olivia's Quinceanera, people had littered the Rodriguezes' backyard with beer bottles. Their door was smashed in another time, and Lupe's van had its tires slashed (1SWH. 91-93).

Outward appearances were very important for Rodriguez, Jr., and he expected everyone in the family to dress and behave in a way that would not be embarrassing for him. This is part of the reason that the abuse that happened in the home was kept secret. Lupe believed that her sisters suspected abuse was going on, but she did not tell them for fear that Rodriguez, Jr., would retaliate against them. He could not tolerate anyone helping Lupe, and Lupe explained that he cut her off from people who might help her (1SWH. 130-32).

Lupe related that Thelia Chaffin worked for her husband for about 18 or 19 years.  She referred to her as his second, or "office," wife.  They would sometimes socialize with the Chaffins.  Lupe did not think that the Chaffins were aware of Rodriguez, Jr.'s behavior at home.  Lupe said that she did not tell people around her because she was afraid that Rodriguez, Jr., would come back and really hurt her.  So people outside the family did not know about much of it (1SWH. 94-97).  Lupe did not discuss the abuse with Chaffin, but she believed Chaffin may have suspected it.  Hank Anderson, Rodriguez, Jr.'s law partner for many years, knew about it because he had to rescue Lupe and the children one night.  "But it was hush, hush" (1SWH. 135-36).  Rodriguez, Jr., hired Patrice Franklin and Mary Brittain to help him in his law practice after his brother, Juan, died.  He was very depressed, and was unable to manage his office and hired these women to take care of day-to-day activities.  Later, Lupe and Olivia worked at the office.  Rodriguez, Jr.'s condition got worse and worse (1SWH. 99-105).  Rodriguez, Jr., was diagnosed with bipolar disorder.  Sophia and Lupe had him committed to a mental hospital, and it was during his hospitalization that he was diagnosed.  He had never been treated for a mental disorder before (1SWH. 113-14).  Rodriguez, Jr., suffered severe depression, particularly toward the end of his life.  She knew that Rodriguez, Jr.'s father suffered from depression.  Lupe agreed that depression ran in her side of the family as well (1SWH. 132-33).  Rodriguez, Jr.'s violence

46

became more of a problem when he started drinking heavily. Things became much

worse when Rodriguez, Jr.'s partnership with Hank Anderson split up (1SWH.

145). Rodriguez, Jr.'s violent outbursts came on all of a sudden, like the "flip of a

switch." Lupe stated that Rodriguez, Jr.'s bipolar diagnosis did not surprise her.

She stated: "I knew something was wrong, you know. I really did. I knew that

there was something wrong, but I just couldn't quite put my finger on it." Once he

was diagnosed, everything seemed to fall into place for Lupe (1SWH. 133-35).

In another act of control, Rodriguez, Jr., told Lupe to stay out of Petitioner's

trial preparations. Lupe, nevertheless met with Rob Cowie and Rick Wardroup

prior to trial. Her longest meeting with Wardroup occurred at her apartment. When

Wardroup met with both Lupe, her husband was present. Wardroup asked about

Petitioner's childhood, girlfriends, and how he did at school. Rodriguez, Jr., got up

and left, and Wardroup asked Lupe about her marriage. Wardroup went into some

of the details that Lupe testified in the hearing. She agreed that Wardroup did not

go into nearly as much detail as did state habeas counsel. Lupe recalled that

Wardroup kept looking at his watch (1SWH. 46-49). The next time Lupe met with

Wardroup was at Sophia's apartment in Lubbock. Lupe indicated that she did not

discuss her marriage and Petitioner's childhood during this meeting (1SWH. 49-

50). Lupe related that Wardroup prepared her to testify by telling her to tell the

truth. Wardroup only asked her briefly about her marriage and Petitioner's

47

childhood (1SWH. 50-51). Lupe had little recollection of her initial meeting with Cowie. She did recall, however, that it was not as long as the meeting with Wardroup (1SWH. 50).

Lupe testified on cross-examination that she gave Wardroup and Cowie as much detail as she testified about at the hearing. She did not talk to anyone else from the defense team (1SWH. 76). The trial was scary to her, and she did not think she had time to explain to the jury what they needed to hear. She was not able to approach the attorneys after her testimony to explain to them that she had more information. They were busy, and Rodriguez, Jr., told her to sit down and stay quite (1SWH. 77-78). Lupe wanted to ask Wardroup questions about her testimony, but she never had the chance or opportunity. She agreed that there was not much detail about abuse based on the questions Wardroup asked her (1SWH. 137-39). Lupe also agreed that no one from the defense team ever sat down and talked to her about the importance of providing sensitive information about her husband and family (1SWH. 140-41).

In its F&C, the trial court found Lupe's version of the "Alice incident as being much more violent than any other witness described" (PRE 3 at 60). The trial court found that Lupe "exaggerated some things some times, and apparently confused events." *Id.* The court cited as an example that "although other witnesses described Petitioner's father's use of vulgar insults to Lupe and his daughters,

48

Lupe described his 'verbal abuse' generally as calling her 'stupid,' or 'dumb,' or accusing her of flirting with other men, but did not really mention such vulgar insults." *Id.*  The fact that Lupe may have exaggerated and/or confused certain events should not have been a basis for the trial court to discount all of her testimony and see no mitigation value whatsoever in it.  By doing so, the trial court failed to make a proper application of the law in *Strickland* to the facts of this case.

### 3.   Trial Court F&C: Olivia Rodriguez:

The trial court made a finding that Olivia's testimony at the State habeas evidentiary hearing was "not credible" (PRE 3 at 57).   The court wrongly concluded that Olivia was not credible because details from her testimony were not reported by her sister Sophia, her mother Lupe or any other witness. *Id.* The court also found Olivia's testimony incredible because she did not report "several of the same things that Sophia and Lupe described to the Petitioner's mitigation specialist. *Id.*

The court added that the trial testimony of Sophia also contradicted Olivia's subsequent evidence because Sophia:

did not mention … the 'gun incident,' the 'Alice incident, the 'curfew incident,' Olivia's bad and extensive bruising from a beating Olivia purportedly got from their father (and which Olivia said was similar to beatings and bruising Sophia had received from him), shots being fired at the house, threats from Petitioner's

father's clients or opposing parties, fleeing to a hotel, the 'quinceaner incident,' and other matters.

(PRE 3 at 61).

Again, the mere fact that Sophia did not recount every single incident that Olivia recounted should not be a basis to completely discount the credibility of all of her testimony. This is especially the case in light of the poor job that trial counsel did in preparing Sophia to testify during the mitigation trial. That obviously contributed to her sparse testimony of events during the penalty trial. The trial court's failure to make any finding whatsoever regarding whether trial counsel was deficient in failing to develop and present these mitigation facts at trial is yet another misapplication of the facts of this case to law in *Strickland*.

### 4.    State Habeas Evidence: Olivia Rodriguez:

In yet another instance of manipulation and control, Rodriguez, Jr. told Olivia that any of her involvement with the defense team had to go through him. As a result, she did not feel that she could simply approach Rob Cowie or the defense attorneys and start telling them information she had (1SWH. 233-34). Olivia stated that she attended the trial in 2008; she believed her role was as familial support.   Cowie met with Olivia, Rodriguez, Jr., and Ana Maria at Sophia's apartment in Lubbock.  He went over some of the evidence and pictures with them.  He did not take Olivia aside and talk to her separately about mitigation

evidence.   Rodriguez, Jr., became very angry with Cowie when he showed gruesome pictures to Olivia.  The meeting only lasted 15 minutes or so (1SWH. 159-63).   Unfortunately, Olivia never personally met with Wardroup and Stangl before trial.  They never asked her to testify.  She stated that Cowie was the only person she ever had contact with prior to trial (1SWH. 164).  Cowie did not make any other attempts to pull Olivia aside and interview her or prepare her to testify. As a result of all these circumstances, she never understood clearly that she was expected to provide testimony at trial (1SWH. 163-64).

After the guilty verdict, Olivia met with Wardroup and Stangl in a room along with her father, mother, and Ana Maria.  She found out about the guilty verdict.  She was very emotional.  The attorneys talked some about the punishment hearing with the family.  However, no one specifically spoke with Olivia about whether she would testify.  No one pulled her aside to talk about what testimony she could provide or that the defense team expected from her (1SWH. 166-67). The following Monday, Olivia did not return to Canyon from San Antonio.  She did not think she was needed; so she stayed home with her two young children, who had been staying with her fiancé (1SWH. 167-68).  Olivia did not feel it was her role or place to approach the attorneys to tell them about abuse that happened in the family that they had not elicited.  She knew that her father did not want her to offer her own ideas or input.  She had never met or talked to Wardroup and

51

Stangl before she met them at trial.  They did not establish any sort of relationship of trust with her.  Furthermore, she did not feel that Cowie developed a very good rapport with her either.  No one spent any considerable time with her prior to trial.  No one from the defense asked her to go around her father and talk to them; no one made that attempt.  It simply was not her role to come forward with painful information.  She asserted that sharing this information was very painful for her, and even now that her father was dead, she found it every bit as difficult if not more so (1SWH. 266-67).

Had Olivia been asked to testify, however, she would have willingly come back.  She also would have provided information about the family, its dysfunction, and childhood abuse had anyone asked, and she would have testified accordingly at trial (1SWH. 168-69).  On cross-examination, Olivia clarified that she was never told that she would "not" testify, but she was not told that she "would" testify either (1SWH. 208).

Olivia knew that her father had been diagnosed with bipolar disorder in 2007; however, she observed erratic behavior from him prior to this diagnosis.  She stated that throughout her childhood, "his extreme highs and lows were constant, a daily, weekly basis."  Her first memory of this was when she was three years old.  When she learned of the diagnosis, she was not surprised by it because she had lived through his erratic mood swings all her life (1SWH. 169).

Olivia also talked about her first memory of violence in her household.  She shared a room with Sophia, and Petitioner was in his own nursery.  Olivia and Sophia were woken up by their mother's screams.  She and Sophia looked into the hallway, and they saw their mother run by with their father chasing after her.  Rodriguez, Jr., turned and started coming toward the girls.  Sophia pulled Olivia back into the bedroom and barricaded the door with a chair.  She then pushed a screen out of the window and allowed Olivia to slide across it over the shrubbery outside.  Olivia and Sophia ran down the block and met up with Olivia.  Lupe called Anderson, who came to pick them up.  Anderson called Rodriguez, Jr., later and was able to return to pick up Petitioner.  They stayed at Anderson's house that night (1SWH. 170-73).  Olivia added this was not the first time this happened; it was only her first memory of it.  Violence like this was prevalent in the household, happening on a near weekly basis.  Rodriguez, Jr., was a severe alcoholic and he was very emotionally and physically abusive toward Lupe.  He hit, punched, and kicked Lupe countless times while the children were growing up.  He was violent mostly when he was drunk, but there were incidences of violence when he had not been drinking.  Olivia observed bruises all over her mother's body–everywhere except her face (1SWH. 173-75).  The children could tell when Rodriguez, Jr., was about to blow up.  His jaw would clench tight, and they could see the muscles in his jawline tighten up (1SWH. 174).

Olivia dreaded the weekends because she knew her father would be home and would drink excessively (1SWH. 202).  Olivia explained that her father often made the children sit on the sofa in the living room for hours, often into the early morning hours, while he berated and screamed at Lupe or them.  She felt that her father wanted an audience and that he was trying to convince them he was not always in the wrong (1SWH. 202-04).  Rodriguez, Jr., constantly demeaned Lupe in front of the children.  He would call her things like "puta" (whore), bitch, stupid, uneducated, and worthless.  He also referred to his daughters in the same manner.  If Petitioner showed emotion or cried, his father would call him names like "faggot" or "pussy."  He would tell him to stop letting his mother turn him into a "pussy."  Rodriguez, Jr., would also get mad and get into Petitioner's face and tell him to "eat it" if he ever saw him actually cry (1SWH. 181-82).

Olivia talked about a time that Lupe tried to leave Rodriguez, Jr.  He had been berating Lupe in front of the children for hours until he passed out.  Lupe then turned to the children and told them to pack a bag.  She gathered whatever money she had and asked the children for their money, and they went a hotel.  At 7:00 the next morning, Rodriguez, Jr., called and told Lupe she better come home.  Olivia was scared to return, and she was angry with her mother when she went back to him (1SWH. 182-83).  Olivia also recounted an incident in which Rodriguez, Jr., beat Lupe when the family had gone to Alice to attend Ana Salazar's graduation.

Olivia was sleeping in Ana's room and they were awakened by yelling. They looked into the hall and saw Sophia being pushed out of the room where Rodriguez, Jr., and Lupe were sleeping. Becky and Israel Palacios were able to get Rodriguez, Jr., to open the door. At some point, Lupe ran out of the room. Petitioner was around 12 or 13 years old at the time, and he was sleeping on a sofa-bed in the living room. Lupe ran out and hid under that bed. Later, Juan and his sons came over and escorted Jr. to a hotel. The next day he was apologetic (SWH. 175-79).

Olivia also recalled an incident after Sophia's Quinceanera. One of her cousins had gone back to the house to change and inadvertently locked the door on his way out. When Rodriguez, Jr., came home with his family around 2:00 or 3:00 in the morning, he became enraged. Ana Maria tried to calm him down, but he turned on her and slapped her. Then he turned on Lupe. Eventually, Petitioner and Olivia were taken back to the hotel where the party had been, and they stayed the night there (1SWH. 236-37).

Olivia reported that Rodriguez, Jr., was very physically and verbally abusive toward her. She recalled an incident when she was nine or ten years old, and her father took her to his room and started screaming at her. She was confused, but she said something to him. He then started beating her with a belt on her legs, butt, and back. He also used his hands and a flip-flop sandal. The next day, Olivia

showed Lupe her bruises (she had a black and blue hand-print on her), but Lupe just shook her head. Lupe did not say anything to her or try to console her (1SWH. 184-87). This was not the only time she was injured by her father. Olivia also knew that her father was physically violent with Sophia as well, although not as severe as he was with her (1SWH. 221-23).

Olivia also saw Rodriguez, Jr., physically abuse Petitioner. These occurrences happened from the time Mr. Rodriguez was three or four years old until Olivia left home when Petitioner was around 16 years old. He would spank Petitioner with his hand and a belt, and when Petitioner was older, Rodriguez, Jr., started punching him with his fist as well (1SWH. 188, 221-23). Rodriguez, Jr., abused Petitioner physically until he got old enough to defend himself (1SWH. 223-24). Olivia recalled several incidences in which Petitioner tried to intervene and help his mother. When Petitioner was 14 or 15, he jumped between Rodriguez, Jr., and Lupe and told his father that he would stop right then and there. Rodriguez, Jr., was shocked and he stopped. Several times when he was younger, Petitioner tried to intervene, but on those occasions Rodriguez, Jr., got angry with him and punished him with a spanking, or he get into his face and threaten him. Olivia explained that all the children knew not to intervene because they risked having their father's anger directed at them (1SWH. 189-90, 223-24). Olivia clarified her affidavit by stating that Petitioner in fact would sometimes stand up

against his father when his verbal and physical abuse of their mother got very bad (1SWH. 248).

The constant abuse made the children closer to each other. They would turn to each other. When Rodriguez, Jr., became abusive, the children would get into Sophia's bed and hold each other. They would promise that they would always be there for each other. Olivia even took the blame whenever Petitioner made a mess or spilled something, and he saw her being punished as a result (1SWH. 190-91). Olivia felt that she had no one else in the family to turn to for comfort or support. She believed that she tried to reach out to her aunt, Ana Maria, once when she was 13 years old; however, her aunt did not help and told her she was too demanding on her father (1SWH. 187). Olivia stated that she talked to other aunts other than Ana Maria about the abuse that was happening to the children. This included Becky and Dolores, but not Maria Elena (1SWH. 240-41).

Olivia explained that her aunts on her mother's side of the family loved and adored Rodriguez, Jr., and they were proud of the fact that Lupe had made it out of poverty. But because of the Hispanic culture, family abuse was something that they did not talk about, and they would not have felt that they could intervene. Olivia never talked to her mother's parents about the abuse, because they admired Rodriguez, Jr., too much. She did not talk to her other aunts because they had abusive marriages and were raising children on their own. However, she stated

that Lupe and the children sometimes had to stay with their aunts in Wichita Falls to get away from Rodriguez, Jr.  Lupe did not want to involve her sisters in her own problems (1SWH. 238-39, 246-47).

Olivia and Petitioner knew some of Rodriguez, Jr.'s criminal clients; they would go over to their houses at times.  Olivia knew that some of them were known drug dealers and charged with serious felonies.  Olivia found this strange and frightening (1SWH. 194).  One night, they were the victims of a drive-by shooting.  They were all asleep, and Rodriguez, Jr., came upstairs and woke Olivia and Sophia up and told them to go downstairs to Petitioner's room and lay on the floor.  Rodriguez, Jr., paced around the house armed with a gun while Lupe and her children huddled together on the floor of Petitioner's room (1SWH. 194-95).  Olivia recalled another time that the family came home and the doors were open.  Rodriguez, Jr., ordered Lupe and his daughters to get into the car and wait, while he and Petitioner, who was 11 or 12 years old at the time, armed themselves and checked the house.  Olivia could see the flashlights Rodriguez, Jr., and Petitioner were carrying as they checked the rooms.  Olivia was afraid for her brother's safety.  Rodriguez, Jr., never called the police; he just handled it on his own (1SWH. 196-98).

Olivia testified that Rodriguez, Jr., kept guns throughout the house, which he had placed in various places.  Olivia believed that Rodriguez, Jr., thought he

needed the weapons for self-protection, particularly against disgruntled clients or people he angered through his work as an attorney (1SWH. 199-200).   Olivia testified that they felt unsafe in their own home because of the element Rodriguez, Jr., represented in his law practice.   They also felt unsafe when out in the public. She explained that she was often approached in public by people who said threatening or derogatory things about her father, and once in high school two boys on the football team asked if she knew that her father was the biggest cocaine dealer in town (1SWH. 200-02).   Olivia identified the brothers, Robert and Ruben Ayala, as well as Roberto Alaniz, as drug dealers that her father cavorted with (1SWH. 224-25).

Olivia testified about vandalism to her house.   She found a bullet the roof next to the TV room.   When someone broke into her house, they wrote a threatening message to her in soap on the bathroom mirror.   It said she should leave a particular boy alone.   Also, someone had sprayed weed killer on the grass in the front yard so that a message would appear in the dead grass–"Fuck you RR." There were several occasions in which their tires had been slashed, and their house and cars had been egged (1SWH. 255-58).

Olivia related that she and Petitioner sometimes sat on the roof of their house and talked about what their lives were like.   They talked about why things were the way they were.   To outward appearance, the family appeared to be loving

and happy; however, inside it was "very chaotic and complete opposite of what people thought our lives were." Olivia and Petitioner spent time talking about this with one another (1SWH. 191-92). Olivia believed that the environment Rodriguez, Jr., created in the house impacted negatively on Petitioner. He was not taught that women had much value. He was not allowed to be emotional or to cry. He could not express how he felt (1SWH. 205-06).

Though they had material comfort growing up, Olivia believed there were essential things missing from her childhood. She explained: "[A]n overall sense of normalcy, and safety, and just – just an overall sense of knowing that we were living these two completely different lives from what was being presented on the outside and what was actually happening inside our home" (1SWH. 270).

Olivia stopped living with her parents after her daughter, Abigail, was born, partly because she did not want her father disciplining her. She also wanted to be on her own and to provide for her daughter (1SWH. 229-30). Olivia related what happened that led to her father's mental hospital commitment. After her uncle Juan's death in 2000, the family started to really notice more erratic behavior from Rodriguez, Jr., and his depression deepened. In 2007, he showed up to pick up his granddaughter from school. Olivia had previously talked to him, and she could tell that he was completely out of it. She told him that her boyfriend would pick Abigail up. However, Rodriguez, Jr., still showed up at school, and he passed out

60

in his car.  The principal came to the window and woke him up.  She would not let Rodriguez, Jr., take Abigail, and she ended up taking Abigail home (1SWH. 231-32, 259-261).   Olivia noticed that Rodriguez, Jr.'s practice and his financial situation started to decline after she began working for him.  In the '90's, it seemed that they had money at their disposal, but after she started working for him, she noticed that he had difficulty in paying his bills, including her salary.  She had to eventually take a second job at Dillards (1SWH. 250-52).  Olivia found it very hard to talk about her father, particularly since he had passed away.  However, she was asked to testify in the hearing, and she would have been willing to testify in the same way in 2008 at trial had she been asked (1SWH. 206-07).

**Trial Court F&C: Ana Maria Salazar**

The trial court made a finding that Salazar's habeas testimony was also less than credible (PRE at 58).   The court reasoned that her hearing testimony "described incidents other witnesses who testified at hearing or by affidavit never mentioned, although Ana Maria Salazar said they were present and were participants or central figures in those incidents." *Id.*   Of course the court immediately follows by noting that those "other witnesses" were never asked about those incidents. *Id.*  The court wrongly takes this to mean that these other witnesses "could not or would not support Ana Maria Salazar's testimony regarding such incidents." *Id.* The trial court summarily sets aside the mitigation value of yet

another of Petitioner's mitigation witnesses simply because neither side bothered to corroborate it. The court does not, however, endeavor as is required under *Strickland*, to weigh whether trial counsel was deficient for failing to present this mitigation evidence to the jury during the punishment trial. Again the court failed to apply the facts of this case to the law in *Strickland*.

### 5.   State Habeas Evidence: Ana Maria Salazar

Ana Maria recalled that the Rodriguez family would come to Alice for holidays and during the summer to visit. They were close. Salazar was close to her uncle, Rodriguez, Jr. She observed him drink often. He drank constantly while he was there (2SWH. 85-87). When sober, Rodriguez, Jr., was very pleasant and talkative. When he drank, however, he changed. He became volatile, aggressive, and like someone Salazar did not know. She recounted that he was like two different people (2SWH. 87-88, 117-18). He would become verbally abusive toward Lupe when he was intoxicated. He would call her a bitch and a whore and would make her feel worthless. He would walk around sternly and would intimidate or push her around (2SWH. 88-89). Salzar did not feel it was her place to intervene when this happened. She was scared of him (2SWH. 89).

Petitioner's bedroom was downstairs across from his parents' bedroom, so he was closest to them when they fought (2SWH. 89, 98). Salazar believed that Sophia had more control over her father than did the other family members. In this

way, she was more like a wife than was Lupe, and this created friction with Lupe. Olivia seemed to bear most of the brunt of Rodriguez, Jr.'s rages (2SWH. 90-92).

Rodriguez, Jr., had very high expectations for Petitioner, as did all of the family.  He was perceived as being very bright  (2SWH. 92).  Salazar thought that the Rodriguez family was very private about their lives, and they would sometimes discuss things behind closed doors (2SWH. 93-94).

Salazar often spent time with the Rodriguez family in Wichita Falls.  On one occasion, she was upstairs with Sophia and Olivia when she heard screaming from downstairs.  She heard Rodriguez, Jr., yell something about getting a gun.  Salazar was scared, and she called her mother, who told her to look for the gun.  Olivia and Sophia tried to stop her from going to look for the gun.  Salazar went downstairs into Rodriguez, Jr.'s bedroom and found the gun under a pillow, and she ran back upstairs where she hid it.  Later, Rodriguez, Jr., came upstairs asking for his gun. He demanded that Salazar turn it over to him, but she refused.  Salazar testified that she and her cousins were very scared and were crying.  The next day, she told Rodriguez, Jr., where he could find his gun.  She did not recall him apologizing (2SWH. 94-101, 103).

This was the first time Salazar saw Rodriguez, Jr., threaten anyone with a gun.  However, she had seen Rodriguez, Jr., try to hurt her aunt Ana Maria

Rodriguez.  It was after Sophia's Quinceanera, and she saw Rodriguez, Jr., try to choke Ana Maria (2SWH. 102-03).

Salazar saw Petitioner about a month before his arrest at a birthday party for their grandmother.  He was not his usual outgoing self; he was more withdrawn (2SWH. 106-07).

Depression runs in Lupe's side of the family (2SWH. 107-08).  No one from the Petitioner's defense ever contacted Salazar.  She would have talked to them and would have testified (2SWH. 108-09).

This was easily obtainable and powerful mitigation evidence that the jury never heard at trial.  The trial court made no finding as to how or why the exclusion of this evidence from Petitioner's mitigation case was a justifiable trial tactic. Accordingly, the court failed to adequately apply *Strickland* to the facts of this case.

### 6.    Trial Court F&C: Rebecca Palacios

The trial court made a finding that in "most respects", Rebecca Palacios was a credible witness (PRE 3 at 77). No finding was made by the trial court concerning whether trial counsel's failure to thoroughly investigate, develop or present Palacios' mitigation testimony to the jury was justified under a tactical decision or instead amounted in IAC under *Strickland*.

### 7.    State Habeas Evidence: Rebecca Palacios

Palacios, Rodriguez, Jr.'s sister, was also never contacted by anyone from the defense team. Had she been contacted, she too would have provided them information and was willing to testify (2SWH. 127, 155-56). Palacios knew that her brother drank, but she did not know the extent of it. It was mostly social drinking when he came to visit. The first time she saw Rodriguez, Jr., intoxicated was when he was staying with his family at her house. Rodriguez, Jr., was already intoxicated when he arrived late that evening. Later, Palacios and her husband heard a commotion, and they came out and saw Rodriguez, Jr., trying to beat up Lupe. He was beating and kicking her. This disappointed and disgusted Palacios, and she told him to stop or leave her house. Rodriguez, Jr., kept going, so they called Juan (Rodriguez, Jr.'s brother), who was an ex-police officer. Rodriguez, Jr., continued pushing and shoving as Israel tried to hold him down. Juan showed up with his son, and they escorted Rodriguez, Jr., out of the house and took him to a hotel for the night. Palacios thought that Petitioner was around six or seven years old when this happened. She recalled Lupe scooped him up during the fight. Rebecca believed that Petitioner was scared during this violent episode (2SWH. 130-35).

Palacios was very upset with her brother over this incident and she did not want him to come back to her house the next day. She had never seen anything

like this and was not accustomed to it.  Rodriguez, Jr., approached her the next day at their brother's house and tried to apologize (2SWH. 135-37).

Palacios became concerned after this incident about Rodriguez, Jr.'s drinking.  She discussed her concerns about Rodriguez, Jr., with her sisters (2SWH. 137-38).  Palacios knew, however, that Rodriguez, Jr., was a very private person and she never asked him about his family or his drinking issues. Rodriguez, Jr., also had a very strong personality, and Palacios did not believe that Rodriguez, Jr., would have been receptive to any intervention. (2SWH. 138-39).

After that incident, Palacios called Rodriguez, Jr., every few months or so to check on him.  She was led to believe that everything was great with him and his family (2SWH. 139-40).  Unfortunately, Lupe and the children did not reach out to her for help (2SWH. 140-41).

Later, Palacios and her family visited the Rodriguez family in Lubbock one Thanksgiving.  Rodriguez, Jr., was again drinking.  One evening, Sophia stayed out late and Rodriguez, Jr., got very angry with her.  He tried to grab her and kick her, but Palacios and her husband intervened.  They threatened to leaven and Rodriguez, Jr., calmed down.  He apologized to them, but he did not apologize to Sophia (2SWH. 141-43).

In 2000, Palacios and her husband stopped in Wichita Falls during a trip to Missouri.  Palacios noticed that the house was shabby and that the yard was

unkempt.  She believed Rodriguez, Jr., was having financial troubles.  Despite his financial problems, Rodriguez, Jr., took them to Oklahoma to gamble at a casino. Palacios thought this was strange (2SWH. 145-48).

After Petitioner moved in with Gesenia Abad (the mother of his child), Palacios spoke with him on the phone and she could instantly tell from the conversation that he was not himself. He seemed distant and un-talkative.  She thought he sounded depressed (2SWH. 150-51).   In July 2004, Palacios saw Petitioner at his cousin's wedding.  He appeared to be very detached and distant at the reception and Palacios was worried because she found this behavior very unusual (2SWH. 152).  The Palacios next saw Petitioner at her mother's birthday party and again he did not socialize with anyone. He looked sad and lonely (2SWH. 152-53).

Palacios knew of the history of family depression and she believed Rodriguez, Jr., was very depressed, particularly after he moved to San Antonio. (2SWH. 153-54).

Finally, Palacios testified that the violence that she observed in the Rodriguez, Jr. family was alien to her.  She did not believe that it happened with any of her other brothers and sisters or with her parents (2SWH. 160-61).

### 8.    Trial Court F&C: Ana Maria Rodriguez

The trial court made a finding that Dr. Ana Maria's testimony was credible (PRE 3 at 76).  The trial court, however, failed to make any finding under the *Strickland* standard as to whether defense counsel's failure to properly investigate, develop and present her testimony during the punishment trial amounted to IAC or was somehow justified by counsel as a tactical decision.

### 9.    State Habeas Evidence: Ana Maria Rodriguez

Ana Maria was Rodriguez, Jr.'s oldest sister and the oldest of the Rodriguez siblings (3SWH. 14).  Although, she testified at the 2008 trial no one from the defense team ever approached her before trial about being a witness.  She initially planned to attend trial to support her brother and sister-in-law.  At some point during the proceedings, Rodriguez, Jr., indicated to her that she might be asked to testify (3SWH. 12-14).

Ana Maria drove Rodriguez, Jr., and Lupe to Canyon for the trial.  They stopped in Lubbock at Sophia's home on the way.  While at Sophia's, Ana Maria met Cowie for the first time and he did not ask to speak with her privately (3SWH. 15).  Present in the living room during that encounter were Rodriguez, Jr., Lupe, Sophia, Olivia, and Ana Maria. As Cowie recounted to Rodriguez, Jr., about all the the aggravating witnesses that the State intended to present during the punishment trial, he became very angry with Cowie who thereafter left.   At that point, Rodriguez, Jr., said to everyone else, "let's go." (3SWH. 15-17).

Ana Maria estimated that Cowie was there about 20 to 30 minutes.  He did not ask anyone to call him, and he did not talk to Ana Maria about being a witness at trial (3SWH. 17).  Ana Maria was present during the entire guilt-innocence trial and Cowie did not talk to her at any point about being a witness or about what her testimony would be (3SWH. 18-19).

After the guilty verdict, Sophia broke down and Ana Maria took her into a witness room. Wardroup and Cowie later came and moved them to a conference room.  Wardroup began to discuss the punishment phase and this was the first time that Ana Maria learned that she would be a witness. She did not recall Wardroup or Cowie directly telling her this, but she instead learned it from Rodriguez, Jr.  Ana Maria still had no idea what she would be called to testify about during the punishment phase.  Rodriguez, Jr., told Ana Maria that she would meet with the attorneys at the hotel on Sunday afternoon to talk about the punishment phase. (3SWH. 20-21).

After the guilt-innocence verdict, Ana Maria took Rodriguez, Jr., Lupe, and Olivia back to San Antonio.  No one from the defense team called her over that weekend to discuss her testimony (3SWH. 21-22).  Ana Maria and Rodriguez, Jr., returned that Sunday and Olivia stayed behind (35SWH. 22).  At approximately 5:00 p.m. on Sunday,  they met with Wardroup's at his hotel for a group meeting.  Present at this meeting were Rodriguez, Jr., Lupe, Sophia, Raul Hernandez, and

Gene Douglas along with Cowie and Wardroup. She recalled that there were 10 or so people there, and they were sitting on sofas and chairs in a circle (3SWH. 22-23). Wardroup asked the witnesses one general question—"If you had to describe Rosendo … what would you say about him?"—and they all, as a group, provided their answers. Ana Maria answered the question and gave general information about Petitioner's character. Each witness took about five to seven minutes to gave their answer (3SWH. 23-24). According to Ana Maria, everyone had very beautiful things to say about Petitioner (3SWH. 24). Wardroup then ended the meeting and told the witnesses that he would see them in court the next day. No one spoke with Ana Maria individually or discussed her testimony in any more detail than this (3SWH. 24-25). The next day Ana Maria testified. Her testimony was substantially similar to the answer she gave to Wardroup during the previous day's meeting (3SWH. 25).

At the state habeas hearing, however, Ana Maria elaborated as to what evidence she could have provided had the defense properly prepared her to testify. Ana Maria thought that her brother was a good, loving husband and an excellent father. He provided for his family. However, he was the one in charge of the family, as provider and protector. Lupe was expected to take care of the house and be subservient to him (3SWH. 27-29). The children were expected to follow his

rules without question.  Olivia was a rebel, however, and this tried Rodriguez, Jr.'s patience (3SWH. 29-30).

In Ana Maria's family, her father set down the rules, and there was no room for negotiation.  Rodriguez, Jr., followed the same pattern in his family (3SWH. 30).  In keeping with that controlling parenting style, Rodriguez, Jr., called on people in the Wichita Falls community, such as police officers, keep tabs on Petitioner.  Ana Maria believed this put a lot of pressure on him (*3SWH. 31-33*.

Education was very important to Rodriguez, Jr., as it was with his father. His father instilled three values with his children–(1) love of family, (2) education, and (3) honesty and integrity.  Rodriguez, Jr., tried to instill these same values in his children (3SWH. 35).  Rodriguez, Jr., had higher expectations for Petitioner than he had for his daughters.  Petitioner started to fall short of these expectations in high school.  Rodriguez, Jr., thought it was a phase, but he was concerned and disappointed.  Ana Maria witnessed Rodriguez, Jr., express his frustrations with his son and his concern that he do better (3SWH. 35-39).

Ana Maria knew that her brother drank.  She recounted that he started sometime in college and continued throughout adulthood, until one day he quit cold turkey (3SWH. 39-40).  Ana Maria recalled one occasion when the Mexican American Community honored Rodriguez, Jr., for his contributions as an attorney. At this event, she saw him drinking, however, it was controlled, and he was able to

spend time socializing and dancing.   Public appearances were important to Rodriguez, Jr., so whenever Ana Maria saw him drink at social or family events, he was able to keep himself controlled and subdued (3SWH. 41-42).

Ana Maria also talked about the incident at Sophia's quinceanera. Rodriguez, Jr., spent considerable money on this event, including bringing in a mariachi band from Mexico.  He invited some 500 guests to attend the event which was held on a hotel ballroom.  Ana Maria explained how important it was to Rodriguez, Jr., to demonstrate the Mexican culture to his peers in Wichita Falls, and it was very important that everything be perfect.  Ana Maria did not see Rodriguez, Jr., or Lupe sit down the entire evening.  He was busy with guests.  Ana Maria explained that Rodriguez, Jr., was under considerable stress that the party go well.  She saw her brother drink a tremendous amount of alcohol that night, and he became intoxicated.  He drank from 4:00 or 5:00 that afternoon until Ana Maria drove them home around 3:00 in the morning (3SWH. 43-51).

During the ball, one of his nephews, who was an escort in the quinceanera, asked to change his clothes, and his father, Juan, took him to Rodriguez, Jr.'s house to change.  They inadvertently locked the door on the way out.  When Rodriguez, Jr., came home with his sisters and family, they were locked out of the house, and Rodriguez, Jr., became enraged.  He thought that Juan was too yielding to his son, and he was not happy that he had changed during the party.  Ana Maria

tried to calm her brother down, but he thought she was taking Juan's side, and this hurt him.  He became very angry with Ana Maria.  He screamed at her and then grabbed her by the neck.  She was wearing a necklace, and was able to work her head away from it; however, Rodriguez, Jr., broke the necklace in the process. Lupe came to Ana Maria's aid, and Ana Maria jumped into a car with Dolores and fled the scene.  Rodriguez, Jr., never talked to Ana Maria about this incident afterwards.  However, she felt he impliedly apologized the next day as they listened to the mariachi band sing a particular song about love and family.  She believed there was a connection between them during this song (3SWH. 51-60).

This behavior shocked Ana Maria because she had never seen it before. Rodriguez, Jr., expressed all the anger he had built up for perceived past wrongs. Ana Maria thought that her brother could not express his feelings when he was sober, but she learned that he could express these feelings when he was drunk (3SWH. 56-57).  Ana Maria elaborated on his need for her approval.  She was the eldest sibling and became like a mother to the younger siblings, including Rodriguez, Jr.  He had a great need for her approval (3SWH. 57).

Ana Maria stated that the quinceanera was held in June 1989, rather than in January when Sophia's birthday was, because of the weather and because their father died in January.  This was a big blow to Rodriguez, Jr., and he had to deal with that very traumatic experience. The death of Rosendo Rodriguez, Sr., was

also a big blow to Petitioner.  His father and grandfather spent time with him at a ranch teaching him ranching.  When his grandfather died, Petitioner, who was nine years old, was asked to read the 23rd Psalm at the funeral.  This greatly touched Ana Maria, as well as the rest of the family (3SWH. 43-44).

On occasion, Lupe called Ana Maria to talk about Rodriguez, Jr.'s behavior. She was concerned about his drinking. Ana Maria told Lupe should would talk to Rodriguez, Jr., however, she felt powerless to do anything about it because of his strong-willed nature.  When she approached Rodriguez, Jr., about it, he told her that it was a private matter.  Ann Maria was also concerned that if she pressed the issue, that Rodriguez, Jr., would stop coming to her house.  She nevertheless stressed that she would have intervened if any of the children approached her about the family problems.   She did not, however, recall any of the children ever approaching her about their father  (3SWH. 61-65).

Ana Maria recalled one incident when Olivia was caught shoplifting. She talked to her about her behavior and the possible consequences.  During the conversation, Olivia became very scared of what her father would do to her. Olivia did not talk about how her father disciplined her, but it was apparent to Ana Maria that she was afraid.  Ana Maria would not be surprised if Olivia saw this as a cry for help (3SWH. 64-65).   Although Rodriguez, Jr., did express joy over

Olivia's pregnancy, Ana Maria knew that Rodriguez, Jr., could be hard on her (3SWH. 66-67).

Ana Maria originally thought that Rodriguez, Jr.'s private life was a mirror image of his public life.  However, after the incident at Sophia's quinceanera, she became more concerned about her brother and how his behavior impacted Lupe and the children (3SWH. 67-68).  Ana Maria believed her brother was depressed, though he was very private and did not express his emotions.  He was very stoic and Ana Maria believed that Petitioner was very much like his father in this respect (3SWH. 68-69).

Rodriguez, Jr., became very depressed after his brother Juan was diagnosed with lung cancer. Juan was his closest male friend, and the only person he really could express himself openly with.  Rodriguez, Jr., was devastated by is illness and painful passing  (3SWH. 69).  About the same time, Ana Maria also learned that Rodriguez, Jr., was having financial troubles.  She noticed that he did not have money to do things he did in the past, and his house was in disrepair (3SWH. 71-72).

In 2003, Rodriguez, Jr., came to visit Ana Maria for Christmas.  During the visit, he stayed in his room appeared to be very depressed.  In an effort to help her brother with his financial troubles, Ana Maria loaned him $25,000. Later in 2003,

she extended another loan of the same amount.  This is the first time Rodriguez, Jr., ever sought her help in this manner (3SWH. 116-17).

In 2004, Rodriguez, Jr., called Ana Maria and told her he was ready to come home.  She went to get him and moved him to San Antonio.  Ana Maria could tell that he was severely depressed.  He told her he was coming to San Antonio to die (3SWH. 117-18).  From this point forward, Ana Maria remained in constant communication with her brother and encouraged him to seek medical attention (3SWH. 119).  Rodriguez, Jr., first entered rehab around the time of Petitioner's trial.  Ana Maria was very concerned at the time that he was overmedicating (3SWH. 119-20).  Ana Maria then learned that Rodriguez, Jr., had been diagnosed with bipolar disorder.  She was also familiar with the fact that he had been committed to a mental hospital in 2007.  She also knew that Rodriguez, Jr., took medication for both mental and physical ailments.  She noticed that he was taking these medications erratically and was not following the recommended schedule. Ana Maria saw that Rodriguez, Jr., was talking Xanax, Abilify, and Tramadol and that he was abusing these medications. He would sometimes appear to be in a stupor and exhibited inappropriate behavior. Rodriguez, Jr., was also sometimes not able to communicate rationally.  His speech was slurred, and he was easily irritated.  He became very defensive about his abuse of medications.  This became

progressively worse as the trial date approached.   He used medications to calm himself down during the trial (3SWH. 73-78).

Depression, as well as alcoholism, ran in the Rodriguez family (3SWH. 78-79).  Had the defense team pursued these issues with Ana Maria, she would have gladly told them, and more importantly the jury at trial (3SWH. 81-82).   During cross-examination at the writ hearing, Ana Maria agreed that Olivia did not return to court because she was grief-stricken and because she had to care for her young children (3SWH. 83, 114-15).   Ana Maria also denied that violence toward women was an aspect of the males in her family (3SWH. 95).   Her brother was the head of the household and made all the important decisions and she testified that she had never seen Rodriguez, Jr., be abusive toward women. It did indeed occur, however, he hid this side of his personality from Ana because of his need for her approval (3SWH. 120-22).

She agreed that her nieces and nephews would have no reason to believe that she would turn them away if they came to her with a need or problem.  None of the children ever told her that Rodriguez, Jr., beat them, that he abused Lupe, or that he drank too much and acted erratically.  She averred that she would have stepped forward had she been aware of such problems (3SWH. 102-03).

As for Olivia, Ana Maria was unaware of what if anything the defense team did to prepare her to testify (3SWH. 115).  Both Sophia and Olivia were greatly grief-stricken over the verdict, only Sophia testified at the trial (3SWH. 115).

### 10.    Trial Court F&C: Rosendo Rodriguez, Jr.

The trial court made a finding that although Petitioner's father had a forceful personality and was perhaps controlling and sometimes domineering in his law practice, in his office, and in his home and personal life with his wife and children; his controlling and domineering nature was not likely as extreme as witnesses in the habeas proceeding attempted to portray it (PRE 3 at 63).   The trial court reached this finding due in part to the fact that his wife loved and stayed with him for 40 years. That fact that Lupe loved and stayed married to Rodriguez, Jr., for 40 years, however, does not support a finding that witness reports of his abusive personality were exaggerated.   Neither does that fact, as suggested by the court, that his children showed love and affection toward their father during the trial. *Id.*

The trial court also made a finding that Rodriguez, Jr., was not an abusive and violent boss, husband and father because no witnesses from the Wichita Falls legal or law enforcement community came forward as witnesses (PRE 3 at 65). Despite the fact that his own law partner, Anderson, had concerns that Rodriguez, Jr., may have had ties to the Mexican Mafia, the trial court declined to entertain such a finding. *Id.*; *see also* (*Anderson Deposition*, at 17-19, 38, 58-64).

78

In stark contrast to the greater weight of the evidence presented at the hearing concerning Rodriguez, Jr.'s, alcoholism and his violent and explosive tendencies when intoxicated, the trial court made a finding that although he was "probably was an alcoholic" and that he "appeared able to control his drinking on many public occasions and large private and family gatherings" (PRE 3 at 65). The court made a further finding that "on other scattered occasions, Petitioner's father did not control his drinking, and became greatly intoxicated" and "also became physically aggressive and even physically violent with Lupe." *Id.*

Despite these finding, however, the trial court failed to make a determination in its F&C as to whether trial counsel were deficient in failing to thoroughly develop and present to the jury the wealth of mitigation evidence offered during the State habeas on this issue. Again, there was not finding by the trial court that defense counsel was justified under some strategic decision in failing to offer this evidence. Instead, the trial court elected to discount the potential mitigation impact of this information by noting that Appellant, Lupe and Rodriguez, Jr. reported a small number of these violent incidents when they were interviewed by Cowie. This was clearly an effort by this very closed family to downplay the dysfunctional nature of their family. A more thorough and coherent mitigation investigation would have likely overcome this initial reluctance and better developed this issue.

The trial court also made specific findings that there were specific instances when Appellant was present for actual or threatened violent acts by Rodriguez, Jr., toward his family (PRE 3 at 69). These incidents included the "window incident" which occurred when Appellant was 6 or 7 months old, the "Alice incident" which occurred with Petitioner as approximately 11-14 years old, the "after-dance/baseball bat" incident.

The trial court also cited a series of other "specific incidents (which *may* have been witnessed by Petitioner, but likely were not) that were reported by Petitioner's family members" which the court did not find said reports to be credible. These incidents included: 1) the "quinceanera incident" which the court found no indication that Appellant was present during; 2) the "gun incident" at Petitioner's home in Wichita Falls reported by Palacios in which she hid Rodriguez, Jr.'s, firearm from him during one of his violent episodes; 3) the "curfew incident" involving Petitioner's sister Sophia; 4) the "downtown Wichita Falls incident in which Lupe jumped out of the car, while Petitioner was inside, for fear that Rodriguez, Jr., was going to beat her; 5) the "hotel incident in which Lupe fled from Rodriguez, Jr., and took the children to a hotel for the night; 6) other "non-detailed, unspecified threats to Lupe by Petitioner's father with guns and machetes reported by Sophia; 7) other non-detailed, unspecified incidents in which

Petitioner's father used a belt against Lupe; and 8) a single incident of physical abuse by Petitioner's father to Olivia with a belt.

The court thereafter makes a finding that "other than these incidents, all testimony in this regard is very general and extremely non-specific and lacking in detail" (PRE 3 at 74) (emphasis added). Regardless of whether these events were non-specific or lacking in detail, they are nevertheless mitigation evidence that the jury should have considered. The court again made no effort to determine whether trial counsel's failure to thoroughly investigate, develop and present the above incidents was somehow justified as a tactical decision or whether it amounted to deficient performance under *Strickland.* Instead the court simply makes a cursory finding that "most of these incidents [were not] credible because of the conflicts, contradictions, and single reports and failures to have other available witnesses within and outside the family testify about or corroborate the incidents." *Id.* (emphasis added). The court's findings and conclusions in this regard amount to an unreasonable application of the facts of this case to the law in *Strickland.*

## 11.    State Habeas Evidence: Rosendo Rodriguez, Jr.

Rodriguez, Jr., testified briefly at trial. He also prepared an affidavit that Petitioner attached to his original writ application. However, he died prior to the hearing. The testimony provided in his affidavit is as follows:

Rodriguez, Jr., was the fourth of six children born to Rosendo Rodriguez, Sr., and Odilia (Luna) Rodriguez.  Rodriguez, Sr., worked his entire life as a chief mechanic for Killam and Hurd Oil & Gas Company.  He worked long hours and was often called out at night.  Sometimes Rodriguez, Jr., would go with him.  Rodriguez, Jr., knew that his father suffered from depression most of his life.  He also knew that depression ran in his family.  Sometimes when he was with his father and could tell he was troubled, Rodriguez, Jr., asked him what was wrong, and his father told him, "I am just one sad Mexican."  Rodriguez, Sr., possessed an internal rage and was angry most of the time.  He noticed that his white counterparts were paid more than him, and he felt that he received no recognition or financial rewards for his hard work.  This only fueled his rage, and he hated the fact that his co-workers were promoted over him based on race, rather than merit.  As a result of Rodriguez, Sr.'s rage and anger, the household was frequently filled with a great deal of tension.  *Affidavit of Rosendo Rodriguez, Jr.*

Rodriguez, Sr., worked long hours every day at the oil company, and when he got home after work, he continued working in an automobile repair shop that he had set up in his garage to earn extra money.  He worked hard and had a strong drive to excel.  He told Rodriguez, Jr., that he did not want to be "just another poor Mexican."  Because of his circumstances, he wanted his children to have an education and to excel.  As a result, he drove each of his children to work hard and

gain academic prominence.  Of the six children born to Rodriguez, Sr., five were valedictorians.   Failure was not an option.   If a child did poorly in school, Rodriguez, Sr., would make that child kneel down facing a corner and then beat the child with a belt.   Rodriguez, Jr., described this as a frequent occurrence in his house.  *Affidavit of Rosendo Rodriguez, Jr.*

Rodriguez, Sr., also demanded absolute loyalty from his children. Rodriguez, Jr., described it as follows:

> He often tried to place a split between me and my siblings so that we would have problems with each other and remain closer to him.  He probably thought if my siblings and I were close to each other it would lessen our loyalty to him.  My father did not consider how it would affect us.  He only wanted what was good for him and did not care about his wife or children's feelings.

Through this, and other activities, Rodriguez, Sr., made it clear to everyone in the family who was the power in the household.  *Affidavit of Rosendo Rodriguez, Jr.*

Rodriguez, Jr., knew that his father experienced similar treatment from his father.  Rodriguez, Jr.'s grandfather had a violent temper and could be a brutal person.  He had no respect for his wife or for women in general.  He was extremely abusive toward his wife, and he would often threaten to leave her.  Rodriguez, Sr., grew up conflicted from this–he loved his mother and was concerned for her, but he also idolized his father.  He found himself torn between wanting to protect his mother and preserving the respect of his father.  Rodriguez, Sr., hated what his

father did to his mother.  But he ended up doing the same thing to his own wife. Rodriguez, Sr., demanded loyalty and respect from his children, but he never demanded they do the same for their mother.  He was verbally abusive toward his wife, telling her she was stupid and would not make it on her own.  Rodriguez, Jr., believed that his father delighted in making his mother feel inferior.

Like his father, Rodriguez, Jr., continued the same patterns there were passed down through the generations.  He also showed contempt and disrespect to his wife and daughters, and he is sure that he instilled the same behaviors and beliefs about women in his son.  Rodriguez, Jr.'s brother, Juan, too was not exempt from family teachings, and he also provided a roll model for Petitioner.  Juan was Petitioner's godfather, and he had a close relationship with him.  Juan was a decorated veteran and served on one of the ships attacked in the Gulf of Tonkin. After leaving the military, he settled in the Rio Grande Valley and became a police officer.  He rose through the ranks and eventually became the Chief of Police in Alice, Texas.  Nevertheless, notwithstanding his accomplishments, he was a womanizer and had numerous affairs.  At one point, he was sleeping with two female officers at the same time.  One day, one of the officers drove up to his house, pulled out her service revolver, and committed suicide on his front lawn. Juan had to resign in disgrace.

Rodriguez, Jr., was not unlike his brother. He rose to prominence through education and later a professional career. The practice of law was stressful for him, and though he enjoyed success for a while, inner demons grew within him and eventually brought him to destruction. But the path was slow, and his family lived through its agonizing progress, which included violence, alcoholism, and the ravages of mental illness. Rodriguez, Jr., started drinking with other attorneys after work, but eventually, he started drinking more and more, which drifted from a social activity to a need. He became an alcoholic. When he was intoxicated he became violent and unpredictable, and he turned his frustration on his wife. He would verbally and physically abuse her in front of the children. Rodriguez, Jr., knew that his son was affected by it and would become angry at him.

Like his father and grandfather, Rodriguez, Jr., held high expectations for his children. He expected them to achieve academic excellence in high school and to graduate from college. Sophia accomplished all that; Petitioner did not. But as the children grew up, Rodriguez, Jr., showed favoritism to his son and disdain towards his daughters. His son's failure to live up to Rodriguez, Jr.'s high expectations was a source of disappointment for him, and he frequently let Petitioner know about it. From 1998 to 2004, Petitioner failed miserably in his college career. Rodriguez, Jr., often expressed exasperation at his son because he could not focus on his studies. In 2000, growing financial problems made it difficult for Rodriguez, Jr.,

to afford Tech, and he wondered if it was worth it because Petitioner was making no progress toward graduation. This was not lost on Petitioner, and he knew that his father was disappointed in him.

But Petitioner was not the only one to spiral into failure. Alcoholism, ill health, and mental illness caught up with Rodriguez, Jr., and his law practice fell into disarray. In 1998, he was involved in an automobile accident, in which Petitioner suffered a head injury. After this accident, Rodriguez, Jr., stopped drinking, but the accident marked his departure into failure. From 1999 to 2002, Rodriguez, Jr., filed for bankruptcy four times. His physical health deteriorated as well, and he suffered from recurrent leg problems, pain, and heart conditions. He often had to be excused from trial work for extended periods. Nevertheless, his spending habits grew out of control, which placed not only financial strain on the family but caused him to take risks with his practice. In 2003, he was placed on six months probated suspension by the Texas State Bar, which was based on a number of complaints from former clients. Finally, in 2005, he lost his law license, again based on a number of complaints from former clients. He was indefinitely suspended from the practice of law. Essentially, he accepted retainers from clients but failed to provide the legal services. In 2004, Rodriguez, Jr., applied for disability. Like his brother, Juan, Rodriguez, Jr., also lost his career.

Rodriguez, Jr., may have quit drinking, but he changed one habit for another. Because of his extensive health problems, which caused him considerable pain, Rodriguez, Jr., started taking pain medications.  He quickly grew dependent on them, which created another pattern of abuse for him.   In March 2007, his daughter, Olivia found him in a zombie like state, and she quickly determined that he had taken an entire bottle of Tramadol, one of his pain medications.  She called the hospital, and hospital staff told her to bring him to the emergency room. Rodriguez, Jr., had been to the hospital the day before where he received treatment for depression; however, he did not meet the criteria for involuntary admission. The family and medical staff were worried that Rodriguez had attempted suicide. At first, Rodriguez, Jr., denied that it was a suicide attempt, but latter he admitted it had been.  He did not want to stay in the hospital, but eventually he relented when he realized that the doctor would not let him leave.   After being admitted, Dr. Nicole Braida diagnosed Rodriguez, Jr., with bipolar disorder.

Learning that he suffered from bipolar disorder explained a lot to Rodriguez, Jr.  He knew that he was severely depressed after losing his law practice in 2004 and after Petitioner's arrest in 2005, but he never recognized the symptoms of mental illness in himself.  From 1976, when he was just starting as a young lawyer, to 1998, when he quit drinking, he drank heavily.  He was irritable and exhibited often violent behavior, and he attributed this to his drinking.  He came to realize

that irritability and a quick temper are also symptoms of bipolar disorder. He also recognized that over the years, a small event could set him off and send him into a tirade. After he calmed down, he would often feel remorseful, but he was unable to control it. Inevitably, he would blow up again. Also, he was impulsive and had impaired judgment. When he was riding the wave of success, he would gamble and go on erratic spending sprees. These were all symptoms of mental illness that he had suffered all these years.

He also knows that his family, and particularly Petitioner, were affected by his mental illness and his self-medication with alcohol and later narcotics. Bipolar disorder combined with alcohol created an unstable environment at home which was unpredictable and often violent. Most of the violence was directed at his wife and daughters, but the lasting effect of it was not lost on Petitioner.

### 12.    Trial Court F&C: Steven Garza

The trial court made no findings or conclusions with respect to Garza's testimony. Therefore, there is no finding with respect to whether trial counsels' failure to investigate, develop and present this evidence during the punishment trial is IAC.

### 13.    State Habeas Evidence: Steven Garza

Steven Garza dated Olivia off and on for a number of years after the Rodriguez family moved to San Antonio. They have a child together, Mia Garza.

88

When Rodriguez, Jr., just shut down his law practice, Olivia was living in a house in San Antonio. Her parents moved in with her.  At the time, Olivia had one daughter, Abbey, from a different father.  When Steven and Olivia went on their second date they left Abbey with her grandparents.  When they returned home, Lupe called Olivia into the kitchen.  Steven could hear Lupe screaming at Olivia about her not spending enough time with her daughter.  Olivia protested and told Lupe that she thought Lupe and Rodriguez, Jr., would like to spend more time with their granddaughter.  The argument got louder and more heated, and Steven came into the kitchen and saw Lupe pulling Olivia by the hair and slapping her. *Affidavit of Steven Garza.*

Rodriguez, Jr., came out of the bedroom, and Steven was relieved to see him because he figured he would put a stop to the situation.  Instead, Rodriguez, Jr., started slapping Olivia as well and pulling her hair.  Lupe and Rodriguez, Jr., continued hitting Olivia, and Steven could not take it anymore, so he stepped between them.  He told Lupe and Rodriguez, Jr., that he would call the police if they did not stop.  Olivia ran crying into her room, but Steven did not want to leave because he was afraid for Olivia's safety.  He sat in the living room, and after a while, Lupe and Rodriguez, Jr., joined him.  Evidently, Steven looked upset, and Rodriguez, Jr., asked him what was wrong.  Steven was flabbergasted because they acted like nothing had happened.  Steven told Rodriguez, Jr., that he came from a

family that did not handle disputes with that kind of violence.   Rodriguez, Jr.,
responded that all families do things differently, and this was the way his family
handled their problems.   Steven told Rodriguez, Jr., and Lupe that they should treat
Olivia better because she was providing them a place to stay.   Rodriguez, Jr.,
responded that Olivia owed him respect for all the things he had done for her and
that it was her duty to help them.   *Affidavit of Steven Garza.*

Steven hoped that this was an isolated incident, but as he grew closer to
Olivia, he learned just how dysfunctional her family was.   Several months later,
Steven and Olivia started living together, and they lived only a short distance from
her parents.   From the very first day, Rodriguez, Jr., called Olivia repeatedly,
twenty to thirty times a day.   Also, because her parents lived close by, they came
by to visit every day.   The constant phone calls disrupted their relationship, and
eventually, Steven had to move out.   He felt that he and Olivia had no private time
together.   *Affidavit of Steven Garza.*

In Steven's experience, Rodriguez, Jr., tried to control everything that goes
on in whatever home he is living in.   He opened all of the mail coming into the
house no matter who it is addressed to.   If anyone confronted Rodriguez, Jr., about
it, he would make up some excuse.   Rodriguez, Jr., went through Olivia's mail
from the moment they moved in with Olivia in San Antonio.   Rodriguez, Jr., also
monitored calls coming into the home, by picking up another phone in the house

and listening in.  Lupe would not answer the phone unless she knew that her husband was not around.  Steven also has noticed that when Lupe called them, Rodriguez, Jr., appeared to be listening in.  *Affidavit of Steven Garza.*

Steven related that Rodriguez, Jr., did not show any respect to his wife (or any woman).  Steven observed similar behavior from Petitioner.  Steven recalled one incident in which Rodriguez, Jr., got mad at Lupe and Olivia because they would not cook for him.  Lupe had worked all day and was tired.  Lupe ended up cooking, but Rodriguez, Jr., got mad once again when she did not eat with him.  An argument ensued and escalated to the point that Lupe and Olivia had to leave the house and go to Rodriguez, Jr.'s sister's house.  Rodriguez, Jr., called and told them he was coming over, but his sister, who was a federal agent, warned him to stay away.  *Affidavit of Steven Garza.*

Steven also related how much pain medication Rodriguez, Jr., takes.  He was addicted to it.  He obtained prescriptions from his doctor, but he would go through them quickly requiring that he find more.  Rodriguez, Jr., begged Steven, who took pain medications for his own back problems, to give him some of his medications.  For a while, Steven helped him out, but he had to stop because of the amount Rodriguez, Jr., was taking.  Also, as time went by, Rodriguez, Jr., became more and more aggressive.  He knew when it was time for Steven to get his prescription filled, and Rodriguez, Jr., would call immediately seeking pills.  Rodriguez, Jr.,

called at work, and Steven was concerned that he would lose his job.  When Steven cut him off, Rodriguez, Jr., started buying pain pills off the street, spending huge amounts of money on the pills.  He took out credit cards in Sophia's name and ran up huge balances, which created severe financial problems for Sophia and affected her credit. *Affidavit of Steven Garza.*

At one point, the Rodriguez family tried to do an intervention, but Rodriguez, Jr., got angry and walked out.  The family then got mad at Olivia because she told them how bad it was.  This devastated Olivia.  *Affidavit of Steven Garza.*

### 14.    Trial Court F&C: Thelia Chaffin

The trial court found Chaffin's State habeas testimony to be incredible because she told Petitioner's trial-team mitigation specialist (Cowie) that Petitioner's father "was a kind and good man" (PRE 3 at 61). Since Petitioner's mitigation specialist had "no further notes to the contrary … other than a vague reference to the 'window incident' that occurred when Petitioner was a baby (of which Chaffin was apparently vaguely aware)", then the court concluded her testimony at the hearing was not credible. The trial court fails to consider, however, perhaps that lack of such information in Cowie's notes might demonstrate yet another instance of deficient performance by the defense team as opposed to lack of credibility on Chaffin's part.

The trial court was correct in noting that in her post-conviction affidavit, Chaffin "went in the other direction to a rather significant degree" as to Rodriguez, Jr.'s violent and volatile nature. *Id.* The trial court fails, however, to consider that this turn around in Chaffin's testimony may have been due the fact that she was properly and thoroughly interviewed by the State habeas team prior go giving her post-conviction affidavit. Amazingly, the trial court also speculates that Chaffin embellished her testimony about Petitioner's father during the State habeas hearing because she opposed the death penalty. *Id.*   The court also speculated that Chaffin's credibility was questionable because such a "capable, competent legal secretary, community leader and businesswoman would not have had to continue working for a man who she testified made her feel like a "battered wife". The court implies that since Chaffin didn't quit working for Rodriguez, Jr., sooner, then all her accounts about his explosive and volatile personality must be false. Again the court sidestepped the central issue of whether defense counsel was deficient in failing to properly investigate, develop and present Chaffin's testimony and instead focused its efforts on picking apart her credibility.  Such a flawed analysis by court resulted in an unreasonable application of the facts of this case to the law in *Strickland.*

The fact that Thelia Chaffin stayed employed as Rodriguez, Jr.'s legal assistant for 18 years and traveled to out of the country with his family on one

occasion does not mean that he wasn't an abusive boss, husband and father. The trial court made a further finding that since Rodriguez, Jr.'s other long-time legal assistant, Charlene "Sam" Beachump, did not testify or provide an affidavit consistent with Chaffin's, that the abusive behavior at work never happened ("her testimony would likely have confirmed or refuted Chaffin's testimony, and its— and her—absence indicates that it would *not* have confirmed it …."). *Id.* The trial court once again bases its findings on speculation and fails to confront the standards set forth in *Strickland*.

The trial court also declined to believe that Rodriguez, Jr., was an abusive person, because "at least one lawyer-associate, David Phillips, who continued service with him for approximately 10 years …was not called upon to provide an affidavit or to testify at the habeas hearing, or who declined to do so." *Id.* The court again speculated that his testimony would have either confirmed or refuted Chaffin's testimony. The court added that Petitioner's failure to call another long-term employee of Rodriguez, Jr., Claudia (Ortiz/McDaniel) to either confirm or rebut Chaffin's testimony must mean that Petitioner's father was not an abusive boss, spouse and father. *Id.*

### 15.   State Habeas Evidence: Thelia Chaffin

It is worth remembering that Chaffin talked to Wardroup the day before she testified.  Yet again, the trial court failed to make any finding of whether such

conduct by counsel falls within acceptable professional norms for trial counsel under *Strickland*. Cowie may have come in and out of the room during the conversation. Wardroup did not ask questions about Rodriguez, Jr., or about the work environment. Chaffin thought it was strange that Wardroup talked to her about his recovery from alcoholism and addiction, and she did not think it was important. He talked to her about her interaction with the family, particularly the trip to Cancun and attending the girls' Quinceaneras. She believed the family was close and loving during these encounters (2SWH. 9-12).

She met with Cowie about six months before the trial started. She understood that a trial was coming up and that the interview related to that. Cowie told her that she might be called as a witness. She did not think, however, that he was preparing her to testify; instead, she thought he was interviewing her to obtain facts. Cowie asked her some of the same questions that Wardroup later talked to her about, but his questioning was broader reaching and sought information about what Rodriguez, Jr., was like. Some of this included the information she included in her affidavit (2SWH. 12-13).

Chaffin said it was not always bad to work for Rodriguez, Jr. It was only about 10 percent of the time that was trying (2SWH. 23). That 10 percent was terrible. Rodriguez, Jr., would begin by yelling and screaming over nothing, and it would happen suddenly. He would continue screaming and berating Chaffin to the

point that she was in tears (2SWH. 23-24).  He would get mad over any little thing, like a misfiled letter, and his anger would be disproportionate to the thing that set him off.  He would be in a rage and would walk around screaming at her, for up to an hour or two.  His face would turn red, his veins in his neck would bulge out, and his jaw would clench.  After he calmed down, he would apologize and want to make up.  He would promise that it would never happen again (2SWH. 24-25).

She talked about the time that she went out to lunch with Anderson just before he moved out of the office.  Rodriguez, Jr., found out and became enraged at her.  He told her, your either with me or against me, and he continued harassing her, even that evening.  Chaffin's husband had to intervene and tell Rodriguez, Jr., to stop (2SWH. 26-27).

She stayed with Rodriguez, Jr., because the good times were very good, and there were not many jobs in the legal field in Wichita Falls at the time (2SWH. 27-28).  Thelia felt like a battered spouse.  Rodriguez, Jr., would yell and scream at her and be thoroughly verbally abusive, then he would calm down and apologize, promising it would never happen again.  But then there would be another incident (2SWH. 28).

She related about the incident in which Rodriguez, Jr., threatened another attorney with a stick during a deposition (2SWH. 29).  She reiterated that Wardroup did not ask her about the work environment, though she talked about

some of it with Cowie (2SWH. 32-33).  Thelia reiterated that when Jr. would lose

his temper, he would simply lose it and become berserk (2SWH. 70).

On cross-examination, Thelia reiterated that she talked to Cowie about the

office environment, but she did not talk to Wardroup about it.  But then she backed

off this and said she may have talked to Wardroup a little about it, but she did not

elaborate on any details concerning what she may have told him (2SWH. 74-77).

**Trial Court F&C: Patrice Franklin**

The trial court made a finding that Patrice Franklin's hearing testimonuy was

not credible in "virtually all instances on all matters" and that her affidavit and

hearing testimony "conflicted with almost all other witnesses' testimony in one

respect or another." (PRE 2 at 58). The court added that "she indicated in her

hearing testimony that she used her imagination in making her affidavit allegations

and provided her affidavit testimony to give Petitioner's investigator the kind of

allegations the investigator wanted." *Id.*

### 16.    State Habeas Evidence: Patrice Franklin

She did not testify at the 2008 trial.  No one from the defense contacted her,

but she would have talked to them had they done so (3SWH. 125-26). She worked

for Rodriguez, Jr., for eight months in 2000.  She left when he failed to pay her

salary (3SWH. 126).  Rodriguez, Jr., stalked and harassed Franklin when she quit.

She had to file a claim for unpaid wages.  Rodriguez, Jr., countersued her, and she

had to fight him even into bankruptcy court.   Rodriguez, Jr., never proved the allegations against her, and she obtained a judgment against him (2SWH. 127-29).

Rodriguez, Jr., exercised considerable control over employees at work.  He required them to wear beepers and would call them to come in and work on minor matters in the evenings and weekends.  Franklin believed that his refusal to pay her back wages was another example of control, and it was in retaliation for her quitting (3SWH. 130-31).  Franklin always had to make a deposit for the payroll.  One day, Rodriguez, Jr., forgot to give her money for the deposit, so she reminded him.  He completely lost it and started yelling at her.  She thought he would slug her.  He eventually gave her the money, and she made the deposit.  The next week, he failed to pay her wages (3SWH. 130-31).

Everyday, Franklin had to pick up two large burritos for Rodriguez, Jr., for lunch.  He came into work around noon and ate his lunch.  One time she failed to get his lunch, and he got very angry with her (3SWH. 132-33).  Rodriguez, Jr., also carried around a large roll of cash and a pistol in a pink bag.  He showed it to Franklin every time he came into the office.  He also told her that he was the head of the Mexican Mafia.  She believed this was another instance of intimidation (3SWH. 133-34).

Petitioner came into the office about four times when Franklin was working there.  Rodriguez, Jr., yelled at him and berated him in front of her.  She could tell

Petitioner was very upset.  He would stand there shaking and was fighting back tears.  This was an ongoing thing (3SWH. 135-36). Franklin also heard Rodriguez, Jr., yell at his son whenever Petitioner would call (3SWH. 136-37).  Franklin said that Rodriguez, Jr., would lose his temper at the drop of a shoe (3SWH. 137).

**Trial Court F&C: Mary Brittain**

The trial court made no findings or conclusions with respect to Mary Brittain's post-conviction affidavit.

### 17.    State Habeas Evidence: Mary Brittain

Mary Brittain worked for Rodriguez, Jr., at the same time as Franklin.  She also witnessed and was subjected to his abusive treatment.  "Working for [Rodriguez, Jr.] was crazy, he went into fits of anger and would pound his fists on desks and curse me even when I was right and he was wrong."  She was not afraid of Rodriguez, Jr., but she knew that Franklin was.  She saw Franklin physically shake when Rodriguez, Jr., was out of control.  She had experience with individuals who were taking drugs, and she believed that Rodriguez, Jr., demonstrated the same symptoms of drug addiction.  "His hands would shake, he would sweat profusely, and he was agitated, out of control and, in general, looked like someone who needed a fix of drugs."  She saw him take pills and knew that he kept pill bottles on his desk.  Rodriguez, Jr., would have massive mood swings and would go "berserk at the drop of a hat."

Rodriguez, Jr., acted bulletproof.  He carried wads of cash with him, but he would not pay his bills.  She saw him give people ten or fifteen dollars on a bill even though he had a pocket full of cash.  Brittain also knew that Rodriguez, Jr., kept one office padlocked.  Men would come and go from the office with paper bags in their hands.  They only stayed for a short time.  Brittain told Franklin to keep her mouth shut about it, but Franklin was scared.

### 18.    Trial Court F&C: Hank Anderson

The trial court made a finding that Anderson's deposition testimony was at odds with Chaffin and Franklin's writ hearing testimony (PRE 3 at 65). The bases this finding on the fact that Anderson's portrayal of Rodriguez, Jr.'s abuse and volatility is less than the portrayal given by Chaffin and Franklin.

### 19.    State Habeas Evidence: Hank Anderson

Hank Anderson and Rodriguez, Jr., formed a law partnership together.  He met when Rodriguez, Jr., started working for Anderson's father in 1973.  They maintained their law partnership from 1979 to 1996, at which point Anderson decided to break up the partnership.  He testified that it was an economic decision based on the fact that he was bringing much more income to the partnership than Rodriguez, Jr., was.  Though they were on good, amicable terms when they broke up the partnership, Anderson still felt that it hurt Rodriguez, Jr.'s feelings and got under his skin.  *Anderson Deposition*, at 6-10, 42-43.

Rodriguez, Jr., had a good reputation as an advocate in Wichita Falls, and he practiced mainly family law and criminal law.  Anderson believed that Rodriguez, Jr.'s reputation stayed pretty much the same through the years; however, he heard later that his reputation may have deteriorated.  His understanding was that Rodriguez, Jr., was becoming more difficult to deal with as far as his clients were concerned.  Anderson heard that he was verbally abusive and disrespectful to a referral that he made to Rodriguez, Jr., after the partnership broke up.  Even during their partnership, Anderson knew that Rodriguez, Jr., could be forceful with clients about meeting discovery deadlines and payment schedules.  Anderson recalled a situation in which Rodriguez, Jr., came to his assistance during a deposition.  The attorney on the other side started becoming aggressive and threatening toward Anderson, and Rodriguez, Jr., came into the conference room wielding a baseball bat and threatened to hit the other attorney.  Anderson believed that Rodriguez, Jr., was defending him, and he never saw Rodriguez, Jr., do something like that with other attorneys on any other occasion, other than occasionally raising his voice with them.  *Anderson Deposition*, at 9, 11-17, 32-35.

Anderson described Rodriguez, Jr.'s clientele as mostly blue collar and a large Hispanic population of clients.  He also represented a number of local police officers.  There was a group of three Hispanic men, who were related to one another, that came in regularly, and these men made Anderson uncomfortable.  He

considered them "shady characters."   Anderson believed one of them could have been Joe Angel Cortez.   Anderson related that after the partnership broke up, there were rumors that Rodriguez, Jr., was associated with the Mexican Mafia. Anderson related an incident that could have indicated to him that Rodriguez, Jr., did associate with "that violent tattooed prison gang."   Once he was handling a very contentious divorce, and the client's husband was rumored to be very dangerous and that he had been involved in a murder in Dallas.   This man told Anderson that he needed to back off or he would be next.   Rodriguez, Jr., approached Anderson in private and informed him that if he needed "something to happen to this guy," he could arrange it for him.   Anderson believed that Rodriguez, Jr., was being very serious about it. *Anderson Deposition*, at 17-19, 38, 58-64.

Anderson stated that both he and Rodriguez, Jr., kept pistols at the office. Anderson knew that Rodriguez, Jr., carried his pistol in his briefcase when he traveled.   At one point, their offices were broken into and the pistols were stolen; Anderson did not replace his, but Rodriguez, Jr., did replace his.   *Anderson Deposition*, at 20-21.

Anderson knew Rodriguez, Jr., drank often, and he saw him intoxicated.  He was still able to remain sociable, though he might become loud and boisterous. *Anderson Deposition*, at 21-23.

Anderson had occasion to get to know Rodriguez, Jr.'s family.  However, he only went over to the Rodriguez house or to his ranch a handful of times, and he only interacted with Lupe less than ten times.  He kept up with Sophia's progress later in life, because she was an overachiever, but he had little contact with Petitioner or Olivia.  Anderson talked about the incident in which Rodriguez, Jr., came home intoxicated and started assaulting Lupe.  Lupe called him up late at night and asked if he could come get her and her children.  He saw Lupe helping the children out of the window, and he and his wife picked them up and took them to their house.  Lupe was very distraught, and the two daughters were crying.  Anderson believed that everything settled down the next day and went back to normal.  Anderson let Lupe know if she needed assistance again that she could call him, but she never did.  Anderson stated that it did not surprise him that Rodriguez, Jr., was verbally abusive, but it did surprise him that it got to the level that Lupe felt she needed to get out of the house.  *Anderson Deposition*, at 23-26, 46-48, 54-55.

Anderson knew that Rodriguez, Jr., was always very macho with is family and that he ruled his family with an "iron fist."  Anderson explained that when Rodriguez, Jr., gave a family member an instruction to do something, he expected it to be done and would not tolerate disobedience.  Anderson saw that Rodriguez, Jr., could be very gruff with Lupe, and she was very submissive toward Rodriguez,

Jr.  He stated:  "I would see him raise his voice, I would see him be forceful verbally.  He got his point across quite well, I would say it like that."  Though he never saw evidence of physical abuse, he would not be surprised that it happened. *Anderson Deposition*, at 26-27, 48-49.

Anderson stated that Thelia Chaffin was Rodriguez, Jr.'s secretary.  He did not recall having lunch with her shortly after the partnership broke up, but he agreed it could have happened.  Anderson also stated that Rodriguez, Jr., could be gruff with his secretary in a manner similar to how he treated Lupe.  *Anderson Deposition*, at 35-36, 49, 55-56.

Anderson testified that his father was like a mentor to Rodriguez, Jr., and his death hit him fairly hard.  Anderson also knew that Rodriguez, Jr., was close to his brother, Juan.  However, Rodriguez kept his family life to himself, and he and Anderson did not socialize much outside of work.  *Anderson Deposition*, at 37-38.

Though Anderson doubted that his testimony could have made a huge impact at trial, he agreed that putting non-family members, such as him in this case, on the stand to testify (he used personal injury cases that he tried as an example) was important to establish credibility and corroboration.  *Anderson Deposition*, at 50-51, 53-54.

Anderson lived in Wichita Falls in 2008, and he recalled someone from the defense team contacting him by phone once or twice, though he did not recall who

it was.  He related that this person asked the same sort of questions that he was being asked in the deposition, though he did not recall all the specifics of the conversation.  For instance, he did not recall being asked about whether Rodriguez, Jr., was in the Mexican Mafia.  He did recall being asked about Petitioner's character, and he told the defense member that Petitioner had always been very polite and well-groomed.  No one from the defense asked him to testify, though he would have testified if asked to do so.  *Anderson Deposition*, at 27-31, 50-51.

### B.    Trial Counsel's Deficient Mitigation Investigation

The defense team failed to investigate, develop and present a cohesive mitigation theme in this case.  Appellant's counsel failed to locate and interview crucial witnesses that would have corroborated the abuse in the family.  Because Petitioner's family was portrayed at trial as a closed, private, and insular family, the State was easily able to exploit the lack of corroborative witnesses. This left the jury with the mistaken impression the testimony offered by the defense was nothing more than show.

Defense counsel's mitigation case also failed to connect Rodriguez, Jr.'s violent and abusive behavior to Petitioner and demonstrate in a compelling manner the impact it surely must have had on him.  Though the defense team's efforts are undeniable, they fell short.

The trial court failed to consider or make any findings concerning trial counsel's deficiencies in investigating, developing or presenting Appellant's mitigation case. Instead the trial court conducted a lengthy credibility assessment in its F&C with respect to each witness called by the State habeas team. As a consequence, the trial court failed to apply any of the facts in this case to the law as set out in *Strickland.*

Rodriguez, Jr., stated that he met with lead trial counsel no more than three times. They met for about an hour 45 days before trial. Most of his interaction with the defense team concerned trying to urge Mr. Rodriguez to take a plea. The defense did not question him about his mental health issues or his diagnosis of bipolar disorder, though they did talk about alcoholism and violence. Chaffin talked to the defense team's mitigation specialist for about two hours, and they had some follow-up phone calls. When she flew in for her testimony, she met lead trial counsel the day before at the hotel. She had previously told the mitigation specialist about a trip she and her family took with the Rodriguez family to Cancun, but she did not believe this story would be the central theme of her testimony. She thought that the impression that her family and the Rodriguez family got together frequently as one big happy family was wide of the mark. She thought she could have offered much more, but she did not feel lead counsel was prepared to use everything she had to offer. She believed she could have provided

the jury with important insights into the dysfunctional nature of the Rodriguez family.  The defense did not contact Steven Garza, Patrice Franklin, and Mary Brittain.

The defense wanted to present a comprehensive picture of what it was like to live in the Rodriguez household, and they wanted the jury to understand what effect it could have on the development of a child as he grew to an adult.  The defense wanted the jury not only to hear about the violence in the house and how alcohol drove Rodriguez, Jr., to extremes in his behavior.  But the defense also wanted to show the jury what it was like to be raised by a mentally ill parent.  The evidence presented in habeas would have conveyed to the jury a comprehensive mitigation case that could have accomplished these goals and helped the jury understand how Mr. Rodriguez grew up to an adult.  It could have helped them understand the disappointments he experienced when he tried to make it away from home.  As a child, he was damaged; as an adult, he was little equipped to live life on his own.  The defense failures in this case were not the product of reasoned or sound trial strategy, but were instead result of lapses or oversights.  As a consequence defense counsel performed deficiently in investigating, developing and presenting Petitioner's mitigation case to the jury.

Since *Strickland*, the Court addressed ineffective assistance of counsel claims, particularly as they relate to failure to investigate mitigating evidence in the

death penalty context, in three key cases that are directly relevant to this issue. In

*Williams v. Taylor*, 529 U.S. 362 (2000), the Court recognized that the defendant

had a constitutionally protected right to "provide the jury with the mitigating

evidence that his trial attorney either failed to discover or failed to offer." *Id*. at

393. The Court noted that trial counsel "failed to conduct an investigation that

would have uncovered extensive records graphically describing [the defendant's]

nightmarish childhood," and that this failure "clearly demonstrate[d] that trial

counsel did not fulfill their obligation to conduct a thorough investigation of the

defendant's background." *Id*. at 395-96 (citing 1 ABA STANDARDS FOR CRIMINAL

JUSTICE Standard 4-4.1, commentary, pp. 4-55 (2$^d$ ed. 1980)). The Court further

held that the lack of investigation and the failure to present the evidence could not

be justified as a tactical decision. *Id*. at 396.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court again addressed a

failure of trial counsel to investigate extensive mitigation evidence concerning the

defendant's background and life history. *Id*. at 522-23. As in *Williams*, the Court

cited the ABA Standards for Criminal Justice as compelling guides to prevailing

professional norms and to what is reasonable. *Id*. at 522, 524-25.

In *Wiggins*, trial counsel knew some of the defendant's background;

however, they apparently decided to focus on retrying guilt at sentencing to

minimize the defendant's participation in the murder rather than focus on

mitigation. *Id.* at 515.  Nevertheless, counsel promised in the opening statement to present mitigation evidence to the jury, but failed to carry through with the promise.  *Id*. at 515-16, 526.  The Court held that counsels' decision to forego further investigation into mitigation was not reasonable under prevailing professional norms as enumerated in the ABA Standards.  *Id*. at 524-26.  Also, the Court held that the information that counsel had concerning the defendant's background (which the Court described as rudimentary, gathered from a few sources), rather than giving counsel reason to limit the investigation and to forego presenting evidence to the jury, should have prompted further investigation.  *Id*. at 524-25, 527-28.   Along these lines, the Court held: "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id*. at 527.  Based on this evidence, the Court held that counsels' decision not to present the extensive mitigation evidence available was not strategic because it was not based on a reasonable investigation.  *Id*. at 534.

In *Rompilla v. Beard*, the Court again addressed inadequacies in a mitigation investigation.   545 U.S. at 380-81.  The Court held that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to

obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id*. at 377. In this case, trial counsel failed to uncover evidence about the defendant's troubled childhood, mental illness, and alcoholism, notwithstanding counsel's interviews with the defendant and his family members (which indicated that the defendant had an unexceptional background), review of certain records, and interviews with three mental health experts. *Id*. at 379-83. Though these sources turned up little in the way of mitigation, counsel failed to review a case file concerning a prior crime that the State had informed the defense that it intended to use in aggravation during sentencing, and this file was both readily available and contained extensive mitigation leads and evidence. *Id*. at 383-93. The Court again resorted to the ABA Standards for guidance into what is reasonable with respect to attorney investigations and found that counsel's actions fell below reasonable professional norms. *Id*. at 387. At the very least, *Rompilla* stands for the proposition that an attorney may not simply rely on a client's instructions not to investigate or representations that investigation would not be fruitful if other circumstances exist that indicate that further investigation is needed and prevailing professional norms dictate that the attorney must conduct such an investigation.

From *Strickland* to *Rompilla*, the Court has repeatedly invoked the ABA Standards for guidance in determining whether attorney actions or omissions are

reasonable.    Similarly,  other  federal  courts  have  found  the  ABA  Standards persuasive.  *Canaan v. McBride*, 395 F.3d 376, 384-85 (7th Cir. 2005); *Hamblin v. Mitchell*, 354 F.3d at 486-88; *Pickens v. Lockhart*, 714 F.2d 1455, 1460-61 (8th Cir. 1983).  The ABA Standards are instructive in this case.  With respect to the duty to investigate, the Standards provide:

> Defense  counsel  should  conduct  a  prompt  investigation  of  the circumstances  of  the  case  and  explore  all  avenues  leading  to  *facts relevant to the merits of* the case and *the penalty* in the event of conviction.    The  investigation  should  include  efforts  to  secure information  in  the  possession  of  the  prosecution  and  law  enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

STANDARDS  FOR  CRIMINAL  JUSTICE:    PROSECUTION  FUNCTION  AND  DEFENSE FUNCTION,  Standard  4-4.1  (3d  ed.  1993)  (emphasis  added)  [hereinafter  ABA STANDARDS].

Furthermore, during punishment, counsel should present "any ground which will assist  in  reaching  a  proper  disposition  favorable  to  the  accused."    ABA STANDARDS, Standard 4-8.1.  With respect to mental retardation and mental health and its effect on punishment, the Standards provide:  "Evidence of mental illness or  mental  retardation  should  be  considered  as  a  possible  mitigating  factor  in sentencing a convicted offender."  ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS, Standard 7-9.3 (1989).

The ABA Guidelines for death penalty representation are also instructive, if not controlling.  They provide:

> A.   Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> * * *
>
> 2.   The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, p. 76 (2003) [hereinafter ABA Death Penalty Guidelines].   The Guidelines are instructive about presenting evidence once it is obtained:

> F.   In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:
>
> 1.   *Witnesses familiar with any evidence relating to the client's life and development*, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;
>
> 2.   Expert and lay witnesses along with supporting documentation (*e.g.*, school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for

rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;

\* \* \*

L.      Counsel at every stage of the case should take advantage of *all appropriate opportunities to argue why death is not suitable punishment for their particular client.*

ABA DEATH PENALTY GUIDELINES, Guideline 10.11, pp. 104-06 (emphasis added).

Along these lines, the commentaries continue:

[D]efense counsel must both rebut the prosecution's case in favor of the death penalty and *affirmatively present the best possible case in favor of a sentence other than death.*

If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence.  Defense counsel accordingly must comprehensively investigate–together with the defense investigator, a mitigation specialist, and other members of the defense team–the defendant's behavior and the circumstances of the conviction.     Only then can counsel protect the accused's Fourteenth Amendment right to deny or rebut factual allegations made by the prosecution in support of a death sentence, and the client's Eighth Amendment right not to be sentenced to death based on prior convictions obtained in violation of his constitutional rights.

If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase.

Along with preparing to counter the prosecution's case for the death penalty, *defense counsel must develop an affirmative case for sparing the defendant's life.  A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death.*  The Eighth Amendment right to

113

offer mitigating evidence does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will *unearth, develop, present and insist on the consideration of those* "*compassionate or mitigating factors stemming from the diverse frailties of humankind*."  Nor will the presentation be persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) *links the client's behavior to the evidence offered in mitigation*.

Finally, trial counsel, like counsel throughout the process, *must raise every legal claim* that may ultimately prove meritorious, lest default doctrines later bar its assertion.

ABA Death Penalty Guidelines, commentary to Guideline 1.1, pp. 7-8 (emphasis added).

## C.   Defense Counsel's Deficient Performance Prejudiced the Outcome of the Trial

In its F&C, the trial court ruled that after evaluating the credibility and weight of the evidence offered by Petitioner:

[t]hat no reasonable probability of a different sentencing outcome exist[ed] based on the lack of credible evidence to establish Petitioner's contentions that his father's conduct and his upbringing would have militated in favor of a life sentence. This is particularly so when such questionable evidence is balanced with Petitioner's well-established history of predatory sexual abuse of women, and his callous and apparently unfeeling murder of Summer Baldwin and the calculated manner in which he disposed of her body, and with his

114

connection to the disappearance of Joanna Rogers, a 16-year-old girl

he had come to be associated with.

(PRE 3 at 80).

Essentially, the court concluded that State habeas counsel failed to persuade

the court that:

> [d]espite his privileged upbringing, blessed with involved parents and loving (even doting) sisters, aunts, and cousins, who paved the way for his happiness and success, and with ample monetary and other resources and all manner of personal, familial support and support systems, his father's high expectations and strict oversight of his actions (which Petitioner disavowed in his conversations with his own mitigation specialist), mitigates in favor of a life sentence. It would be nonsensical to concluded that a parent's reasonable and realistic high expectations for such a promising person (which promise was recognized by all family members), coupled with an upbringing geared to provide close supervision of a lively child and young man to avoid associations with the wrong kind of people and getting into trouble, becomes a matter of mitigation.

*Id.*

There is no doubt, however, that defense counsel's deficient performance

prejudiced the outcome of Petitioner's punishment trial. In closing argument at

punishment, the District Attorney asked a series of rhetorical questions:

> Why don't you think they asked that paralegal about all these drunk deals?  Remember mom said it happened everyday.  Get drunk and beat her every day.  Do you think a paralegal of 19 years would have seen some of that?  Do you think his law partner–where was his law partner that everybody escaped to?  Where was he?  Why didn't Mr. Douglas get asked those questions?  What he said was we had outdoor barbeques all the time.  My daughter slept at his house all the time. Do you think they would have saw something?  Do you think that

would have really happened?  Do you think that really would have
happened?
(RR 38/36).

Through these questions, the State essentially called into doubt the veracity
of the defense's entire mitigation case.  According to the State, the alcoholism and
abuse just did not exist.  If it did, there would have been someone, at least one
person, outside the family who witnessed it.  These questions were easy and safe
questions for the State. These questions would have been irrelevant and the
outcome of this case different, if trial counsel had adequately investigated,
developed and presented Petitioner's mitigation case.

The "paralegal of 19 years" (Chaffin) knew a considerable amount about
Rodriguez, Jr., that would have shown the jury detailed portrait of her boss and his
controlling, abusive, and violent behavior.  She described herself as suffering from
battered spouse syndrome after working in a hostile environment for close to two
decades.  She was indeed like family.  Only, it was not the happy family the jury
heard about.  As the District Attorney surmised, she knew; the jury just did not
hear about it.

But Chaffin was not the only person outside the family that could have
provided chilling detail about what this family was like.  Franklin lived it first
hand, and she saw the scars that it left on Mr. Rodriguez.  She offered descriptions
of what Rodriguez, Jr.'s rage did to his son.  After his father was finished with

him, Mr. Rodriguez could only stand there shaking, staring at the floor with tears in his eyes.  But this was not all the evidence that was available to show a direct impact on Mr. Rodriguez from his father's mental illness, addiction, and violence. Steven also saw it and could have described it.

This argument was not the only instance in which the prosecution cast doubt on whether Mr. Rodriguez grew up in an environment of violence or questioned the motives of the family members who testified:

> But the father, sister and mother talk about something else.  Talk about something deep hidden.  You know what?  Families will do and say anything.  Sometimes it's not your fault that he's here. . . .  But let's consider the true nature of that evidence.  Lots of people have bad childhoods.  And I venture to say most of you have known people that had way, way worse childhoods than that happy family that goes to Washington D.C., and Cancun, and goes to New York City and takes trips together, and goes to college.  I venture to say you know a lot of people that had worse childhoods than that.

(RR 38/11-12).

The State continued:  "Ladies and gentlemen, that's not mitigating evidence. If anything, that's aggravating, because that shows you what kind of true character he comes from, what kind of true person he is, that hidden evil that he is"  (RR 38 at 12).  If the jury had heard the entire story, it would not have come away with the impression the State attempted to give it.  This was not a happy family.  It was a deeply disturbed and dysfunctional family that left everyone in it, including Petitioner, scarred and permanently damaged.

117

Garza, in addition to Chaffin, Franklin, and Brittain, could have described the control and manipulation that Rodriguez, Jr., thrived upon. Garza described how no one in the Rodriguez household could escape his gaze. There was no private life for the family; only loyalty to him. And this control is crucial to understanding why family members can be both repelled and victimized, but at the same time drawn to Rodriguez, Jr. This is crucial to understanding the family dynamic they were caught in. It explains why Sophia could testify about abuse she endured growing up and still sit in the courtroom with her father and show affection toward him.

As evidence by the State habeas record, addiction, violence, and mental illness ran through generation after generation of this family. It was instilled into every male member. Rodriguez, Sr., suffered from depression all his life. He was an alcoholic, and he abused his wife and children. Rodriguez, Jr., and Juan Rodriguez, hated their father for what he did to their mother, but they revered him nonetheless. They were both driven to succeed, and they both fell into disgrace. They also both carried his example on to the next generation just as it had been handed down from the previous generation. Rodriguez, Jr., suffered from mental illness, and he self-medicated with alcohol and then drugs. His family suffered as a result. Appellant showed the same addiction tendencies, and he self-medicated

his pain like his father.  He was driven to succeed and ended up a failure in his father's eyes.  He followed his father in a downward spiral of self-destruction.

The jury may have heard some of this evidence, but the mitigation case it heard left it with an inaccurate picture of Petitioner's family and the trauma he inevitably suffered as a result of growing up with a mentally ill and abusive father. This abbreviated version of the potential mitigation evidence was no substitute for the testimony that all the witnesses who could have testified at trial possessed.  *See Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (holding that conclusional testimony provided by defendant's grandmother was "wholly inadequate to present to the jury a true picture of the tortured childhood experienced by Lewis"); *Jermyn v. Horn*, 266 F.3d 257, 308 (3d Cir. 2001) ("But the mere fact that counsel presented some mitigating evidence of a different nature and quality seems largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of the available evidence (presented at trial and at the [writ] hearing) might have led to a different result.").

Under the *Strickland* prejudice standard, all the defense had to do was convince one juror that mercy was warranted in this case and to vote for life vote. It did not have to sway every juror.  Had the jury heard all this evidence, there is a reasonable probability that the one holdout juror would have voted for life. The trial court's findings dismiss this possibility and instead discounts the credibility of

most all of Petitioner's mitigation evidence. Such a finding runs contrary to accept federal precedent.

The Supreme Court extensively elaborated on the prejudice prong of *Strickland*, particularly the case-by-case, totality of the evidence aspect of the review process, in *Williams*, *Wiggins*, and *Rompilla*. In *Williams*, the Court held that a state court failed to "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. at 397-98. The Court criticized the state court for failing to consider the additional evidence elicited during the post-conviction proceedings as part of its totality of the evidence review. *Id*. at 397-98. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case. The Virginia Supreme Court did not entertain that possibility. It thus failed to accord *appropriate weight* to the body of mitigation evidence available to trial counsel." *Id*. at 398 (emphasis added). According to the Court, this evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Id*. at 398.

In *Wiggins v. Smith*, the Court again addressed the totality of the evidence aspect of the prejudice analysis. 539 U.S. at 534-38. The Court held that "[i]n

assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigation evidence." *Id*. at 534. In finding prejudice as part of its reweighing process, the Court stated as follows:

> We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence. In reaching this conclusion, we need not, as the dissent suggests, make the state-law evidentiary findings that would have been at issue at sentencing. Rather, we evaluate the totality of the evidence–"both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*."

*Id*. at 536 (internal citations omitted and emphasis in original) (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

It is clear, at least in *Willams* and *Wiggins* that a reviewing court must address all of the evidence, from all sources available to the court, in determining whether prejudice is established.

Finally, in *Rompilla v. Beard*, the Court reiterated that *Strickland* requires that reviewing courts must consider all of the evidence in determining whether prejudice is shown. 545 U.S. at 390-93. After addressing mitigation evidence that the jury never heard, the Court stated

> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, *that is not the test*. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," and the likelihood of a different result if the evidence had

gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing.

545 U.S. 393 (internal citations omitted and emphasis added) (quoting *Wiggins v. Smith*, 539 U.S. at 538; *Williams v. Taylor*, 529 U.S. at 398; and *Strickland v. Washington*, 466 U.S. at 694).

**D.      No AEDPA Deference to Specific Issues Within the IAC Claim Because The State Court's Adjudication of This Claim Was Only Partial.**

The trial court in this case effectively saw no mitigation value in anything Petitioner offered during the State habeas proceedings. The trial court essentially sidestepped the issue of whether trial counsel was deficient in failing to fully develop these mitigation facts and instead simply discounted the evidence as incredible. There is not a single reference anywhere in the trial court's F&C concerning what tactical or strategic decision making factors might have justified or discouraged counsel from further developing any of the evidence later offered at the State habeas stage.   As a consequence, the trial court's findings and conclusions are contrary to the well established federal law in *Strickland* and are the product of an unreasonable application of facts of this case to *Strickland*.

If the state court does not adjudicate a component of the petitioner's federal claim, that component is reviewed de novo in federal court. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of

the *Strickland* analysis"); *Potter v. McCollum*, 558 U.S. 30 \*\*\* (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Henderson v. Cockrell*, 333 F.3d 592, 601–02 (5th Cir. 2003) (first *Strickland* prong (deficient performance) reviewed *de novo* by the federal court where state court only addressed second prong of petitioner's *Strickland* claim (prejudice)).

Post-*Richter*, courts have continued to apply the principle established in *Wiggins* that "[w]hen a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the Strickland prong not relied upon by the state court." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

Trial court failed Petitioner in two distinctive respects. First it failed to make any finding whatsoever concerning the trial counsel's failure to thoroughly investigate, develop and present a coherent and effective mitigation case. Secondly, the trial court discounted the credibility of virtually of Petitioner's mitigation evidence and thereby failed to consider how this lack of mitigation evidence prejudiced the outcome of this case. The trial court's findings and conclusions of law in this case are therefore not entitled to any deference whatsoever under the rigid standards set forth in AEDPA.

### GROUND FOR REVIEW TWO:

PETITIONER'S CONFESSION WAS NOT FREELY, KNOWINGLY, AND
INTELLIGENTLY GIVEN IN VIOLATION OF THE FIFTH, SIXTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION;
ARTICLE I, SECTIONS 9 & 10, OF THE TEXAS CONSTITUTION; AND
ARTICLE 38.22 OF THE TEXAS CODE OF CRIMINAL PROCEDURE.

### GROUND FOR REVIEW THREE:

PETITIONER'S CONFESSION WAS NOT VOLUNTARY IN VIOLATION OF THE
FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION;
ARTICLE I, SECTIONS 9 & 10, OF THE TEXAS CONSTITUTION; AND
ARTICLE 38.22 OF THE TEXAS CONSTITUTION.

### GROUND FOR REVIEW FOUR:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNTIED STATES CONSTITUTION WHEN HIS FIRST TRIAL COUNSEL,
ALBERT RODRIGUEZ, AGREED TO ALLOW PETITIONER TO CONFESS
WITHOUT FIRST INVESTIGATING THE STATE'S CASE AGAINST HIM.

### GROUND FOR REVIEW FIVE:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION WHEN HIS TRIAL AND DIRECT APPEAL
COUNSEL FAILED TO RAISE ISSUES RELATING TO THE SUPPRESSION OF HIS
CONFESSION AT TRIAL AND ON APPEAL.

Shortly after his arrest, Petitioner's father retained Albert Rodriguez

("Rodriguez"), an attorney in San Antonio, to represent his son. This is the same

Albert Rodriguez who was the subject of the ineffective assistance claim in the

landmark decision of *Trevino v. Thaler*, 569 U.S. ___, 133 S.Ct.1309, 1320 (2012).

In July 2002, Rodriguez filed a motion to withdraw as Trevino's federal habeas counsel citing the following reasons:

> Over the last few years counsel has become progressively ill from a thyroid condition, diabetes, hypertension, and mental stress and depression from all of the above. Counsel is taking the following daily medications: Synthroid, Cartia, Glucophage, and Zoloft. Dr. Jose Sanchez has strongly urged that counsel discontinue death penalty writ cases as they greatly aggravate his existing medical condition.

*Trevino v. Thaler,* No. 11-10189, Petition for Writ of Certiorari at 19

Trevino's federal habeas counsel noted in this petition for certiorari that:

> It is clear from Mr. Rodriguez's own description of his conditions and daily prescription medications that his medical and psychological conditions were long-standing, growing progressively worse, and taking a serious toll on his day-to-day functioning. It is also clear that practicing death penalty law was exacerbating all of his health problems. His physician "***strongly urged***" him to stop representing death row inmates in post-conviction proceedings, because such cases "***greatly aggravate his existing medical condition***." *Id.* at 2 (emphasis added).

*Id.* at 19-20.

On August 14, 2002, A. Rodriguez was discharged as Trevino's counsel by the federal district court. *Id.* at 19. Rodriguez represented Petitioner in 2005.  It should be noted that shortly after taking on Petitioner's case, he moved to withdraw. This was apparently an ongoing pattern of conduct by Rodriguez as noted supra in the *Trevino* case. In 2007, Rodriguez withdrew from several cases after having a heart attack and stroke.  *See id*. (*United States v. Willie Clark*, 5:05-CR-134-WRF; *United*

125

*States v. Mauro Rivera-Rosales*, 5:06-CR-0050(18)-XR).

During his time on this case, Rodriguez conducted a minimal investigation. On October 10, 2005, he arranged for Petitioner to meet with investigators and provided a full confession in this case. In light of his physical and mental condition, as well as the paucity of his investigation, Rodriguez was in no position to properly advise Petitioner. As a consequence, Rodriguez rendered deficient performance in this case. An obvious key piece of evidence in the State's case against Petitioner at trial was his confession. Therefore, there is no disputing that Petitioner was prejudiced as a consequence of Rodriguez' deficient performance.

Petitioner's subsequent trial counsel initially attempted to suppress his confession based on Rodriguez' ineffective assistance of counsel.  Prior to trial, counsel withdrew the motion to suppress. Counsels' decision was based in part on a misperception or misunderstanding of the law. As a consequence, new trial counsel committed ineffective assistance that compounded Rodriguez' original deficient performance. Appellate counsel filed a motion for new trial which raised a claim concerning Rodriguez' ineffectiveness. The trial court held a hearing on this motion and heard testimony from Rodriguez.  Regrettably, appellate counsel failed to brief the issue of Rodriguez' ineffectiveness in Appellant's brief.

As noted supra, there are essentially three separate and distinct instances of ineffective assistance of counsel surrounding Petitioner's the confession.

### a. **Albert Rodriguez**.

A. Rodriguez failed to investigate this case fully and properly before setting up the meeting with Lubbock Police detectives that resulted in Petitioner's confession (2C. 605-08). Rodriguez testified at the hearing on Petitioner's motion for new trial. Albert Rodriguez testified that he first met Rodriguez, Jr., in a courthouse in Anson, Texas (RR 40/8). Albert stayed in touch with Rodriguez, Jr., after that first meeting. *Id.*

After Petitioner's arrest, Albert Rodriguez saw a news report and contacted Rodriguez, Jr., to offer his help with the case (RR 40/12). He told Rodriguez, Jr., that "as a friend, [he] could help him, whatever he needed." *Id*. Rodriguez, Jr., hired Albert Rodriguez to represent his son. *Id.* Rodriguez then travelled to Lubbock to visit with Petitioner (RR 40/12-13). Shortly that visit, Rodriguez sent the District Attorney a representation notice (RR 40/13).

Rodriguez believed that due to his experience as a police detective and an FBI agent, he could conduct much of the investigation with the need of an investigator (RR 40/17). Apparently, at some point the in case, Rodriguez may have had some assistance with his investigative assistance, although the record is not clear as to what specific work was done (RR 40/19-20).

During his time on the case, Rodriguez made numerous trips to Lubbock to met with Petitioner. Rodriguez got the Police report from the DA's office and

contacted Detective Breunig to discuss the case. He also spoke to some of the witnesses in this case, including Baldwin's friend Estrada (RR40/15, 28, 53-54). Rodriguez also attempted to speak with the medical examiner, Dr. Natarajan, but he was never able to schedule a meeting (RR40/22-23, 33, 49).

At the time, Rodriguez knew that Baldwin's autopsy had been performed, but that the pathology report was not yet available (RR40/21-23). The medical examiner's office did not release Baldwin's autopsy report until May of 2006, long after Rodriguez withdrew from Petitioner's case (RR40/49).  Prior to serving-up Petitioner to detectives, Rodriguez claimed he had a general idea about the autopsy results. By general idea, Rodriguez meant the obvious, that Baldwin "had been killed, that she died." (RR40/23).  He did not know what the medical examiner presumed was her cause of death. All Rodriguez knew was that blunt a force trauma was involved and that there had been blood found "all over the – I guess the scene at the Holiday Inn"  (RR 40/34).

 Rodriguez testified that Petitioner was very insistent on giving a statement to the police (RR 40/27).  When asked if this was a prudent decision, Rodriguez dodged the question (RR40/ 28) ("Let me tell you, Counsel, your client is a very convincing person").  Rodriguez therefore elected to subject his client to an interrogation with out knowing all the facts about the case, because his client

insisted that this case involved self-defense, and he wanted to talk to the police to clear it up (RR 40/28-29, 31).

The obvious problem with this line of reasoning is that all the information Rodriguez knew about the self-defense claim came from Petitioner, and Petitioner alone (RR 40/23). Petitioner told Rodriguez that he had two knives in a duffle bag at his parent's home that belonged to Baldwin (RR40/23-26). He claimed that Baldwin used one of the knives to attack him in the hotel room. *Id.* After Baldwin's death, Petitioner collected both knives from her belongings and secured them at this father's home. *Id.*

Rodriguez, Jr., brought the knives were brought to his office and Albert Rodriguez had Petitioner's father deliver them directly to the detectives (RR 40/24). Other than Petitioner's claim of self-defense, some minor bruising and scrapes on his arm, and the knives, Rodriguez had no independent corroborating evidence to support this claim. Rodriguez had not seen the crime scene photographs or reviewed the autopsy results to substantiate Petitioner's theory of self defense (RR 4025-27, 29, 35, 49). Although Rodriguez knew that self-defense and consent to the sexual intercourse in this case were possible defenses, (RR 40/31-32), he had no clue whether these theories were consistent with the physical evidence collected from the crime scene. That evidence ultimately revealed that

Baldwin had extensive injuries that were entirely inconsistent what Petitioner reported to Rodriguez.

Despite being in the dark with respect to these critical details, Rodriguez set up a meeting between Petitioner and the detectives. He naively asserted that "clearing matters" up through the confession was prudent pretrial strategy (RR 40/37-38, 42, 51, 56, 67).   One of the many major flaws with counsel's reasoning, however, is that he set this meeting without an agreement from State to take the death penalty off the table.   Taking a cue from the prosecutor during cross-examination, he agreed that with respect to self-defense claims, it is best to get them out there sooner than later (RR 40/51).

Another problem with Rodriguez' strategic move is that it was based upon belief, rather than the findings of the investigation. Rodriguez agreed with the prosecutor that because he believed Petitioner's account, he did not need the autopsy report or other aspects of the police investigation before going forward (RR 40/49-50).   Amazingly, Rodriguez contradicted the logic of his own tactical decision when he testified that he would have counseled Petitioner not to confess if he knew that this was not a self-defense case (RR 40/36, 57, 65).   Rodriguez is basically saying that it is best to get a self-defense claim out on the table early, unless it turns out that the facts don't actually support a self-defense claim. Then it's a terrible strategy.

It is obvious from his circular reasoning that Rodriguez inadequately counseled his client about the pros and cons of giving a confession at this stage in the case (RR 40/65-66).  In other words, though he knew that the decision whether to waive the Fifth Amendment privilege and talk to the police belonged to Petitioner, he did not investigate the case thoroughly in order to advise Petitioner about this course of action before taking it (RR40/55-57, 65-66).  And as a result, Rodriguez committed to a specific defensive posture in this case before having all the information.   In doing so, he rested his decision entirely on Petitioner's assurances that "once this self-defense issue was clarified, everything would be fine."  (RR 40/38-39).

It is also painfully obvious that Rodriguez was in over his head on this case. Though he professed to have some experience with capital murder cases (most of which he asserted was post-conviction work), he was simply not equipped to prepare this case for trial in the event the State opted to seek the death penalty (RR 40/39-40). As noted supra, he volunteered his services to Rodriguez, Jr., as a friend. It was his friendship with Rodriguez, Jr., however, that ultimately led caused him to withdrawal from this case (RR 40/8, 12, 45-47).   Although Rodriguez' motion to withdraw cited "unreasonable difficulties," he explained that he did not want to develop mitigation evidence about family violence and alcoholism in Petitioner's family out of his respect for Rodriguez, Jr.  (RR 40/46-

47).   Consequently, Rodriguez entered into this case with a glaring conflict of interest.

Additionally, at the time he was counsel, Petitioner's case had not proceeded to the grand jury and the State had not yet decided to seek the death penalty (RR 40/59-60). That meant that all options were on the table. At this critical stage of the case, Rodriguez was both unwilling and unprepared to develop a mitigation case. He instead hoped to achieve a Petitioner's swift confession would persuade the State not to elect the death penalty (RR 40/59). Competent counsel under similar circumstances would have negotiated for a formal offer or agreement from the State not to seek the death penalty in exchange for such a degree of client-cooperation (RR 40/40-41). He instead blindly presumed that death would not be sought if Appellant cooperated and served up a full confession (RR 40/40).   Rodriguez did this, knowing full and well that the State had no interest in cutting any deal in this case because they were still actively investigating the Joanna Rogers disappearance (RR 40/41-42).   Although at the time, Petitioner consistently denied any involvement with the Rogers case or any other murder investigation, Rodriguez made no independent investigation of these other cases and he knew nothing about their merits (RR 40/37-38, 63).

Shortly after he was arrested, Petitioner informed detectives that he did not want to talk to them outside the presence of counsel (RR 33/163) and (RR 34/21).

Petitioner therefore invoked his Fifth Amendment right to counsel. "In *Miranda v. Arizona*, the Supreme Court of the United States determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). Thus, a defendant has a Fifth Amendment right to counsel. *Id*. at 482. In *Edwards*, the Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id*. at 484. Thus, once an accused asserts his right to counsel, the police cannot subject him to further interrogation "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*. at 484-85.

As *Miranda* was fashioned to counteract the inherently compelling pressures of the custodial interrogation, *Edwards* was designed to provide a "corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own

instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. 675, 681 (1988) (quoting *Miranda v. Arizona*, 384 U.S. at 467). Therefore, if a defendant is denied counsel during a subsequent police interrogation, any confession is presumed involuntary. *Id*. at 681. *See also Minnick v. Mississippi*, 498 U.S. 146, 153-54 (1990) (holding that under *Edwards*, a defendant must have counsel present at any subsequent police-initiated interrogation).

The right to counsel, including the Fifth Amendment right to counsel, means the right to effective counsel. *See Commonwealth v. Moreau*, 572 N.E.2d 1382, 1384 (Mass. Ct. App. 1991). *See generally Strickland v. Washington*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759 (1970)). Defense counsel has a duty to investigate the State's case prior to advising a client to confess. *Moreau*, 572 N.E.2d at 1386 n.4. *See also Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir. 1997) (holding that counsel "should always advise the defendant about the benefits and hazards of testifying and of not testifying"); *United States v. Frappier*, 615 F. Supp. 51, 52-53 (D. Mass 1985); *People v. Wilson*, 133 A.D.2d 179, 181 (N.Y. App. Div. 1987).1 *See generally Strickland v. Washington*, 466 U.S. at 690-91.

---

1 The privilege against self-incrimination is a necessary corollary to the right to testify, and, thus, the duty of counsel to investigate the case and advise a client about the exercise or waiver of a

In the case *sub judice*, counsel attempted to develop a plausible defensive theory for later use at trial. But before competent counsel commits the client to a theory of defense, he/she must first thoroughly investigate the evidence in the case to be sure that theory holds water. Rodriguez committed Petitioner to a self-defense theory without knowing the full extent of the evidence against his client. This strategy was both foolhardy and reckless, because it gave the State what would prove to be very damaging evidence.

In its F&C, the trial court excuses counsel's deficient performance and instead passes blame upon Petitioner for insisting on pursuing the self-defense theory (PRE 2 at p.40, ¶24). It is, however, of little importance that the client instructed counsel to set up the debriefing to "clear the air". As noted supra, Petitioner had the right and a reasonable expectation that his attorney would provide him appropriate counsel and advice before making such a critical decision. *See Brown*, 124 F.3d at 79. Petitioner's decision was the by-product of his counsel's woefully insufficient investigation. Such deficient performance by counsel falls below acceptable standards and renders his efforts constitutionally ineffective.

The trial court stressed in its F&C that "Petitioner had the unqualified right to do with or without Albert's acquiescence, permission, or approval, i.e., initiate

---

personal constitutional right should be the same. *See Rock v. Arkansas*, 483 U.S. 44, 52 (1987). *See also Brown v. Artuz*, 124 F.3d at 78.

contact and conversation with police ….." *Id.* The trial court's statement though correct, completely overlooks counsel's obligation to guide and advise Petitioner about the pitfalls of such a move.

> Indeed, a lawyer's **complete, independent investigation is so vital a component of effective representation** that even the defendant's confidential admission of guilt does not affect the obligation and scope of counsel's duty to investigate. The ABA Standards explicitly state that "(t)he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty." ABA Standards s 4.1 (2d ed. s 4-4.1). Whether the client decides to plead guilty or to go to trial, investigation is essential in fulfilling the lawyer's role of raising mitigating factors and obtaining the most favorable disposition for the defendant in the contexts of pretrial release, charging and plea negotiations, argument to the jury, and sentencing.

*See* ABA Standards at 227; *see also United States v. Decoster*, 624 F.2d 196, 284 (D.C. Cir. 1976) *judgment entered*, 598 F.2d 311 (D.C. Cir. 1979).

Defense counsel's decision to offer Petitioner up for an interrogation before he had fully investigated the plausibility of his self-defense theory cannot be justified as a reasonable tactical decision. *See Strickland*, 466 U.S. at 687.

The trial court made a finding that counsel's "reasons why he allowed Petitioner to give a statement to detectives [were] credible" (PRE 2 at 41). The court further ruled that Petitioner was entitled to a "free pass" because he lies to his attorney, and presses his attorney to set up an interview with police, only to complain later that the attorney was deficient for allowing him to put himself in a

136

bad situation … [something he could have done with or without his attorney's consent]." *Id.* at 42.

The logic of *Strickland's* holding demands that even when a client insists on implicating himself in the commission of a crime, his counsel nevertheless has a duty to fully investigate the case. *See Decoster*, 624 F.2d at 284 *citing*  ABA Standards s 4.1 (2d ed. s 4-4.1).  Rodriguez fell well short of fulfilling this duty. As a consequence, the trial court's finding to the contrary is the product of a misapplication of the facts of this case to the law in *Strickland*.

### b. Trial Counsel

Contrary to the trial court's findings, Petitioner's subsequent trial counsel saw the degree of ineffective assistance Rodriguez rendered and filed a pretrial motion to suppress the confession (CR 1/400-03).  Specifically, this motion alleged that "Albert Rodriguez allowed Defendant to give a statement admitting to the homicide that is the basis of this cause without properly investigating the facts of the case and without performing his duty to provide effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution." (CR 1/ 400).  The motion continued:

> That in the instant cause, Albert Rodriguez's investigation regarding the facts of this cause was next to non-existent.  Without making more than the slightest inquiry into the merits of the charges or the evidence available for inspection, Albert Rodriguez counseled Defendant and appeared with him to make a statement to police

137

> regarding his involvement in the death of Summer Baldwin. Specifically, Attorney Rodriguez was unaware of the medical examiner's report of the autopsy of the ivctim [sic] in this case which repudiated virtually all of the statement given by defendant with his counsel's consent.

(CR 1/401).

Finally, in addressing prejudice, the motion stated:

> Furthermore, without Defendant's statement, the evidence against Defendant would be much weaker and could lead to a different result in the proceedings now pending before the Court. Specifically, the State is now in the position of being able to offer a statement given by defendant and then offer expert evidence that the death couldn't have been caused in the fashion set out in the statement such that the jury will disbelieve anything defendant testifies to at trial.

(CR 1/401-02).

Petitioner's subsequent counsel therefore knew that Albert's conduct fell far short of acceptable standards for counsel in a capital murder case. This is evident in above passages from the motion to suppress.

On March 18, 2008, at a pretrial hearing just prior to the start of trial, defense counsel withdrew their motion to suppress the statement.2 After informing the court that the motions were withdrawn, the district attorney informed the court that he intended to call the former counsel to the stand if the defense made any

---

2 Counsel also withdrew a motion to suppress a second statement that was given in accordance with a plea bargain and immunity agreement arranged by second counsel (RR 2/260-61). Because the State did not attempt to present the second statement or any evidence derived from it during trial, it had no impact on the verdict, and any issues with respect to it are moot.

attempt to re-urge the motions during trial (CR 2/261). Specifically, the District

Attorney asserted the following:

> If they're claiming either one of those lawyers was ineffective, I'd like to call both those lawyers to the stand to talk about them, what their strategy was, what they investigated, what they found out, *what their client told them, and everything else*, because that's why I wanted to put that on the record, your Honor, because it's my understanding that any claims of those two lawyers being ineffective–if they're still making that claim, *then the attorney-client privilege has been waived*, and we would like to inquire of both those lawyers as to what their strategy was, and the things they did.

*Id*. (emphasis added). Defense counsel assured the court that "we're not making

that claim at this time." *Id*.

From this exchange, it appears defense counsel made a strategic decision

not to press the suppression issue in order to preserve the attorney-client privilege

between Petitioner and Rodriguez. And in fact, this is what happened. Leading up

to this hearing, counsel found out that the State intended to pierce the attorney-

client privilege, and, ostensibly, they believed the trial court would allow it, so they

decided to withdraw the motion and not risk this eventuality.

The problem with this decision, however, is that the district attorney

overstated the extent of the waiver of the attorney-client privilege that came with

pursuing the suppression issue. Counsel unfortunately bought into the State's threat

and backed off the motions. Rule 503 of the Texas Rules of Evidence provides

that a client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client.  TEX. R. EVID. 503(b)(1). The special rule of privilege in criminal cases establishes a client's privilege "to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship."  TEX. R. EVID. 503(b)(2).  The privilege does not apply to "a communication *relevant to an issue of breach of duty* by a lawyer to the client or by a client to the lawyer."  *Id*. at 503(d)(3) (emphasis added).

This exception to the rule of nondisclosure is limited, not only in scope but also by who may assert it. First, it is the attorney against whom the allegation is being made who may assert the exception to the privilege, and, second, such attorney may divulge confidential information only to the extent that the attorney is protecting himself or herself against the allegation.  *See United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) (holding that a lawyer may reveal otherwise privileged communications from his clients in order to recover a fee due him, or to defend himself against charges of improper conduct, without violating the ethical rules of confidentiality or the attorney-client privilege) (footnote omitted) (emphasis added); *Smith v. Guerre*, 159 S.W. 417, 419-420 (Tex. Civ. App.– Amarillo 1913, no writ) (holding that an attorney may reveal privileged attorney-

client communications to protect himself when the client charges that the attorney has been unfaithful to the client's interests) (emphasis added).   Though it is apparent that an attorney may testify at a subsequent hearing, even if called by the State, and defend against the allegations of deficient performance, it is also clear that the attorney may not divulge any more evidence than is reasonably necessary to address the issues raised by ineffective assistance of counsel claims.  *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967).  Accordingly, the State's veiled threat that it would question Rodriguez about "what [he] investigated," and "everything else," is simply not the law.  Had defense counsel understood this and urged the motion, the State would have only had access to such privileged information from Rodriguez to the limited extent necessary to defend himself.  Otherwise Rodriguez would have had an obligation to maintain attorney-client privilege as to all other matters.

Because trial counsel misunderstood the extent of the potential attorney-client waiver, they acquiesced to the State's threat and failed to litigate the scope of the actual waiver.  As a result, defense counsel not only waived any challenge to the confession, they also waived any issue stemming from the error that the State

sought, and likely received, from the trial court that it could rummage freely through Rodriguez' entire file.3

The trial court made a finding that it was impossible for the court to understand the full extent of the danger that might come to Petitioner from the disclosure of Albert's file (PRE 2 at 46). Trial counsel was also in the dark with respect to the contents of Albert's file and made the decision to withdraw the motion without first confirming what if any damaging information might have come from calling the State's bluff and going forward.  If counsel would have discussed this matter with Rodriguez ahead of time and reviewed his file, they would have better understood the potential risk if any of revealing such information and thereafter made a better-informed decision with respect to withdrawing the motions. Of primary concern to trial counsel was the possibility that the State might find out information about the Joanna Rogers case. However, at the time Rodriguez was involved with this case, Appellant had never admitted any involvement in her disappearance or with any other unsolved murder in Lubbock County or elsewhere.

The trial court acknowledged in its F&C that the it only "informally indicated to the parties that it believed that, because the claim of ineffectiveness

---

3 Furthermore, trial counsel failed ensure that the trial court's ruling that the State would be allowed to question Rodriguez about anything in his file was properly included in the record on appeal, and, therefore, they waived any challenge on direct appeal relating to it.

was the basis for the claim …, some waiver of the attorney client privilege between Petitioner and Albert Rodriguez would result, <u>but</u> the record does not indicate that a formal ruling on the waiver of the attorney-client privilege, <u>either complete or partial</u>, was ever made" (PRE 2 at 45). Trial counsel failed to press the court for a ruling on the extent of the disclosure. They instead made the ill-informed decision to swiftly withdraw the motion.

As a consequence, counsel were deficient in misunderstanding the legal principles involved with the waiver of the attorney-client privilege, and for not challenging or pressing the trial court for a specific adverse ruling with respect to it. *See United States v. Mooney*, 497 F.3d 397, 404 (4th Cir. 2007) (holding that counsel was deficient in choosing a course of conduct based upon a misunderstanding of the law). Because of an inadequate legal investigation prompted their decision to withdraw the motion to suppress the statement, the decision was not based upon "sound" trial strategy. At the very least, counsel should have objected and pursued the objection to an adverse ruling from the court, all of which should have been on the record, in order to preserve the issue for appeal. As noted supra, counsel had little to risk by, and a great deal to gain, by developing an appropriate record for appeal. For all these reasons, counsel provided deficient performance under *Strickland*'s first prong.

The trial court made a finding that counsels' decision to withdraw the motion to suppress was was "professionally reasonable" in light of the potential risk versus benefit that would have come with pursuing the motion (PRE 2 at 49). The trial court's finding, however, is again an unreasonable application of the facts to *Strickland*.   Counsel's decision was unreasonable and contrary to ordinary professional norms because it was rashly made without the benefit of a definitive ruling from the court on the extent of the potential attorney-client disclosure that would have come if the motion were urged.   The fact that Petitioner's confession was a recurring theme of the State's case makes it clear that counsels' failure to argue for its exclusion was prejudicial at both the trial and subsequent appellate stages of this case.

c.     **Appellate Counsel**.

The trial court's insistence that Albert's strategy was not IAC and did not prejudice the outcome this case is also inconsistent with appellate counsel's assessment of the case. Appellate counsel filed a motion for new trial asserting that Rodriguez provided ineffective assistance of counsel by arranging Petitioner's confession without first investigating the merit of his defense theory  (CR 2/605-09).   Counsel developed evidence supporting the claim in a hearing on the motion. Both subsequent trial counsel and appellate counsel argued that Albert's representation of Petitioner fell well below acceptable professional norms.

144

Regrettably, counsel failed was deficient in failing to present the claim in the direct appeal brief and this deficiency prejudiced Petitioner's case. The trial court's finding to the contrary is a misapplication of the facts to *Strickland*.

### d. Prejudice.

The trial court urged in its findings that Petitioner was not prejudiced by his confession (PRE 2 at 53). The court's finding, however, ignores the many devastating consequences that the confession had on the outcome of Petitioner's case.

The jury viewed approximately two hours of footage of Petitioner, dressed in jail garb, explaining how Baldwin's death was self-defense (State's Trial Exhibit 253). Detective Breunig then cross-examined Petitioner on the video and poked holes in his story. *Id.* Detective Breunig told Petitioner at the conclusion of the interrogation that he did not believe him, that his statement contradicted the evidence the State had obtained, and that if he wanted to correct it in any way, then would be a good time. *Id.*

Appellant's pre-indictment confession gave the State ample time and information to later refute his self-defense claim at trial. The State also was able to use the interrogation as evidence that Petitioner lied to investigators about, not only the self-defense claim, but also about other key aspects of the crime. The State made Petitioner's character for untruthfulness a key component of their case.

Chris Rodriguez, Petitioner's frat buddy from Texas Tech, testified for the State at trial that Petitioner told him he was a Marine and he had been deployed to Iraq (RR 32/146).  Petitioner also told Chris that the red Dodge pickup truck he was driving on the day Baldwin died was a loaner from the dealership until the pickup he ordered was ready (RR32/151).  While Petitioner hung out at Chris' apartment, he regaled the group with stories about children and prostitutes trying to kill soldiers in Iraq, about sleeping with married women, about having to be careful about who he slept with because of the danger of castration, and about having to kill a five year old child (RR 32/154, 174, 188). Chris' girlfriend, Laura Davidson, recounted a similar version in her testimony of Petitioner's stories at the apartment (RR 32/187-89).  The State showed the jury evidence confirming that many of Petitioner's stories were lies. That he'd never been deployed to Iraq and that red pickup he was driving during that trip was a rental (RR 34/33).

Before offering Petitioner's confession, Detective Breunig offered a great deal of the forensic evidence against him, including evidence found in the hotel room (RR 33/194). He told the jury that he was always interested in hearing a suspect's side of the story because he wants to see if it fits the evidence.  *Id*.  It's a pity that Petitioner's counsel, Rodriguez, didn't see this obvious police tactic before offering up Petitioner to the police.

146

After the videotaped confession was played for the jury, Breunig listed all the instances in which he believed Petitioner lied and he referenced the physical evidence that he believed refuted his version of the events (RR 34/29). He disbelieved Petitioner's assertion that he did not know that Baldwin was a prostitute or that she agreed to engage in sex with him for free (RR 34/22-23). Breunig knew that despite Petitioner's story that he was by the bathroom door when he struggled with Baldwin for her knife and choked her, because identification detectives found a large pool of blood across the room by a bed (RR 34/29-30). Petitioner explained that after he killed Baldwin, he sat on the toilet and panicked. Breunig to the contrary believed that the video footage that they obtained from the Walmart showed that Petitioner was calm and in control (RR 34/30).

The evidence at trial also revealed that Petitioner watched a movie and ate a value-sized fast food meal in the hotel room the day after Baldwin's death (RR 34/31). Petitioner also withdrew money from the hotel ATM and had an argument with the front desk clerk over his bill (RR 34/19-20, 32). Additionally, Petitioner called Chris and joked with him about how drunk they got the night before (RR 34/19). Petitioner maintained during his interrogation that he did not tell anyone about Baldwin's death until he spoke to his father. But the evidence established that he did not mention her death to anyone from the time he returned to San

Antonio until his arrest (RR 34/31-32). All of this evidence, according to Breunig, contradicted Petitioner's claim that he panicked after Baldwin died.

The autopsy, however, was perhaps the most damming evidence against Petitioner at trial. Petitioner explained that he held Baldwin from behind compressing her neck with one arm as he held Baldwin's knife wielding hand with the other (RR 34/30-31). Petitioner went so far on the video as to demonstrate the maneuver on Detective Breunig. He showed Breunig how Baldwin was able to flick the knife around and scratch his arm and face with her other hand. *Id*. Detective Breunig testifed that based on his 23-years of law enforcement experience, he would expect to see more significant knife wounds to both Baldwin and Petitioner if the struggle happened in that fashion (RR 34/24-25, 30-31).

Additionally, based on the manner in which Petitioner demonstrated holding Baldwin, Breunig expected to see significant crushing injuries to her neck. These injuries, however, were not present (RR 34/23, 31). Petitioner described his struggle with Baldwin as lasting for three to five minutes at which point Baldwin went limp and he lowered her to the floor. Other than her head bobbing around and some discoloration to her face, Petitioner denied that she had extensive injuries to her body. *Id.* He also denied that he hit her, struck her, or pushed her down or against anything (RR 34/20-21, 31). Breunig believed the autopsy results flatly refuted these assertions and that they were "[t]otally untrue." (RR 34/21, 31).

148

The State presented other evidence that refuted Petitioner's confession. Estrada testified that she saw Baldwin just prior to accompanying Petitioner to her room, and according to Estrada, Baldwin did not appear to be injured (RR 32/224-25).  Manale testified about Mr. Rodriguez's computer activities after returning to his home in San Antonio.  He looked up news websites concerning the fact that Baldwin had been found at the landfill, which were interspersed with web searches on singles sites (RR 35/148-64).

Though it is true that Mr. Rodriguez received a jury instruction on self-defense based solely on the presence of the confession in evidence, it is likewise true that this was in no regard helpful.  First, the instruction he received as to the charge that he committed capital murder during the course of committing or attempting to commit aggravated sexual assault,4 was only a partial defense and only applied if the jury believed that the State failed to prove aggravated sexual assault beyond a reasonable doubt (CR 2/527).

Second, and more importantly, the defense focused the jury on two issues– whether the sex was consensual and whether Petitioner knew that Baldwin was

---

4 In the State habeas proceedings, the State conceded that there is legally insufficient evidence to show capital murder through the murder of two or more person in the same criminal transaction based on holding in *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008).  *Brief for the State*, p. 11.  Therefore, discussion of self-defense as a defensive issue in this case is limited to Paragraph 1 of the indictment.

pregnant (RR 36/17, 32).  With respect to the first issue, defense counsel told the jury:

> I want to point to the very single and sole issue on this part of the trial. One issue.  And that issue is was the sexual contact between Mr. Rodriguez and Summer Baldwin consensual, because if the answer to that question is yes, then the answer to the first paragraph's question about capital murder is no, okay.

(RR 36/17).

Defense counsel pointed out that a murder <u>after</u> consensual sex is not capital murder in Texas (RR 36/18) (emphasis added).  He argued persuasively from the evidence at trial that the State failed to prove aggravated sexual assault, and in doing so he pointed out gaps in the medical examiner's testimony and evidence that Baldwin was conducting a business transaction for sex with Petitioner (RR 36/18-21).

Counsel then turned to Petitioner's confession and his statement that the sex was consensual, and counsel characterized this evidence as follows:

> Now, alternatively, you'll remember that the State is the one that offered Rosendo Rodriguez's statement.  It wasn't us.  The State brought you that.  The State brought you the evidence that sex between Mr. Rodriguez and Ms. Baldwin was consensual, and that it was a natural outgrowth of amorous feelings early in the morning.

(RR 36/22).  Defense counsel clearly attempted to distance himself, and Petitioner, from the statement by reminding the jury that it was the State who sponsored that evidence.

Admittedly, the defense did not completely ignore self-defense, but it is apparent that this was not a central theme of the defense (RR 36/22-23, 25-31). One need only see the lengths defense counsel went to preface his discussion of the self-defense:

> [W]hen they put on the testimony–or the interview of Rosendo Rodriguez, that he gave to Chris Breunig, brought the issue of self-defense. We didn't bring that. And so when Mr. Payne complains about there being four, five, or six pages of self-defense charge in the charge, that's because of evidence they brought forth.

(RR 36/22-23). Defense counsel then discussed the evidence supporting self-defense (RR 36/25-31). Defense counsel concluded by reiterating the two issues it believed the jury had to decide:

> Now, the thing that we've got to be–that we've got to remember here, is that we're looking for two–we're looking at two issues. Was it aggravated sexual assault? The evidence doesn't show that it was. And the second thing is was either–did either–did Mr. Rodriguez know that Ms. Baldwin was pregnant, or is there a transferred intent appropriate there?

(RR 36/32).

Counsel told the jury that this case was not a "who done it", but instead a "what was done" case. He urged the jury to consider the evidence with respect to the two issues he had framed (RR 36/33). Before sitting down, counsel informed the jury, "But if all those injuries show you what happened some time after the sex,

I suggest to you it's not important, and that it was only meant to inflame your minds and to make you make an emotional decision." (RR 36/34).

Contrary to the trial court's finding, the State exploited the self-defense theory, and Petitioner's confession in particular, with devastating precision. Unlike the defense, the State did not attempt to distance itself from self-defense; instead, it embraced it to its fullest measure. In opening before defense counsel spoke, the prosecutor told the jury, "Ladies and gentlemen, I submit to you that this issue of self-defense [the issue it pressed] is nonsense." (RR 36/14). But when the District Attorney, Matt Powell, stood up to conclude after defense counsel sat down, he hammered self-defense straight out of the gate. "One thing is clear. There certainly is a self-defense claim. Certainly is a self-defense claim. Summer Baldwin has a self-defense claim. Summer Baldwin has a self-defense claim. That is the only one who has a self-defense claim." (RR 36/35). He asked the jury, "Do you really believe he was acting under self-defense?" *Id.* He pointed out that the jury heard evidence that in a knife fight, there will be cuts and punctures on the arms and face, and that there was no evidence that Mr. Rodriguez had been injured in this manner. *Id.*

The State then emphasized in great detail all the instances in which Mr. Rodriguez lied, which included: 1) his stories of exploits in Iraq; 2) his panic after killing Baldwin (pointing out that he was calm in the Walmart when he purchased

the suitcase); 3) that he purchased dinner and watched a movie in the hotel room; 4) that he was smiling when he photographed himself in the bus on the way back to San Antonio); and 5) his claim that Baldwin did not have any injuries when he left her in the room (RR 36/36-42). "Lie, after lie, after lie, after lie. From a liar. From the only one in this whole courtroom you know for sure is a liar. 100-percent no question about it. The only one in the courtroom we know for sure is a liar." (RR 36/42).

Contrary to the trial court's ruling, the prejudicial impact of counsel Albert Rodriguez' deficient performance on Petitioner's case is plain to see. His inadequate pre-indictment investigation was in no way sufficient given the seriousness of this case. The fact he failed to thoroughly investigate the case and in any way challenge his client's desire to confess and urge a self-defense claim left Petitioner with essentially no counsel. By tethering Petitioner to a defense that was totally at odds with the evidence, Rodriguez compromised both the guilt-innocence and punishment states of Petitioner's trial.

Petitioner's unsupported self-defense claim presented trial counsel with an obstacle rather than an opportunity. This foolish strategy gave the State an open invitation to present a painstaking and detailed attack of Petitioner's videotaped confession. The State successfully exploited this opening at both stages of the Petitioner's trial. Without the confession, there is a substantial probability that both

the guilt-innocence and punishment would have had a different outcome in this case.  As a consequence, the trial court's finding of no prejudice is the product of an incorrect and unreasonable application of the facts of this case to *Strickland*.

Finally, as a consequence of the above ineffective assistance of counsel, Petitioner's confession was not freely, knowingly, and intelligently given in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 9 & 10, of the Texas Constitution; and Article 38.22 of the Texas Code of Criminal Procedure. In addition, counsels' ineffective assistance rendered Petitioner's confession involuntary in violation of the Fourteenth Amendment to the United States Constitution; Article I, Sections 9 & 10, of the Texas Constitution; and Article 38.22 of the Texas Constitution.

The trial court's findings and conclusions are contrary to and involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Moreover, the trial court's findings in conclusions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d)(2).  Accordingly, Petitioner is entitled to federal habeas relief as to this claim.

### GROUND FOR REVIEW SIX:

PETITIONER WAS DENIED A FAIR TRIAL AND A FAIR AND IMPARTIAL JURY
WHEN THE JURY AT HIS TRIAL LEARNED OF AND CONSIDERED FACTS NOT

PRESENTED AT TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION; THE RIGHT TO TRIAL BY JURY GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; AND ARTICLE I, SECTION 10, OF THE TEXAS CONSTITUTION.

### GROUND FOR REVIEW SEVEN:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS TRIAL AND DIRECT APPEAL COUNSEL FAILED TO INVESTIGATE THE JURY MISCONDUCT CLAIMS.

## 1. Introduction

Petitioner's jury considered facts not presented at trial–which included that Rogers had been murdered and that Mr. Rodriguez had entered into a plea deal with respect to it, that several jurors had friends or relatives that worked as guards in prison, and that there had been a recent prison break.  This extraneous information denied Petitioner's rights to a fair trial and to a fair and impartial jury.  Accordingly, Petitioner is entitled to relief.

## 2. Discussion

Juror Gregory Cole provided State habeas counsel a statement concerning his experiences with the trial.  Cole stated that when considering the future dangerousness special issue, the jurors felt that Petitioner would pose a danger to workers, particularly women workers, in prison if incarcerated for life.  Someone mentioned that eight prisoners had recently escaped from a Texas prison.  *Id*.  "After hearing that it was clear

that life in prison did not seem like the best way to go.  It just didn't sit well with me that Rodriguez may harm other people or even escape and I think other jurors felt the same way."  *Id.*  Cole also stated that the jury knew that Petitioner had killed a third person–Joanna Rogers–and that he had entered into some sort of plea deal, and it was this deal that prevented the State from talking about it.  He said that the jurors found out about this "before the punishment part of the trial . . . ."  *Id.*  Specifically, Cole said:

> [The State was] effective in insinuating that Rodriguez killed a third person.  In fact, Rodriguez had a plea bargain that was initially accepted and later rejected, which is why the trial occurred in the first place and why the prosecution were pursuing the death penalty.  This plea bargain involved a third murder that Rodriguez had committed, but the prosecution could not talk about it because of the earlier plea bargain.  We learned about this plea deal before the punishment part of the trial and it seemed odd to me.  However, one thing that worked well was when the prosecutor threw down three roses on the suitcase during closing statements.  One rose was for Baldwin, one for her unborn child, but many jurors felt that the third rose was for another victim.  I felt like that was a great strategy since the prosecution could not talk about the other murder directly.  Many of the jurors were very smart and good at figuring things out like that.

*Id.*  Whether Petitioner knew that Baldwin was pregnant did not matter to the jury, because they had been instructed, both by the court and the prosecution, that the law of transferred intent made it irrelevant to guilt.  *Id.*  But it is apparent from his affidavit that it was important to the jury that Petitioner had killed more than one person.  Finally, Cole mentioned that one juror initially held out voting for death, but "it didn't take long . . . to convince her . . . ."  *Id.*  The other jurors took turns explaining why they believed death should be imposed, after which, one holdout juror "said she wanted the death penalty too."  *Id.*

156

The Sixth Amendment to the United States Constitution guarantees a defendant facing criminal charges a fair and impartial jury. U.S. CONST. amend VI. Indeed, an impartial jury is fundamental to our criminal justice system. *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). *See also Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). Every defendant, and especially one charged with a capital crime facing the death penalty, is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors," and if a single juror is improperly influenced, the verdict is as unfair as if all were. *Parker v. Gladden*, 385 U.S. 363, 366 (1966); *United States v. Delaney*, 732 F.2d 639, 643 (8th Cir. 1984). Furthermore, the guarantee of an fair and impartial is a fundamental requirement of due process. *See In re Murchison*, 349 U.S. 133, 136 (1955). *See also Smith v. Phillips*, 455 U.S. 209, 225 (1982) (Marshall, J., dissenting); *Estes v. Texas*, 381 U.S. 532, 565 (1965) (Warren, C.J., concurring). Finally, when, as here, evidence that was not presented during trial is interjected into the jury deliberations, the defendant's rights to cross-examination and confrontation and to counsel is affected in violation of the Sixth Amendment to the United States Constitution. *See Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).

In this case, it is apparent that the jury considered evidence that was not presented at trial. In particular, the jury considered evidence that Petitioner killed Rogers, and that the State could not talk about it because of a prior plea deal. Also, the jury knew that Appellant walked away from a plea, and that was why the State was seeking the death penalty. The extent that the jury could hear about the circumstances surrounding

157

Rogers's disappearance was potentially a contested issue at trial.   Though the State

elected not to present this evidence, it is apparent that the defense was poised to object to

it if the State offered it (RR 37/94-98).   Furthermore, had the State offered this evidence

at trial and the trial court overruled the defense objections, Petitioner would still have

been afforded the opportunity to confront and cross-examine witnesses concerning it.

But when the jury considered this evidence in arriving at a punishment, Petitioner lost his

confrontation rights.   Finally, the jurors considered evidence about a prior prison escape

in determining the future dangerousness special issue.   For these reasons, Petitioner did

not have a fair and impartial jury, and he is entitled to a new trial.

The trial court denied relief as to this claim finding that:

> Based on the Court's own observations, recollections and awareness of procedures in place during trial, and based on the jurors' sworn statements, the Court finds that some of the matters addressed in Petitioner's [claim] indicating that prosecutors or other persons spoke with jurors as a group outside the presence of the Court and Petitioner's trial counsel about matters not in evidence before the jury in open court before the trial was over, are simply not true, could not have happened, and did not happen. The Court, therefore, concludes that no juror misconduct occurred, and no outside influence was brought to bear upon the jurors.
> …
> [l]ikewise [Applicnat] has failed to provide a basis upon which relief can be granted with regard to his Ground for Relief Seven. Neither trial nor direct-appeal counsel were deficient for failing to discovery nonexistent juror misconduct or outside influence.

PRE 2 at 8-9.

The trial court's findings and conclusions are contrary to and involved an

unreasonable application of clearly established federal law, as determined by the

Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Moreover, the

trial court's findings in conclusions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d)(2). Accordingly, Petitioner is entitled to federal habeas relief as to this claim.

### GROUNDS FOR REVIEW EIGHT:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS TRIAL COUNSEL FAILED TO CHALLENGE OR OTHERWISE OBJECT PROPERLY TO AUTOPSY PHOTOS OF THE FETUS.

### GROUNDS FOR REVIEW NINE:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS DIRECT APPEAL COUNSEL FAILED TO RAISE AN ISSUE ON APPEAL RELATING TO IMPROPERLY ADMITTED AND IRRELEVANT EVIDENCE CONSISTING OF AUTOPSY PHOTOS OF THE FETUS.

Prior to Dr. Natarajan testifying, the trial court took up a defense objection to PowerPoint presentation that the State intended to use with the ME. 34R. 168. Defense counsel stated that the State provided him, which depicted "the uterus and fetus." *Id.* The defense objected under the Texas Rule of Evidence 403 that the probative value of the pictures were substantially outweighed by their prejudicial and inflammatory effect. 34R. 169. The court expressed doubt about the pictures' relevance and initially instructed the State not to use them at this time, by the court

also added the caveat that the State could approach at the appropriate time, and it

would consider them. *Id*. The State then explained why it needed the pictures:

> I can tell you right now there is, because we're going to have to show
> that the baby died not because of cocaine ingestion, not because she
> was a prostitute and unhealthy not because of anything like that but
> because of the different blows and the different--basically, killing the
> momma. And so we have to be able to show that. I mean, I can get up
> here and he can say that all day long, but I promise you in closing
> what's going to happen is, "The baby wasn't going to live because of
> this, because of that." And the only reason I'm showing that is to
> demonstrate this was a healthy baby, and that fluid was clear. I can
> show everything else, as far as this is concerned. We have been very
> diplomatic—I'm even using a chart on the vaginal and anal areas not
> to prejudice this jury, but I have to be allowed to show these very—
> two small pictures. And I don't mind cutting it off where everybody
> else can't see it. That's not my point. But the jury has to be able to see
> that picture—for me to be able to say this ain't from—because of
> cocaine, or prostitution, or because she's living an unhealthy lifestyle,
> it's because she got killed.

34R. 169-70. After this explanation, the court told the State to approach outside the

jury's presence before presenting them. 34R. 170-71. From this exchange, it is

apparent that the State believed these photos were crucial to its proof that Mr.

Rodriguez murdered Baldwin's unborn child, which was an element of the second

capital murder count.

The next day, before the jury entered, the court took up this issue again.

35R. 4. Dr. Natarajan testified that he understood that the State had to prove

beyond a reasonable doubt that the fetus died as a result of Baldwin's death and not

from natural causes. 35R. 4-5. He believed the two pictures, which depicted a dissected uterus with the fetus exposed and another with the fetus removed and laid out a table, were important to show all of the different anatomic sites and why there were not areas of trauma to them. 34R. 5-6. Again the court expressed concern with the photos. 34R. 8-9 The State then argued that the photos were not only relevant, but necessary, to the State's proof:

> Well, your Honor, we-it's essential that—I mean, one of the things that we have to prove is that this child was caused—the death of this child was caused at the hands of this Defendant. We cannot—he can't benefit from the fact that the child was a fetus. We still have to be able to say that—we have to be able to rove that this wasn't—this child was not already dying, that it was in a different state of decomposition than its mother, and we have to be able to prove these things. We have been extremely selective on the pictures.

34R. 9. The court expressed concern about the effect these pictures would have on the jury and asked to hear the medical examiner's testimony first before ruling. 34R. 9-10. The State again tied its need for the pictures to the fact that it had to prove Mr. Rodriguez killed a viable fetus. 34R. 10. The State again tied its need for the pictures to the fact that it had to prove Mr. Rodriguez killed a viable fetus. 34R. 10. The State asserted that the fetus was a victim that it named in the indictment and that it had to "prove that this victim died at the hands of the Defendant." *Id*. The State believed that the only way it could do that was "to show it." *Id.* The State also argued that it did not matter that Rodriguez did not know that Baldwin was

pregnant. *Id.* The court then altered its ruling and told the parties that the picture of the fetus laying on the table outside the uterus would be admissible but that the court would withhold ruling on the picture of the fetus inside the uterus. 34R. 10-11. Defense counsel reurged the Rule 403 objection, which the court overruled. 34R. 11-12.

Once Dr. Natrajan testified up to the point in the PowerPoint presentation in which the State wanted to show the photos, the court removed the jury and took up this issue again. 34R. 69-70. The court held, "Based on the doctor's testimony and based on the Court's review of the other photographs that have been introduced, the Court will allow you to show that photograph to the jury . . . ." *Id.* The defense objected on 403 grounds again, and the court overruled the objection. 34R.70.

In urging the admissibility of the photos, the State linked their relevance to the fact that it had charged Mr. Rodriguez with capital murder under section 19.03(1)(a)(7). This section defines capital murder as murder of more than one person during the same criminal transaction. Tex. Pen. Code § 19.03(a)(7). The indictment charged that Mr. Rodriguez:

> on or about the 14th day of September, A.D. 2005, did then and there intentionally and knowingly cause the death of an individual, Summer Baldwin, by striking the said Summer Baldwin wit and against a hard object the exact nature of which is unknown to the Grand Jurors and by choking the said Summer Baldwin and by causing the asphyxiation of the said Summer Baldwin, and the said Rosendo Rodriguez III did

then and there intentionally and knowingly cause the death of an individual, an unnamed child, by striking the said Summer Baldwin with and against a hard object the exact nature of which is unknown to the Grand Jurors and by choking the said Summer Baldwin and by causing the asphyxiation of the said Summer Baldwin, while the said unnamed child was in utero within the said Summer Baldwin.

1C. 3. The court's charge on this count instructed the jury that "'Individual' means a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." 2C. 545. In the application paragraphs, the charge instructed the jury that if it believed beyond a reasonable doubt that Mr. Rodriguez intentionally and knowingly caused the death of the unborn child, then he would be guilty only of murder. 2C. 545-46. Finally, the court instructed the jury on the law of transferred intent, and by this instruction, the jury was instructed that if it believed beyond a reasonable doubt that Mr. Rodriguez intentionally and knowingly caused Baldwin's death and if by causing this death, he caused the "death of a different individual, an unnamed child who was in utero with the said Summer Baldwin," then the jury would find Mr. Rodriguez of capital murder. 2C. 547-48. In other words, the jury was authorized to find Mr. Rodriguez guilty of capital murder under this count in the indictment regardless of whether there was any evidence that Mr. Rodriguez knew Baldwin was pregnant.

Mr. Rodriguez challenged the constitutionality of this count in the indictment prior to trial, and the fact that he did not know that Baldwin was

pregnant was a central theme of his defense. 1C. 71-80; 36R. 24-25; 32. Furthermore, the defense objected to the instruction on transferred intent as applied to this count of capital murder. 35R. 183-85. The State consistently insisted that this did not matter, and it argued as much to the jury:

> He chose to beat her. He chose to rape her. And he chose to kill that unborn child. And Mr. Warroup just slid over that, because he knows you take them as you get them. You can't fly a plane into the World Trade Center and say I was only going to kill one person. You can't throw a bomb in a house and kill five, and, say, "I was only going after you." You take your victims as they come. And if you intentionally kill that first victim and you cause the death of another one, you're guilty of two or more. The law is extremely clear on that.

36R. 41. The jury found Mr. Rodriguez guilty of capital murder on both counts. 2C. 558. Subsequently, the Court of Criminal Appeals issued its opinion in *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008), in which the court held that the law of transferred intent may not be used to elevate a single murder to capital murder based solely on the intent to kill one person. *Id.* at 331. In its direct appeal brief, the State conceded that the evidence was legally insufficient to support the jury's verdict finding that Mr. Rodriguez was guilty of this count of capital murder. *Brief for the State*, p. 11-12. There was simply no evidence presented at trial that Mr. Rodriguez knew that Baldwin was pregnant.

Because the State not only failed to prove that Mr. Rodriguez was guilty of capital murder for killing more than one person in the same criminal transaction, it could not prove it under the circumstances of the case, it was nevertheless able to take advantage of highly prejudicial and inflammatory photographs showing Baldwin's dissected uterus with a fetus inside of it and the fetus laid out on a table. This evidence turned out to be wholly irrelevant to any issue in the case. Particularly, it was not relevant to whether Mr. Rodriguez killed Baldwin while committing or attempting to commit aggravated sexual assault. Because it did not have any tendency to make the existence of any fact of consequence to the case more probable or less probable, it should have been excluded. Tex.R.Evid. 401 & 402. And even if it could be argued that this evidence had some relevancy to the case, its overwhelming prejudicial effects substantially outweighed it. *See Erazo v. State*, 144 S.W.3d 487, 492-96 (Tex.Crim.App. 2004) (holding that color photograph of fetus removed from mother's womb was substantially more prejudicial than probative); *Reese v. State*, 33 S.W.3d 238, 240-44 (Tex.Crim.App. 2000) (holding in death penalty case that photographs of fetus laid out in a casket next to deceased mother was substantially more prejudicial than probative and merited a new punishment hearing).

Under Texas Rule of Evidence 403, evidence, though otherwise relevant, "may be excluded if its probative value is substantially outweighed by the danger

of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Notwithstanding the fact that evidence may be relevant, a court, upon timely objection, must perform a balancing test under Rule 403. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (opinion on rehearing). Generally, when conducting this balancing test, the court should consider the following factors:

> (1) how compelling the evidence serves to make a fact of consequence more or less probable--a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

> (2) the potential the offense evidence has to impress the jury "in some irrational but nevertheless indelible way;

> (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;

> (4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Id*. at 389-90. *See also Wyatt v. State*, 23 S.W.3d 18, 26 (Tex.Crim.App.2000).

When a Rule 403 objection concerns the admission of photographic evidence, "it is the task of the trial court to weigh the probative value of the photos against their potential for unfair prejudice." *Narvaiz v. State*, 840 S.W.2d 415, 429

(Tex. Crim. App. 1992). The basic Rule 403 balancing test is essentially the same, and a court should weigh the potential the photographs have for impressing upon the jury in an irrational yet indelible manner and encouraging them to decide the issues on an improper emotional basis against the relevance and relative weight of the evidence and the disadvantage the proponent might be placed in without them. *Id.* (quoting *Fuller v. State*, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992)). *See also Erazo v. State*, 144 S.W.3d at 489; *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999); *Richardson v. State*, 879 S.W.2d 874, 880-81 (Tex. Crim. App. 1993). A number of factors may be considered, including, but not limited to, the number of photographs offered, their gruesomeness, the amount of graphic detail shown, whether they are in color or in black and white, whether they are normal size or enlarged, whether they depict the victim clothed or naked, and whether they are close-up shots of the body or injury. *See Hayes v. State*, 85 S.W.3d 809, 815 (Tex.Crim.App. 2002); *Salazar v. State*, 38 S.W.3d 141, 152 (Tex. Crim. App. 2001); *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991).

Additionally, relevant criteria in determining whether the prejudicial effect of a piece of evidence substantially outweighs the probative value include the fact "that the ultimate issue was not seriously contested by the opponent; that the State had other convincing evidence to establish the ultimate issue to which the [evidence] was relevant; that the probative value of the . . . evidence was not,

either alone or in combination with other evidence particularly compelling; that the [evidence] was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely be efficacious." *Salazar*, 38 S.W.3d at 152 (quoting *Reese v. State*, 33 S.W.3d at 241). Generally, "[a] photograph should be excluded if it is so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of the case after viewing it." *Tidrow v. State*, 916 S.W.2d 623, 631 (Tex. App.--Forth Worth 1996, no pet.).

There is a presumption that relevant evidence is more than prejudicial, and the rule is designed to favor the admission of all relevant evidence. *Hayes v. State*, 85 S.W.3d at 815; *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997); *Brimage v. State*, 918 S.W.2d 466, 505 (Tex. Crim. App. 1996) (opinion on rehearing). The opponent of the evidence bears the burden to demonstrate a clear disparity between the danger of unfair prejudice and the probative value of the evidence. *See Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992); *Brimage*, 918 S.W.2d at 506. The trial has broad discretion in admitting or excluding evidence, and a reviewing court will reverse a trial court rarely and only after finding a clear abuse of discretion. *Mozon v. State*, 991 S.W.2d 841, 846-47 (Tex. Crim. App. 1999); *Castillo v. State*, 910 S.W.2d 124, 127 (Tex. App.--El Paso 1995, no pet.). However, discretion is not unlimited, and the reviewing court

does not cease its analysis upon determining that the trial court conducted the requisite balancing test. *Mozon*, 991 S.W.2d at 847; *Santellan*, 939 S.W.2d at 169. "The trial court's ruling must be measured against the relevant criteria by which a rule 403 decision is made. In other words, the reviewing court must look at the proponent's *need for the evidence* in addition to determining the relevance of the evidence." *Mozon*, 991 S.W.2d at 847 (emphasis added); *see also Moreno v. State*, 858 S.W.2d 453, 464 (Tex. Crim. App. 1993) (holding that the Rule 403 balancing criteria include, among other things, "that the State had other evidence to establish the ultimate issue and that the probative value of this evidence was not, either alone or in combination with the other evidence, particularly compelling").

In this case, the photos bore no relevance to any issue at guilt-innocence, and even assuming that Baldwin's pregnancy was itself relevant, which as to guilt-innocence is a dubious proposition, the jury knew about it and that the fetus was viable through the ME's testimony. Thus, as in *Reese*, the photos bore little relevance to the special issues in punishment. *Reese v. State*, 33 S.W.3d at 242. The photos were of little or no probative value at either phase of the trial; however, the photos were highly inflammatory and served this purpose well. The photos were part of a PowerPoint presentation that would have been projected on a large screen in the courtroom. One photo depicted Baldwin's uterus that had been removed from her body and cut open to reveal the fetus lying inside. The other

photo depicted the fetus removed from the uterus and laid out on a table. This evidence had a strong tendency to appeal to the jury's emotions. As the Court of Criminal Appeals recognized in *Reese*:

> The unborn child in the photograph appears tiny, innocent, and vulnerable. Society's natural inclination is to protect the innocent and the vulnerable. The contents of the photograph has an emotional impact that suggests that the jury's decision be made on an emotional basis and not on the basis of the other relevant evidence introduced at trial.

*Id*. Because the State could not prove that Mr. Rodriguez knew Baldwin was pregnant, the State had virtually no need for the photos. Admittedly, the exhibition of the photos took little time at trial, but this is the only factor in the Rule 403 analysis to weigh in the State's favor. The trial court not only erred in admitting these photographs, Mr. Rodriguez was harmed by them.

The foregoing demonstrates that the trial court's error in admitting the photos was not only a meritorious claim, it was a strong one. Trial counsel objected under Rule 403. Thus, that issue was appealable. However, even though trial counsel contended the same criminal transaction because he did not know that Baldwin was pregnant, counsel failed to object to the photos' relevancy. As a result, the relevancy claim has been defaulted. Tex.R.App.P. 33.1(1); Tex.R.Evid.

103(a). *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (holding that most error may be defaulted on appeal when trial counsel fails to object).

Additionally, the Rule 403 claim has been defaulted for purposes of habeas review because appellate counsel inexplicably failed to raise them on direct appeal. These are issues that should be raised on direct appeal, not on habeas. *See Ex parte Gardner*, 959 S.W.2d 189, 199-200 (Tex. Crim. App. 1998 (op. on rehearing); *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). Given the strong merits of these claims, they should have been presented on direct appeal.

As a result, trial and appellate counsel were deficient for failing to present them. Mr. Rodriguez has been prejudiced by this deficiency, particularly the failure to present the preserved Rule 403 issue on direct appeal, given its obvious strength. Mr. Rodriguez is entitled to a new trial as to guilt-innocence and, if not that, then as a to punishment. At the very least, he is entitled to a new direct appeal in which these issues are presented and considered.

### GROUNDS FOR REVIEW TEN:

PETITIONER'S CONVICTIONS FOR CAPITAL MURDER SHOULD BE SET ASIDE IN THEIR ENTIRETY BECAUSE HE WAS CONVICTED OF TWO COUNTS OF CAPITAL MURDER, ONE OF WHICH THE STATE HAS CONCEDED THERE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION; THEREFORE, THE JURY CONVICTED PETITIONER OF TWO COUNTS OF CAPITAL MURDER, ONE OF WHICH WAS CONSTITUTIONALLY INVALID, RENDERING BOTH CONVICTIONS UNRELIABLE IN VIOLATION OF THE HEIGHTENED RELIABILITY REQUIREMENT IN DEATH PENALTY CASES AS GUARANTEED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH

AMENDMENT, THE RIGHT TO A FAIR TRIAL PROVISIONS OF THE SIXTH AMENDMENT, AND THE REQUIREMENTS OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

### GROUNDS FOR REVIEW ELEVEN:

PETITIONER'S DEATH SENTENCE SHOULD BE SET ASIDE AND HE SHOULD BE AFFORDED A NEW SENTENCING HEARING BECAUSE HE WAS CONVICTED OF TWO COUNTS OF CAPITAL MURDER, ONE OF WHICH THE STATE HAS CONCEDED THERE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION; THEREFORE, THE JURY ASSESSED PUNISHMENT BASED UPON ONE INVALID CAPITAL MURDER CONVICTION, WHICH RENDERED THE PUNISHMENT HEARING UNRELIABLE IN VIOLATION OF THE HEIGHTENED RELIABILITY REQUIREMENT IN DEATH PENALTY CASES AS GUARANTEED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT, THE RIGHT TO A FAIR TRIAL PROVISIONS OF THE SIXTH AMENDMENT, AND THE REQUIREMENTS OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

### GROUNDS FOR REVIEW TWELVE:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS DIRECT APPEAL COUNSEL FAILED TO RAISE ISSUES ON APPEAL RELATING TO THE UNRELIABILITY OF HIS CONVICTION AND SENTENCE.

Mr. Rodriguez was charged with two counts of capital murder-murder in the course of committing or attempting to commit aggravated sexual assault and murder of more than one person in the same criminal transactions. 1C. 3. Prior to the submission of guilt/innocence instructions to the jury, Mr. Rodriguez's trial counsel complained about Tex. Pen. Code Section 6.04(b)(2) language in the charge. RR Vol. 35/183, 185. The trial court denied Mr. Rodriguez's complaint.

RR Vol. 35/184. The two capital murder charges were submitted to the jury under Tex. Pen. Code Sections 19.03(a)(2) and 19.03(a)(7)(A).

The jury returned separate verdicts as to each count. 2C. 541, 558. In a single punishment verdict form, the jury answered the special issues in such a way that a death sentence was imposed. 2C. 566-67. The State has conceded that there was legally insufficient evidence to prove that Mr. Rodriguez committed murder of more than one person in the same criminal transaction. *Brief for the State*, p. 11. In fact, during final arguments, the State's counsel admitted that there was no proof that Mr. Rodriguez knew of Baldwin's pregnancy, but that it did not matter. However, the State argued that the conviction on the first count and the sentence should stand. *Id.* at 12, 76-80. Because of the illegality of the second count of capital murder, Mr. Rodriguez remaining conviction and his death sentence should be set aside.

Because of the uniqueness of the death penalty and its irrevocability as a punishment, the Constitution requires "heightened reliability" in capital sentencing. *See Zant v. Stephens*, 462 U.S. 862, 884 (1983). The death penalty is "qualitatively different" from a sentence of a term in prison, and because of this difference, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). *See also Thompson v.*

173

*Oklahoma*, 487 U.S. 815, 856 (1988) ("Under the Eighth Amendment, the death penalty has been treated differently from all other punishments."). A state has a constitutional obligation to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1976).

The Supreme Court has recognized that the requirement of heightened reliability means that rather than diminishing procedural protection, capital cases may require additional due process safeguards. *See Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring) ("Because sentences of death are 'qualitatively different' from prison sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice or mistake.") (citation omitted); *see also California v. Brown*, 479 U.S. 538, 543 (1987) (discussing the heightened reliability required of capital sentencing systems by the Eighth Amendment); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1984) (Burger, C.J., concurring) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases."). *See generally Beck v. Alabama*, 447 U.S. 625, 638 (1980) (collecting cases in which the Court invalidated procedural rules that diminished sentence reliability).

Because the State alleged capital murder for the murder of more than one person in the same criminal transaction, the State was able to present what would have been otherwise inadmissible and highly inflammatory evidence to the jury. In order to obtain a conviction under the multiple-victim theory of capital murder, where the victims are a mother and her unborn child, a defendant must have specifically intended to cause the deaths of both mother and child. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007).

As demonstrated above, the State was able to project photographs of Baldwin's removed and dissected uterus, with a fetus inside and of the fetus removed and lying on a table, on the big screen inside the courtroom. With respect to the remaining capital murder count for murder in the course of committing or attempting to commit aggravated sexual assault, this evidence was completely irrelevant. But this is not all the irrelevant evidence the jury was allowed to consider during guilt-innocence. From the very beginning, the jury heard evidence that Baldwin was pregnant. Because the pregnancy and the death of the unborn child were irrelevant to the first capital murder count, the jury should not have heard this evidence. *See White v. Thaler*, No. 06-20736, Slip Op. at 32-35 (5th Cir., Jun. 30, 2010) (holding that murder victim's pregnancy was irrelevant, it was highly prejudicial and likely encouraged the jury to return a verdict, not based on

the evidence alone, but also on an emotional basis wholly disconnected from the issue of factual guilt).

With respect to sentencing, the jury considered this evidence as additional aggravating evidence. Without a legally sufficient underlying conviction, the photographic evidence was largely irrelevant to the sentencing issues, but in any event, should have been excluded under the Texas Rule of Evidence 403. *See Reece v. State*, 33 S.W.3d at 242. Additionally, the jury would have considered the fact that it had just convicted Mr. Rodriguez of two counts of capital murder, rather than one, in making its decision to assess the death penalty. The salient fact of the second conviction of course is the death of another individual. This would not have been lost on the jury, and it was free to consider this as aggravating evidence as well. But this consideration would have been unwarranted because the Due Process Clause of the United States Constitution prohibited the second capital murder conviction. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In *Jackson v. Virginia*, the Supreme Court held that Constitutional due process requires reviewing courts to determine whether the record contains evidence that can reasonably support a finding of guilt beyond a reasonable doubt. *Id.* at 308.

Inevitably, the jury considered irrelevant and highly prejudicial evidence in returning a verdict at guilt-innocence and in assessing the death sentence. These

considerations render his sentence and death verdict impermissibly unreliable. As a result, Mr. Rodriguez is entitled to relief.

Mr. Rodriguez's appellate counsel raised these issues with respect to sentencing, but he did not challenge the conviction for capital murder in the course of committing or attempting to commit aggravated sexual assault. Because the State's concession on the second capital murder count happened after his brief was filed, and because the case is still pending in the Court of Criminal Appeals awaiting decision, it is doubtful that Mr. Rodriguez was required to raise any of these issues on direct appeal. *See Ex parte Rich*, 194 S.W.3d 508, 512 (Tex.Crim. App. 2006) (holding that claim may be raised in habeas when the record is not adequate for raising it on direct appeal); *Ex parte Brown*, 158 S.W.3d 449, 453-54 (Tex.Crim.App. 2005) (same). However, if appellate counsel should have raised these claims, either in part or in whole on direct appeal and procedurally defaulted them for failing to do so, *see Ex parte Gardner*, 959 S.W.2d 199-200; *Ex parte Banks*, 769 S.W.2d at 540, then this failure is deficient given the merits of the claims. Mr. Rodriguez was prejudiced as well by the failure. Again, he is entitled to relief.

## GROUND FOR REVIEW THIRTEEN

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS TRIAL COUNSEL FAILED TO INVESTIGATE AND TO CROSS-EXAMINE OR OTHERWISE CHALLENGE

PROPERLY THE EVIDENCE THAT SUMMER BALDWIN WAS STILL ALIVE
WHEN SHE WAS PLACED IN THE SUITCASE.

### 1. Background

Dr. Natarajan testified that he could not rule out the possibility that Baldwin was still alive with she was placed in the suitcase.  During closing arguments at guilt-innocence, the District Attorney argued:

> What kind of man does that?  The same man that will tuck a woman in a suitcase that's alive. And what Dr. Natarjan said was, "I can't rule that out."  That's about as good as you get to a yes.

(RR 36/38).

Thus, the jury was told that Baldwin was still alive when she was in the suitcase, and this brought before them the horror of being buried alive.

Dr. Natarajan's testimony about his conclusions in the autopsy came as a surprise to the defense.  They were not prepared to cross-examine him about the possibility that Baldwin was still alive.  Proper preparation and effective cross-examination could have rebutted the State's argument that she "was still alive" and blunted the horror the jury surely felt.

### 2. Discussion

Asphyxia is a lack of oxygen to the brain, and it can be caused in three distinct fashions:  (1) choking (through an obstruction in the trachea); (2) strangulation; and (3) positional asphyxiation.  Asphyxia is a diagnosis of exclusion, which means that if the medical examiner does not know what caused a

178

death, asphyxia will be listed as a possibility.  Thus, when asphyxia is listed as a cause of death in the autopsy report, it is only meant to be a possibility that could not be excluded by other evidence.

In this case, the indictment listed three different means of causing death–blunt force trauma, choking, and asphyxiation.  There was no evidence that Baldwin choked, which leaves blunt force trauma and asphyxiation.  The defense in this case expressed surprise that Dr. Natarajan testified that Baldwin's positioning in the suitcase could have caused her death.  This indicates a failure in their investigation.  It also indicates that they were not prepared to properly cross-examine Dr. Natarajan about the cause of death.  As stated, there are three ways to cause asphyxiation, choking, strangulation, and positional asphyxiation.  The defense should have been prepared to ask Dr. Natarajan questions relating to each because each was relevant to the case.

There were two relevant causes of death listed in the autopsy report–blunt force trauma and asphyxiation.  Dr. Natarjan did not rule out blunt force trauma as the cause of death.  All he opined was that he could not say for sure blunt force trauma actually caused Baldwin's death.  Importantly, Dr. Natarajan did not say in his testimony that it was *more likely* that Baldwin died of asphyxia than of blunt force trauma, which was listed first.  The defense failed to explore with Dr.

Natarajan whether blunt force trauma was equally likely to have caused Baldwin's death.

Furthermore, the defense did not explore possible ways in which a person can die of positional asphyxiation.  Dr. Natarajan cast doubt on Mr. Rodriguez's version of how he killed Baldwin with a so-called "choke hold" across her neck, which he demonstrated in his videotaped confession.  However, the defense did not ask Dr. Natarajan if a person could die of positional asphyxia if she were strangled in another means until she went limp and was then dropped to the floor and left there for up to an hour.

Finally, the defense failed to explore circumstantial evidence that Baldwin was actually dead by the time Mr. Rodriguez showed back up in the room with the suitcase.  They did not ask whether a layperson can correctly determine whether a person is merely unconscious or actually dead.  The defense did not explore whether other circumstantial evidence indicated Baldwin was already dead.

The defense counsels' failure to investigate and prepare for cross-examination on the causes of Baldwin's death was deficient.  Proper and thorough cross-examination could have dispelled the fear that Baldwin was buried alive. Importantly, this could have rebutted what turned out to be powerful aggravating evidence that the State exploited.

The trial court made findings and conclusions that Petitioner's trial counsel were not deficient for failing to conduct more investigation or for not engaging in more extended cross-examination of Dr. Natarajan and further that Petitioner was not prejudiced because the same evidence would have been admitted, and:

> [h]e had (and still has) no other tactic or strategy to employ to meet it beyond what was don at trial. Thus, no possibility of a different outcome exists, leading to the conclusion that Petitioner was not prejudiced by Stangl's failure to investigage more (because nothing more could be found to exclude, mitigate, or negate Dr. Natarajan's testimony), or to conduct more cross-examination that would not have changed that testimony. Stangl did not render ineffective assistance to Petitioner.

PRE 2 at 32-33.

The trial court's findings and conclusions are contrary to and involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Moreover, the trial court's findings in conclusions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d)(2).   Accordingly, Petitioner is entitled to federal habeas relief as to this claim.

### GROUND FOR REVIEW FOURTEEN

PETITIONER'S DEATH SENTENCE SHOULD BE SET ASIDE BECAUSE THE TEXAS MITIGATION SPECIAL ISSUE GIVEN IN HIS CASE FAILED TO ASSIGN A BURDEN OF PROOF IN VIOLATION OF PETITIONER'S RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND TO RELIABILITY OF THE DEATH SENTENCE AND FREEDOM FROM ARBITRARINESS AND

CAPRICIOUSNESS IN CAPITAL SENTENCING AS GUARANTEED BY THE EIGHTH AMENDMENT.

### GROUND FOR REVIEW FIFTEEN

PETITIONER'S DEATH SENTENCE SHOULD BE SET ASIDE BECAUSE THE TEXAS MITIGATION SPECIAL ISSUE GIVEN IN HIS CASE FAILED TO ADEQUATELY DEFINE WHAT IS MEANT BY MITIGATION OR MITIGATING EVIDENCE AND THE TERMS USED CREATED A REASONABLE POSSIBILITY THAT THE JURY WOULD CONSTRUE MITIGATING EVIDENCE NARROWLY SUCH THAT IT WOULD NOT GIVE FULL CONSIDERATION AND EFFECT TO ALL OF PETITIONER'S MITIGATING EVIDENCE IN VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

### GROUND FOR REVIEW SIXTEEN

PETITIONER RIGHT TO A MEANINGFUL DIRECT APPEAL IS FRUSTRATED BECAUSE THE COURT OF CRIMINAL APPEALS' REFUSAL TO ALLOW REVIEW OF THE MITIGATION SPECIAL ISSUE AND THIS REFUSAL VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, TO RELIABILITY OF THE DEATH SENTENCE AS GUARANTEED BY THE EIGHTH AMENDMENT, AND TO A FAIR TRIAL SECURED BY THE VARIOUS PROVISIONS OF THE SIXTH AMENDMENT.

## 1. Background

In Mr. Rodriguez' case, the jury was asked two special issues, the answers to which could result in the death penalty. With respect to mitigating evidence and its impact on the jury's consideration of the special issues, the jury was instructed as follows:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, by the evidence presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, personal moral culpability, or circumstances of the crime which you believe could make a death sentence inappropriate

in this case.  If you find there are any, thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue.  If you determine, when giving effect to mitigating evidence, if any, that a life without parole sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration.

*2C. 561-62.*  The first special issue read as follows:

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

*2C. 566.*  The second special issue was the one relating to mitigating evidence, and with respect to this issue, the jury specifically was instructed concerning the definition of mitigating evidence as follows:  "In answering Special Issue Number 2 you shall consider mitigating evidence to be evidence that juror [sic] might regard as reducing the defendant's moral blameworthiness" *2C. 563.*  The charge then set forth the special issue in the following terms:

Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

*Id.*  With respect to the first special issue, the charge assigned to the State the burden of proof and set the standard at "beyond a reasonable doubt."  *2C. 566.*  However, the mitigation special issue did not assign a burden of proof.  *2C. 567.*

The charge set forth the special issues consistent with what is required by law.  *See* TEX. CRIM. P. CODE ANN. art. 37.071, § 2.

Mr. Rodriguez filed numerous objections to the court's charge at punishment, which included the issues raised here.  *2C. 568-77.*  The trial court overruled the objections.  *38R. 4.*

### 2.  Discussion

The charge only assigned a burden of proof with respect to the first special issue, and consistent with the legislative provisions in Article 37.071 and the Court of Criminal Appeals's holdings interpreting that provision, the charge did not assign a burden of proof to the mitigation special issue.  *See Eldridge v. State*, 940 S.W.2d 646, 654 (Tex.Crim.App. 1996); *McFarland v. State*, 928 S.W.2d 482, 498-99 (Tex.Crim.App. 1996).

Like the future dangerousness special issue, the State should bear the burden of proof with respect to the mitigation special issue to establish it beyond a reasonable doubt.  Because of the heightened reliability requirement in capital sentencing, only the reasonable doubt standard can adequately impress upon the jury the significance and solemnity of their decision between life and death.  "The

184

function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of the factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)).   The beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship*, 397 at 364 (internal quotation marks and citation omitted).   As Justice Harlan wrote in *Winship*:

> In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.  It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation.

*Id*. at 372 (Harlan, J., concurring) (footnote omitted).

The level of certitude that the beyond a reasonable doubt standard impresses upon juries is no less applicable in the context of capital sentencing.  In *Ring v. Arizona*, the Court wrote, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how

the State labels it–must be found by a jury beyond a reasonable doubt." 536 U.S. 584 (2002) (citing and relying upon *Apprendi v. New Jersey*, 530 U.S. 466, 482-83 (2000)).  Under the capital sentencing framework in Texas by which Mr. Rodriguez was sentenced to death, both a "yes" answer to the mitigation special issue as well as a "non" answer based on jury disagreement concerning it results in a life sentence.  Thus, life is the default sentence, and the only possible answer that may result in the imposition of death is a "no" answer.  In this sense, the fact at issue–the lack of sufficient mitigation evidence–increases the punishment from life in prison to death.  Under *Ring*, such a fact must be found by a jury beyond a reasonable doubt.

Furthermore, though the mitigation special issue does require the jury to make a value judgment, this fact does not distinguish it from the future dangerousness special issue as given in this case.  The jury received an instruction concerning mitigation as it applied to the jury's framework in answering the future dangerousness special issue, which would have required a similar value judgment in reaching an answer, and yet the jury was likewise instructed that it had to find that Mr. Rodriguez would pose a future danger beyond a reasonable doubt before answering that issue "yes."

Finally, the lack of a standard of proof and an assignment of the burden with respect to the mitigation special issue raises the problem of unfettered and

open-ended jury discretion with respect to capital sentencing.  *See Furman v. Georgia*, 408 U.S. 238 (1972). As such, a jury may require the State to prove that the mitigation special issue should be answered no beyond a reasonable doubt just as easily as it might require the defendant to prove beyond all possible doubt that mitigating circumstances exist.  The latter scenario, though entirely possible under the current framework, would offend most sensibilities and notions of fair play and would likely be found unconstitutional.    The level of capriciousness and arbitrariness possible under the current system violates the Eighth Amendment.

Though the Court of Criminal Appeals has rejected this argument, *see Perry v. State*, 158 S.W.3d 438, 446-47 (Tex.Crim.App. 2004); *Blue v. State*, 125 S.W.3d 491, 501 (Tex.Crim.App. 2003), Mr. Rodriguez requests that it be reconsidered.  He is entitled to relief and a new punishment hearing.

In addition to the lack of a burden of proof with respect to the mitigation special issue, the charge given in Mr. Rodriguez's case, as authorized by Article 37.071, defined mitigating evidence, as used in the charge, as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."  This instruction impermissibly limited the jury's consideration of Mr. Rodriguez's mitigation evidence and effectively instructed them to disregard important classes of mitigating evidence when considering the mitigation special issue.  As a result, the charge created a reasonable likelihood that the jury would understand the

instructions such that they could not give full consideration and full effect to all of Mr. Rodriguez's mitigating evidence.

Simply put, mitigating evidence is any evidence that a sentencer could reasonably find warrants a sentence of less than death. *See Tenard v. Dretke*, 542 U.S. 274, 284-85 (2004); *Nelson v. Quarterman*, 472 F.3d 287, 301 (5th Cir. 2006). It is evidence concerning the defendant's background and character and the circumstances of the offense, but it is not limited to evidence that reduces the defendant's moral blameworthiness for the crime at hand alone. It is clear that the Supreme Court has never so limited the scope of mitigating evidence. If mitigating evidence is relevant under this low threshold for relevancy, the constitution requires that a capital sentencing jury must be able to give full consideration and full effect to it. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 U.S. 1654, 1664, 1672 (2007); *Brewer v. Quarterman*, 550 U.S. 286; 127 U.S. 1706, 1713 (2007); *Nelson*, 472 F.3d at 300-03. A defendant is entitled to sentencing relief if there is a reasonable likelihood that the charge precluded the jury from giving full consideration and full effect to all of the defendant's mitigating evidence. *Nelson*, 472 F.3d at 303.

By limiting mitigating evidence to only evidence that reduced Mr. Rodriguez's moral blameworthiness, the charge effectively instructed the jury to find a nexus between the mitigating evidence and his culpability for committing

the crime.  Such a nexus has been rejected.  *See Tennard v. Dretke*, 542 U.S. at 285-86; *Nelson v. Quarterman*, 472 F.3d at 313 (discussing past erroneous Fifth Circuit cases).  Or at the very least, the charge linked the two unrelated concepts together.  As such, the jury reasonably could have understood the charge to require it to disregard evidence that had nothing to do with Mr. Rodriguez's underlying culpability for committing the crime or any evidence that tangentially bore such relevance.   Mr. Rodriguez presented important mitigating evidence–such as evidence of his respect for adults, his intelligence, his ability to adapt favorably to the structured environment of prison, and his father's abusive nature and alcoholism–that the jury may not have been able to give full consideration and full effect to in assessing whether he live or die.  For this reason, he is entitled to sentencing relief.

Finally, the Court of Criminal Appeals has consistently rejected any review whatsoever of the sufficiency of the evidence to support the mitigation special issue.  *Prystash v. State*, 3 S.W.3d 522, 536 (Tex.Crim.App. 1999).  Because the jury's unbridled discretion in answering the mitigation special issue is unchecked by *any* appellate review, the Texas capital sentencing scheme falls short of the Due Process Clause in another respect.  In *Clemons v. Mississippi*, 494 U.S. 738 (1990), the Court held that "[a]n automatic rule of affirmance in a weighing state would be invalid [because] it would not give defendants the individualized treatment that

would result from actual reweighing of the mix of mitigating factors and aggravating circumstances." *Id.* at 752. However, the Court of Criminal Appeals has held that *Clemons* has no application to the Texas scheme because Texas is not a weighing state. *McGinn v. State*, 961 S.W.2d 161, 171 (Tex.Crim.App. 1998) (McCormick, J., concurring). The impact of the court's refusal to provide any appellate review is that it makes the jury's consideration of the mitigating evidence almost meaningless when combined with the failure to place the burden on the state, the failure to impress upon the jury the seriousness of its inquiry through the reasonable doubt standard, and the confusing supplemental instruction limiting what mitigating evidence the jury can consider.

The statutory "mitigation" special issue is unconstitutional because it fails to place the burden of proof on the state regarding aggravating evidence. The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 650 (1990) (noting the state's method of allocating burdens of proof during capital sentencing phase cannot lessen the State's burden to prove the existence of aggravating circumstances). In order to understand why *Walton* applies to the statutory "mitigation" special issue, the Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are

190

"sufficient…mitigating circumstances", the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. *Cf. Johnson v. Texas*, 509 U.S. 350, 370-71 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).   Because the statute is silent about whether the state or the defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

The original Texas special issue capital sentencing system was constructed in response to the Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238 (1972). The lack of a vehicle to permit consideration of a good many types of mitigating circumstances was quickly noticed, but it took some 17 years for the Supreme Court to mandate the use of a vehicle that would permit sentencing jurors to fully consider and give effect to mitigating circumstances. *See Penry I.*   The Texas legislative response to *Penry I* was a grudging one.   Here is a list and description of what this writer calls the "crippling amendments" that were enacted

with the legislation providing for the special issue set forth above. First, in a departure from the long accepted practice that prevailed in Texas as of the date of the *Penry* amendments, the Texas legislature relieved the prosecutors from the burden of proving the lack of sufficient mitigating circumstances beyond a reasonable doubt. *See e.g. Steadham v. State*, 119 Tex.Crim. 475, 43 S.W.2d 944 (1931). Second, in the face of *Skipper v. South Carolina*, supra, the Texas legislature enacted a mandatory supplemental instruction limiting Texas capital sentencing jurors, in deciding the mitigation inquiry, to the consideration of evidence that they believe to reduce "moral blameworthiness."  Intended or not, this instruction directs many jurors away from consideration of mitigating facts other than the circumstances of the offense, especially background facts like abuse as a child or mental illness less severe than insanity, where the nexus to the crime is not present or less pronounced.

Third, the Texas legislature provided that jurors must be told that a life verdict requires 10 votes, and not told the practical result of a failure to reach a unanimous verdict, when the law actually only requires that 1) a life verdict results if there is one vote dissenting from a death verdict, and 2) no mistrial or new trial will result from a failure to reach a unanimous verdict. The result of these crippling amendments is to deny full consideration of mitigating evidence, especially the kind Petitioner presented to his sentencing jury.

A reasonable, law abiding Texas capital sentencing juror after hearing the horrific crime facts, and the evidence of extraneous misconduct, might well decide to place the burden of proving facts in mitigation of sentence upon Petitioner. Absent a proper jury instruction, such a juror could very well require proof *beyond all doubt* that Petitioner was badly and consistently abused and neglected as a child. A Texas capital sentencing juror that placed such an impossibly high burden of proof and persuasion on Petitioner in the mitigation inquiry would not be violating his oath as a juror to render a true verdict based on the law and the evidence. Such a Texas capital sentencing juror would not be in violation of any law given him by the trial court because the charge does not purport to set any burden of proof or persuasion on any fact for any party. This feature of the charge, even considered alone, demonstrates an egregious violation of the principles of *Furman v. Georgia.* While the *Furman* Court "did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments," *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it did recognize that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Id.* Because of its uniqueness, the death penalty can not be imposed under sentencing procedures that "create a substantial risk that it [will] ... be inflicted in an arbitrary and capricious manner." *Id.* Because the Court found that the capital sentencing procedures then being utilized did create such a

risk, the *Furman* Court invalidated those procedures as incompatible with contemporary standards of decency.

There is another feature of the failure to assign a burden of proof or persuasion in the mitigation inquiry that leads directly to the arbitrary and capricious infliction of death as a penalty that *Furman* forbids.  The state will often offer evidence of its own that tends to rebut the defense mitigation case.   A reasonable law-abiding Texas capital sentencing juror, exposed to the horrific crime facts and the extraneous misconduct, might well decide to believe that Petitioner is a future danger.  Again, such a Texas capital sentencing juror would not violate his or her oath to render a true verdict according to the evidence and the law because the court's charge, the only law the jurors are to follow, leaves the evidentiary threshold for consideration of facts adverse to the defendant completely up to the sentencing juror.

The Texas mitigation inquiry simply does not provide the guided discretion required in *Furman* that saved the Texas system from facial attack in *Jurek* or the vehicle for reasoned moral response that the Supreme Court required in *Penry I.* Whether a sentencing juror will conclude that a mitigating circumstance exists or whether life or death is "warranted" depends heavily on how the court channels his or her thought processes.

Petitioner argues that the constitutional principles, derived from *Furman*,

and more recently acknowledged by the Supreme Court in *Kansas v. Marsh*, 548 U. S. 163 (2006) are offended by the Texas CCA's refusal to grant relief from the constitutional frailties of the Texas capital sentencing system, and the mitigation inquiry in particular. The *Marsh* opinion, authored by Justice Thomas, acknowledged that the high court had long required due process in the capital sentencing process, citing to the concurrence by Justice Thomas in *Graham v. Collins*, 506 U.S. 461 (1993), which, in turn cited *Gardner v. Florida* 430 U.S. 349 (1977)[due process required that the capital defendant be afforded an opportunity to rebut and explain the evidence adduced to support the state's death aggravators] and *Walton v. Arizona*, 497 U.S. 639, 672 (Scalia, J., concurring in part and concurring in judgment). Other Supreme Court cases have upheld the notion that the right to present mitigating evidence and to rebut aggravating evidence can only be vindicated with a rational process, one that will permit a reasoned moral response to the body of evidence before the jury.

As Justice Thomas noted in his concurrence in *Graham*, supra, the major emphasis of our Eighth Amendment jurisprudence has been on "reasoned" sentencing.  The Supreme Court has continually sought to verify that States' capital procedures provide a "rational basis" for predictably determining which defendants shall be sentenced to death. States may satisfy *Furman*'s demands--providing objective standards to ensure that the sentencer's discretion is "guided and

channeled by . . . examination of specific factors." "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to 'instruct the fact-finder concerning the degree of confidence our society thinks he [or she] should have in the correctness of the factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). With respect to guilt phase elements, the beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship,* 397 at 364 (internal quotation marks and citation omitted). The same principle applies to aggravating factors in death penalty cases. See *Ring v. Arizona*, supra., *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).

The principles of *Ring,* derived from *Furman,* require that the same rule must apply to the prosecution's facts offered to rebut the defense mitigation case. Applying these principles to Petitioner's case, the Court can readily see that Petitioner explained his misconduct as the product of the abuse he suffered as the hands of his parents, whereas the prosecutors argued to the contrary, that he was a remorseless antisocial personality.

To decide these issues without the application of a burden of proof to any

party at all is a clear violation of our traditional notions of due process that all members of the *Marsh* court acknowledge are applicable in capital sentencing. Though Petitioner does claim that the constitution requires the state to prove its basic, underlying facts used to rebut the defense mitigation case beyond a reasonable doubt, he does not go so far as to demand that the overall burden of proof and persuasion on the ultimate mitigation inquiry be placed on the prosecution in this case. What Petitioner asks the Court to require the prosecution to prove beyond a reasonable doubt is just the truth of the adverse facts the state presented in rebuttal to his mitigation case.  As to the ultimate mitigation issue, Petitioner merely asks for our usual adversarial process, the traditional means of assuring reliability and due process of law in the resolution of important disputes.

### GROUNDS FOR REVIEW SEVENTEEN:

WERE PETITIONER'S RIGHTS TO A FAIR AND IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND BY ARTICLE I, SECTION 10, OF THE TEXAS CONSTITUTION VIOLATED WHEN THE TRIAL COURT REFUSED TO ALLOW HIM MEANINGFUL *VOIR DIRE*?

### GROUNDS FOR REVIEW EIGHTEEN:

WERE PETITIONER'S RIGHTS TO DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND BY ARTICLE I, SECTION 19, OF THE TEXAS CONSTITUTION VIOLATED WHEN THE TRIAL COURT REFUSED TO ALLOW HIM MEANINGFUL *VOIR DIRE*?

## GROUNDS FOR REVIEW NINETEEN:

WERE PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND BY ARTICLE I, SECTION 10, OF THE TEXAS CONSTITUTION VIOLATED WHEN THE TRIAL COURT REFUSED TO ALLOW HIM MEANINGFUL *VOIR DIRE*?

## GROUNDS FOR REVIEW TWENTY:

WERE PETITIONER'S RIGHTS NOT TO BE SUBJECT TO CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND BY ARTICLE I, SECTION 13, OF THE TEXAS CONSTITUTION VIOLATED WHEN THE TRIAL COURT REFUSED TO ALLOW HIM MEANINGFUL *VOIR DIRE*?

## GROUNDS FOR REVIEW TWENTY-ONE:

WAS PETITIONER DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS TRIAL AND DIRECT APPEAL COUNSEL FAILED TO PROPERLY RAISE THE *VOIR DIRE* ISSUES?

During individual *voir dire*, the defense attempted to question the jurors whether they could give meaningful consideration to particular types of mitigation evidence. The defense also attempted to question jurors about whether they would consider mitigation notwithstanding that a person committed capital murder during the course of aggravated sexual assault in which a fetus was also killed. The State objected to these questions, and the court sustained the objections. As a result, Mr. Rodriguez was denied an opportunity to determine whether the jury would be fair and impartial and could follow the intricacies of death penalty law.

On the first day of individual *voir dire*, the defense attempted to ask the following question: "You were told by Mr. Payne that the allegations in this case are that one of the victims was in utero, an unborn child. If you sat on the case, and I'm not talking so much about this case. But if you sat on a case where those were the facts, would you be able to consider mitigating evidence-" 15R. 158. The State objected, and the following colloquy ensued:

THE COURT: Mr. Powell.

MR. POWELL: Your Honor, again, we're going to specifically object to that question. That is clearly getting this juror to commit to a specific set of facts on whether or not he can consider mitigation evidence.

THE COURT: I don't think that's a specific commitment. I think - -

MR. POWELL: On a case involving a child in utero, can you - - will you consider mitigating facts? That's exactly what a commitment question is. He's given on a type - - a specific type of case, can you consider mitigation evidence? That's exactly what a commitment question is.

THE COURT: Mr. Wardroup?

MR. WARDROUP: Your Honor, we're asking him if he can follow the law and that's all—if he can follow the law in this case, and we're certainly entitled to do that.

MR. POWELL: The law is, will you consider mitigation evidence in a capital murder case, not on a specific set of facts.

MR. WARDROUP: But there are - - I'm sorry.

MR. POWELL: That is what he's doing, your Honor. I mean, he's committing him to this case, whether or not he will consider mitigation evidence on this case. That's exactly what he's doing.

MR. WARDROUP: The Court is aware of cases where the opinion of the Appeal Court is that you have to ask that question to see if they're qualified to serve in this case. Because if he's not able to consider mitigation because of the - - one of the victims was in utero, then he's not qualified under the law. And he's subject to a challenge for cause. And there's no way for us to know that without asking the question.

THE COURT: Well, I can see where Mr. Powell is coming from.

MR. POWELL: We obviously know he has to be - - to make and informal decision whether or not he can - - will consider mitigation evidence. But - -

THE COURT: The Court will order that you ask - - if you're going to ask a question such as that, that you not related anything concerning the facts of this case in any way.

MR. WARDROUP: May it please the Court, I didn't do anything more than what Mr. Payne did by examining the indictment.

THE COURT: But he didn't go into whether or not that would affect his decision with regard to what punishment he might assess.

MR. WARDROUP: So - - and I'm happy to do what the Court wants. I want to be sure, though, I'm just not to say that this case alleges a death of a - -

THE COURT: Can he imagine a set of circumstances where he could or could not determine or assess a life sentence in a capital murder case involving two persons?

MR. WARDROUP: Where one of the persons was pregnant?

THE COURT: No. We're not going to ask anything about that.

MR. WARDROUP: Well, then, I'm not being permitted to ask a question that would qualify for a challenge for cause, because if he can't consider it when one of the victims is in utero, then he's subject to a challenge for cause.

MR. POWELL: That's like saying, if I give you a set of - - a specific set of fact patterns, could you consider probation on a murder case, then it's the same thing. But that's not what the law requires. What the law requires is, can you consider a set of circumstances where you can answer those questions in a such a way that life sentence is imposed, not if I give facts of this case to each juror.

THE COURT: I'm going to sustain you objection as far as what you just said.

MR. WARDROUP: I'm going to object to not being allowed to ask the prospective juror a question about his ability to consider mitigating evidence in cases where a victim is a child in utero, and I'll - - I would also ask leave of the court to bring questions that would follow up that question, since I'm not being allowed to ask that to supplement the objection. And I'll bring that in the morning first thing.

THE COURT: That's fine.

MR. WARDROUP: Also for purposes of the record, I believe that the Court's ruling deprives my client of his rights to an impartial jury under the 6th and 14th Amendments under the United States Constitution as well as to a fair jury under Article 1, Section 13 and 19 of the State Constitution.

THE COURT: That will be noted.

MR. WARDROUP: All right. Now, so I don't run afoul of the Court's ruling, I'm just not to talk about the age of the victim?

THE COURT: Yes.

MR. WARDROUP: But - -

THE COURT: Can you consider mitigating evidence involving the death of two or more persons? And if one of those persons was a child?

MR. WARDROUP: Okay. I intend to ask those questions, but I don't want to waive my objection.

MR. POWELL: Just so I'm clear, Judge, you're saying - - what can he ask? I'm confused, too.

THE COURT: Can he consider mitigating evidence if there's a death of more than one person, and if one more of those persons is a child.

MR. POWELL: Okay.

MR. WARDROUP: Is there anything else ya'll want to take up outside the juror's presence?

MR. POWELL: No.
THE COURT: Ya'll ready to bring him back in?

15R. 159-64. The defense then asked the prospective juror the question as framed by the court. 15R. 164-65.

After questioning the prospective juror, the court informed him that one of the jurors above him could not be there until Monday, so the attorneys could not make a decision about whether to exercise a peremptory strike. 15R. 170-71. The court asked the juror to return on that day.

Before individual *voir dire* began again on the day the juror was to return, the trial court took up Mr. Rodriguez's objections:

MR. WARDROUP: Judge, before we get started on that, we—the Court granted a Motion in Limine last week regarding questions – we proposed hypothetical questions we proposed to ask prospective jurors relative to the – one of the victims being a fetus, and there – at that time, I told the Court that there would be a list of questions that we intended to ask. And we want to go ahead and make that record at this point, and re-urge the Court to allow us to ask these questions of Joe Davidson, who was the prospective juror that we stopped on.

Specifically, we'd ask the prospective jurors if the fact that one of the victims was a five-gram fetus, would that affect their ability to consider mitigating circumstances? Not to find that mitigating circumstances were specifically sufficient but to consider them at all. The same thing asked if the fact that a fetus was killed during a rape, would that affect their ability to consider mitigating circumstances. We'd also propose to ask the prospective jurors if the fact that the victim, Summer Baldwin, was severely beaten would affect their ability to consider mitigating circumstances. Ask the prospective jurors if the fact that a body – that would affect their ability to consider mitigating circumstances. And finally, in this area to ask prospective jurors whether the fact Ms. Baldwin was a prostitute and addicted drugs would affect their ability to consider mitigating circumstances.

And we proposed to ask those questions based on Morgan and Waynewright versus Witt.

THE COURT: The Court previously denied your request to ask those questions because of the fact that you're talking about facts relating to this case. The Court sustains the objection. The Court will not permit you to go into questions that specifically related to the facts of the case.

MR. WARDROUP: Your Honor, there has not been a Motion in Limine per se on this area, but there – it's along the same thing. We have specific questioning regarding mitigation that we anticipate may be applicable in this case. And, again, under Morgan and Waynewright, I'd suggest to the Court that if the jurors can't tell us

that they can consider this, not find it specifically sufficient, but consider these mitigating circumstances that they would be subject to challenge for cause and therefore we should be allowed to ask these questions. First of all, whether the fact that there had been abuse in the Defendant's home as he was growing up, if they can consider that as a mitigating circumstances or to attribute whatever weight they sought to give to it. Secondly, whether the fact that the accused was raised in a household with a father with a mental illness would be a fact that they could consider. And third, whether the fact that there might be evidence that the accused had been a good father and husband would be a type of mitigating circumstance that they could consider. And finally, whether the fact that the Defendant in this case is capable of living or being confined for the rest of his life without incident would be a mitigating circumstance that they could consider in this case.

THE COURT: The Court will allow you to ask if the jurors would automatically vote for the death penalty in every case where they found somebody guilty of the offense of capital murder. But for you to go into specifics relating to this Defendant, the Court will not allow such.

MR. WARDROUP: Please the Court, so the record is clear, both the questions regarding the circumstances of the case in guilt or innocence and mitigation questions that we've just gone over, those are questions that we would propose to ask every juror going back to Joe Davidson, but every juror from this point forward.

THE COURT: The Court will allow you to inquire as to whether or not they would consider mitigating circumstances, but the Court will not permit you to provide examples of mitigation. And especially any mitigation factors that you would intend to solicit in the testimony of the case.

MR. WARDROUP: Please note our objection, your Honor, under the 6th and 14th Amendments of the United States Constitution, as well as our objection that a jury comprised of jurors that we have not been allowed to ask these questions of, is very likely to impose the death sentence in violation of the 8th Amendment of the United States Constitution. Also the deprivation of our right to question jurors, to

qualify jurors under Article 1, Section 10 of the State Constitution, the due process, and cruel and unusual punishment Articles 1, Section 13 and Section 19 of the Texas Constitution.

THE COURT: The Court will allow you to inquire of potential jurors whether or not they would be willing to consider the Defendant's background and character in answering any mitigation questions, and whether or not they would automatically answer the special issues based on the evidence presented at the guilt or innocence phase of the trial.

MR. WARDROUP: Then may we have a running objection as to each prospective juror on these grounds, your Honor?

THE COURT: You will. Okay. Anything else before we bring in Mr. Drake?

17R. 4-8. After the court overruled Mr. Rodriguez's objections and granted a running objection, Mr. Rodriguez exercised his first peremptory strike against the juror. 17R. 9. Later, in individual *voir dire*, the defense reiterated many of its objections and also objected that the trial court restriction of *voir dire* restricted Mr. Rodriguez's ability to receive effective assistance of counsel. 20R. 6-7.

A defendant has a right to a fair and impartial jury, which is guaranteed by the Due Process Clause and the Sixth Amendment. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Irwin v. Dowd*, 366 U.S. 717, 722 (1961). As recognized by both the Texas Constitution and Texas Statutes, Petitioner enjoys the right to ask voir dire questions about he law on which the Petitioner relies. Tex. Const. Art. 1, Sec. 10; VACCP Art. 36.16(c)(2). A broad *voir dire* is the fullest guarantee of a fair

trial. *Hernandez v. State*, 508 S.W.2d 853, 854 (Tex.Crim.App. 1974). Just as the question of guilt may not be entrusted to a jury that is organized to convict, "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).

The Eighth Amendment, applicable to the States though the Fourteenth Amendment, demands the use of a jury in capital sentencing because a death sentence must reflect a community based judgment that the sentence constitutes proper retribution. *Ring v. Arizona*, 536 U.S. 584, 614 (2002); *Spaziano v. Florida*, 468 U.S. 447, 486-87 (1984). Therefore, the ability to properly *voir dire* a juror or jury in a capital case is critical. To that end, the Supreme Court in *Morgan v. Illinois* held that a juror who would automatically vote for the death penalty is not fair and impartial. 504 U.S. at 729. Specifically, the Court held:

> We reiterate this view today. A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any such prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

206

*Id.* A juror must be excluded if his or her views on the imposition of a death sentence regardless of the other evidence in the case are such as they would prevent or substantially impair his or her ability to follow the law. *Id.* at 733-34; *Wainwright v. Witt*, 469 U.S. 412, 421-22 (1985).

The right to present mitigation evidence during a capital trial is firmly secured by the Eighth Amendment. In *Jurek v. Texas*, the Court held: "[A] sentencing scheme that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today held in *Woodson v. North Carolina*, 428 U.S. 280, 303-305 [(1976)], to be required by the Eighth and Fourteenth Amendments. . . . A jury must be allowed to consider on the basis of *all relevant evidence* not only why a death sentence should be imposed, but also why it should not be imposed." 428 U.S. 262, 270-71 (1976) (emphasis added). Thus, the Court concluded that "a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances." *Id.* In *Locket v. Ohio*, 438 U.S. 586 (1978), the Supreme Court addressed the requirements that a jury be able to consider mitigating evidence that animated its decisions in the series of cases that included *Jurek*. A plurality of the Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded

from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis in original). Also, the Court held that an "individualized decision is essential in capital cases." *Id.* at 605. Though *Lockett* was a plurality opinion, the Court later adopted its essential holdings that individualized sentencing is required in death penalty cases and that the sentencer may not be precluded from considering any aspect defendant's character and record and the circumstances of the offense that may support a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Importantly, in *Eddings*, the Court made it clear that the introduction of mitigating evidence is not enough if the sentencer refuses to consider such evidence as a matter or law. *Id.* at 113-14. Thus, the Court contemplated that the setencer would actually consider and give effect to this evidence. *Id.* at 114-15 & no.10 (holding that even though state law allowed a defendant to present mitigating evidence, *Lockett* required the "sentencer to listen"). *See also Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987) (holding that requirement that sentencer not consider nonstatutory, but otherwise relevant mitigating evidence rendered death sentence invalid). In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court held that the rules in *Lockett* and *Eddings* "are now well established . . . ." *Id*. at 4.

208

Clearly, a death sentence may not be automatic. *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). Because no legislature may simply define a capital crime as one meriting an automatic death sentence regardless of other evidence or circumstances, no juror may do so either. Thus, a defendant in capital case must be able to tailor *voir dire* to set circumstances regardless of mitigating evidence. Also, because sentencers must listen to mitigation and cannot refuse to consider particular mitigating evidence, a defendant must be able to ask questions to find jurors predisposed to ignore specific mitigation facts. From this standpoint, the death is different jurisprudence applies with equal force in jury selection. State law restrictions on *voir dire* must give way.

The trial court erred in refusing to allow Mr. Rodriguez to tailor his *voir dire* questioning of each individual juror. Mr. Rodriguez is entitled to a new trial.

A jury is not required to find any mitigating circumstances in order to make a recommendation of mercy that is binding upon the trial court. *Gregg v. Georgia*, 428 U.S. 153, 203 (1976). Therefore, the State's assertions during *voir dire* that jurors had to base their decisions on the special issues based solely on the evidence presented at trial and only that evidence, was in error.

Finally, the restriction on Mr. Rodriguez's right to *voir dire* concerning the facts of the offense and specific mitigation facts rendered his counsel ineffective in violation of the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. at 686

(citing *Geders v. United States*, 425 U.S. 80 (1976); *Herring v. New York*, 422 U.S. 853 (1975); *Brooks v. Tennessee*, 406 U.S. 605 (1972); and *Ferguson v. Georgia*, 365 U.S. 570 (1961)).

As demonstrated, defense counsel objected to the trial court's restriction on his *voir dire* of individual jurors. The court overruled his objections and granted a running objection as to the remaining prospective jurors. Mr. Rodriguez challenged the court's rulings on direct appeal, which is still pending in the Court of Criminal Appeals. *Appellate Brief in a Death Penalty Case*, pp. 38-58. Typically, claims presented on direct appeal may not be urged again on habeas. *See Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). However, if trial counsel failed to make a proper and timely objection, secure a ruling, or otherwise waived any of these claims, counsels' performance was deficient, and Mr. Rodriguez has suffered prejudice as a result. Finally, if appellate counsel should have raised these claims, either in part or in whole, on direct appeal and procedurally defaulted them for failing to do so, *see Ex parte Gardner*, 959 S.W.2d at 199-200; *Ex parte Banks*, 769 S.W.2d at 540, then his failure is deficient given the merits of the claims. Mr. Rodriguez was prejudicial as well by the failure. Again, he is entitled to relief.

## GROUND FOR REVIEW TWENTY-TWO:

TRIAL COUNSELS' FAILURE TO CHALLENGE WHETHER PETITIONER, AS OPPOSED TO THE GARBAGE TRUCK TRASH COMPACTOR, WAS THE SOURCE OF BALDWIN'S 50-PLUS BLUNT FORCE INJURIES WAS

INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Due to the ineffective assistance of State habeas counsel, this claim was not adjudicated in the State courts.  State habeas counsel failed to raise this issue in Petitioner's State habeas writ. As a consequence, counsel raises this unexhausted and procedurally defaulted claim under the Supreme Court's holding in *Trevino*. In *Trevino v. Thaler,* the Supreme Court held that the holding of *Martinez* applies to Texas: "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)). Petitioner submits that State habeas counsel was ineffective for failing to present this claim in his State writ of habeas corpus.

The autopsy findings revealed that Baldwin died from blunt force trauma and asphyxiation. The County medical examiner, Dr. Sridhar Natarajan, opined that the majority of the approximately fifty blunt-force wounds, including abrasions, lacerations, and bruises to her torso, extremities, head and neck, occurred shortly before or at the time of Baldwin's death.  She also suffered contusions, abrasions and hemorrhages to her urethra, anal, and vaginal areas,

including injury to her cervix. Dr. Natarajan distinguished Baldwin's pre-death wounds from her post-death injuries that occurred when the suitcase was transported by garbage truck to the landfill.

At trial, the State called Bryan Chapa who was the supervisor at the landfill where Baldwin's body was found.   He testified that trash was delivered to this landfill by garbage trucks. Prior to delivering to the landfills, the garbage trucks compact the trash several times.  As a consequence, Baldwin's body was crushed by the time it was transported and left at the landfill.

Dr. Natarajan testified at trial that given the manner in which Baldwin's body was disposed of, he would expect that it would have been compressed, tossed around, and battered from the dumpster to the landfill thereby causing injuries to the body (RR 34 at 197).   Dr. Natarajan could not, however, tell the jury whether Baldwin was dead or alive at the time she was placed in the luggage (RR 35 at 93). Despite this fact, he nevertheless claimed he could discern which of Baldwin's injuries occurred before and after her death.  His opinion was that the majority of Baldwin's injuries were sustained prior to her death and thereby were in no way attributable to the repeated crushing she sustained from the compactor.

Sadly, trial counsel failed to conduct any investigation with respect to whether the blunt force injuries sustained by Baldwin were due to here struggle with Petitioner or were the result of being crushed by the garbage truck compactor.

No expert was sought be defense counsel to explore this issue. Instead, defense counsel simply focused his cross-examination of Dr. Natarajan on whether Baldwin's cause of death was asphyxia.

Trial counsels' failure to investigate the source of these injuries cannot be justified under any reasonable tactical decision. This deficiency by counsel was only compounded by the fact that no meaningful cross-examination was conducted to raise doubt as to whether Petitioner simply chocked Baldwin during a struggle or instead brutally and repeatedly beat her prior to dumping her body. Leaving the jury with the impression that Petitioner, and not the garbage truck trash compactor, was the source of the great majority of Baldwin's injuries most certainly was a contributing factor in the return of his death verdict. Accordingly, the outcome of this case was prejudiced by trial counsels' ineffective representation.

State habeas counsel also failed to investigate and develop this issue or raise it in Petitioner's writ as a claim of ineffective assistance of trial counsel. As a consequence, State habeas counsel's performance was deficient. The State Bar of Texas has identified the "Duties of Habeas Corpus Counsel" in the State Bar of Texas' Guidelines and Standards for Texas Capital Counsel.5 The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as

5http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapitalGuidelines.pdf).

213

follows: Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case. Further, the State Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place." *Id.*

Defense counsels' failure to challenge the source of Baldwin's 50-plus blunt-force wounds should have been readily apparent to State habeas counsel as a viable ineffective claim. Thus, under the principles established in *Trevino,* this claim, at least as it applies to the ineffectiveness of trial counsel, is not barred from this court's review.

However, the principles established in *Trevino* and *Martinez* are also applicable to this claim as a whole, including the Due Process arguments. *Trevino* pointed out that generally, "if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino*, 133 S. Ct. at 1911. Of course there are many traps for the unwary defendant, one being the general requirement that claims first

be presented to the state courts, this is referred to as procedural default. *Id.* However, the Supreme Court has pointed out that "the doctrine barring procedurally defaulted claims from being heard is not without exceptions.   A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* (internal quotations omitted).

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, Petitioner must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez,* 132 S.Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.; Trevino,* 133 S.Ct. at 1921. *See Preyor v. Stephens*, 12-70024, 2013 WL 3830160 (5th Cir. July 25, 2013).   State habeas counsel's failure to raise this issue resulted in a total deprivation of Petitioner's right to counsel under the Sixth Amendment.   This claim therefore meets the "substantial" requirement set forth in *Martinez* because such a fundamental deprivation of counsel at both the trial and habeas level shakes the very "bedrock" of our justice system.

To demonstrate prejudice, Petitioner must also show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

215

proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. ___, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2013). As noted supra, Petitioner meets this very high burden of prejudice.

Accordingly, Petitioner has established that the cause for the default of his ineffective assistance of trial counsel was the result of his State habeas counsel's ineffectiveness.   He is therefore entitled to consideration by this Court of the merits of this otherwise procedurally defaulted claim.   *Martinez,* 132 S.Ct. at 1320.

### GROUND FOR REVIEW TWENTY-TWO:

THE EQUITABLE RELIEF AVAILABLE UNDER *MARTINEZ* FOR PROCEDURALLY DEFAULTED CLAIMS THAT RESULT FROM INADEQUATE REPRESENTATION AT THE INITIAL STATE COURT POST-CONVICTION STAGE, SHOULD BE EXTENDED TO PETITIONERS LIKE PETITIONER, WHOSE POST- CONVICTION COUNSEL FILED THE APPROPRIATE POST-CONVICTION INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM, BUT THEN FAILED TO DO ANYTHING ELSE OF CONSEQUENCE TO PRESS THOSE CLAIMS.

Similar to the petitioners in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), Petitioner raises a claim of ineffective assistance of counsel that was not properly pursued by his State habeas counsel. Petitioner's case differs, however, from *Martinez* and *Trevino* in one respect. Although Petitioner's State habeas counsel did raise a *Wiggins* claim with respect

to trial counsels' performance, counsel's investigation and presentation of the issue amounted to ineffective assistance of counsel.

In *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), however, the Supreme Court recognized a narrow equitable exception to the rule in *Coleman* regarding claims of ineffective assistance of trial counsel. It held, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez,* 132 S.Ct. at 1320.

In *Trevino,* the Court extended the rationale of *Martinez* to cases where, as a matter of systemic operation, the first opportunity to challenge trial counsel's effectiveness is in state post-conviction proceedings. *See Trevino v. Thaler,* 133 S.Ct. 1911, 1918, 1921 (2013). Thus, to demonstrate cause in circumstances where *Martinez* and *Trevino* apply, a Petitioner must establish (1) a "substantial" claim of ineffective assistance of trial counsel; (2) the cause for failure to exhaust the claim is ineffective post-conviction counsel or lack of post-conviction counsel in the initial-review collateral proceeding; (3) the state collateral proceeding was the "initial" opportunity to review the claim regarding trial counsel's performance; and

(4) the state requires, either by law or as a practical matter, that ineffective assistance of trial counsel claims be raised in the post-conviction proceeding. *Trevino,* 133 S.Ct. at 1918, 1921; *Martinez,* 132 S.Ct. at 1320. An "initial-review collateral proceeding" is a "collateral proceeding[ ] which provide[s] the first occasion to raise a claim of ineffective assistance at trial." *Martinez,* 132 S.Ct. at 1315. The Court in *Martinez* explained that a "substantial" ineffective assistance of trial counsel claim is one with "some merit. *Cf. Miller–El v. Cockrell,* 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)." *Martinez,* 132 S.Ct. at 1318–19. An "insubstantial" claim, the Court explained, "does not have any merit or [ ] is wholly without factual support, or [ ] the attorney in the initial-review collateral proceeding did not perform below constitutional standards ." *Id.* at 1319. The Court went on: "Most jurisdictions have in place procedures to ensure counsel is appointed for substantial ineffective-assistance claims [in state collateral proceedings]." *Id.* at 1319 (alteration added). "And [the Court's ruling] permits a State to elect between appointing counsel in initial-review collateral proceedings or not asserting a procedural default and raising a defense on the merits [of attorney trial error] in federal habeas proceedings." *Id.* at 1320 (alteration added).

In *Gallow v. Cooper*, 133 S. Ct. 2730, 186 L. Ed. 2d 935 (2013), the petitioner failed to obtain a hearing on the merits of his ineffective-assistance-of-

trial-counsel claim because state habeas counsel neglected to "properly presen[t]" the petitioner's ineffective-assistance claim in state court.  The Court noted that

> A claim without any evidence to support it might as well be no claim at all. In such circumstances, where state habeas counsel deficiently neglects to bring forward "any admissible evidence" to support a substantial claim of ineffective assistance of trial counsel, there seems to me to be a strong argument that the state habeas counsel's ineffective assistance results in a procedural default of that claim. The ineffective assistance of state habeas counsel might provide cause to excuse the default of the claim, thereby allowing the federal habeas court to consider the full contours of Gallow's ineffective-assistance claim. For that reason, the Fifth Circuit should not necessarily have found that it could not consider the affidavit and testimony supporting Gallow's claim because of *Cullen v. Pinholster,* 563 U.S. ——, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

*Id.*

In the present case, State habeas counsel failed to provide sufficient corroborating witness testimony to support Petitioner's post-conviction mitigation evidence. The trial court made a finding that many of Petitioner's post-conviction witnesses either lacked credibility or that their testimony was uncorroborated. As a consequence, the trial court made a finding that trial counsels' mitigation investigation was not ineffective under *Strickland*.

In its response to Petitioner's writ, the State provide a exhaustive list of instances in which State habeas counsel fell short of presenting a convincing mitigation case. The State argued that habeas counsel's "mitigation witnesses are largely non-credible or are so contradictory as to

render their testimony unreliable and to make the likelihood of a different sentencing outcome unlikely." *See* (PRE 3 State's Credibility Summary).

Because State habeas counsel failed to call any corroborating witnesses, Petitioner's *Wiggins* claim was not adequately investigated and developed before the state court. State habeas counsel's conduct therefore rises to the level of an ineffective assistance of counsel contrary to *Strickland* and is subject the cause and prejudice exception carved out in *Trevino*.

### GROUND FOR REVIEW TWENTY-THREE:

THE REFUSAL OF THE TEXAS COURTS TO PROPERLY DEFINE THE TERMS AND PHRASES IN THE FUTURE DANGEROUSNESS SPECIAL ISSUE WAS A DECISION CONTRARY TO, AND AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED CONSTITUTIONAL LAW IN THAT PETITIONER WAS: 1) DEEMED ELIGIBLE FOR THE IMPOSITION OF DEATH AS A PENALTY BY THE USE OF AN UNCONSTITUTIONALLY VAGUE AGGRAVATOR; AND 2) PETITIONER WAS SELECTED FOR THE DEATH PENALTY WITHOUT GIVING FULL CONSIDERATION AND EFFECT TO RECORD EVIDENCE OF HIS MITIGATING CIRCUMSTANCES.

Petitioner's trial counsel objected to the court's failure to define certain terms in the future dangerousness special jury issue (CR 2/568-69) (RR 38/4). The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Petitioner was 1)

deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator, and 2) Petitioner was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.

Special Issue Number 1 of the Court's charge asked the jury: In deliberating on Special Issue No. 1, the Jury shall consider all evidence admitted at the guilt innocence stage and the punishment stage, including the defendant's background or character of the circumstances of the offense that militates for or militates against the imposition of the death penalty." The court added that "you may not answer Special Issue No. 1 'No' unless ten (10) or more jurors agree" (CR 2/562).

Special Issue Number 2 asked the jury: Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentences be imposed?" (CR 2/557). The court added that "[y]ou may not answer Special Issue Number 2 'yes' unless ten (10) or more of you agree to do so" (CR 2/563).

Petitioner will demonstrate that Texas has broken the promises it made to the Supreme Court in oral argument in *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950 (1976)[and later recognized by Justice O'Connor in *Penry v. Lynaugh,* 492

U.S. 302 (1989) (*Penry I*)]*, and that, as a result, the application of the undefined terms and phrases of the Texas future dangerousness inquiry offended the constitutional principles that underlay *Jurek* under the facts and circumstances of Petitioner's case.

Article 37.071 § 2(b)(1) of the Texas Code of Criminal Procedure, the future dangerousness issue, is unconstitutional because the aggravating factors it uses are vague and do not properly channel the jury's discretion in violation of the Eighth and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. VI, VIII, XIV. *See Maynard v. Cartwright*, 486 U.S. 356 (1988).  Since the jury is not provided with definitions of such terms as "probability", "continuing threat to society" and "criminal acts of violence", the statute violates the constitutional requirement that each statutory aggravating circumstance genuinely narrows the class of persons eligible for the death penalty and reasonably justifies the imposition of the death penalty. *Stringer v. Black*, 503 U.S. 222, 235 (1992).

The words "probability" and "society" are certainly capable of definition in such a way as to provide meaning to the jury and relevance to the issues to be decided, i.e. "probability" can be defined to mean "more likely than not", "continuing" can be defined to mean "uninterrupted"; and "society" can be defined to mean "prison society". In fact, when the Court of Criminal Appeals reviews the

222

legal sufficiency of the evidence of future dangerousness, it has applied such definitions. *See, e.g. Ellason v. State*, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991)("probability" means "more than a bare chance"); <u>Muniz v. State</u>, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993). It is also true that a juror with a "faulty understanding" of these terms is challengeable for cause. *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1993). And a prosecutor errs if he defines those terms improperly in argument. *Felder v. State*, S.W.2d 85, 97 (Tex. Crim. App. 1992).

Nevertheless, the Court of Criminal Appeals has repeatedly held that the terms "probability", "society", "criminal acts of violence", and "continuing threat" need not be defined for the jury, *see, e.g., Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Newbury v. State*, 135 S.W. 22, 45 (Tex. Crim. App. 2004); *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); *Turner v. State*, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Caldwell v. State*, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991), *Boyd v. State*, 811 S.W.2d 105, 113 (Tex. Crim. App. 1991). The rationale for such holdings has always been that because the legislature provided no statutory definition of these terms, the terms should be taken and understood in their usual meaning in common language. And jurors are "presumed to know and apply such meaning[s]". *See, e.g., Cuevas v. State*, 742

S.W.2d 331 (Tex. Crim. App. 1987). But presuming that jurors know and understand these terms is an unconstitutional risk.

It would seem that if the court goes to the trouble of defining these terms for itself when it analyzes the sufficiency of the evidence, the jury should be given the same tools. If potential jurors and prosecutors, on occasion, apply improper definitions of these terms, why should we presume that the seated jurors do not? Certainly, if a juror answered the first special issue "yes" because he thought there was a "bare chance" that the defendant would be a future danger, such a verdict could not stand. Allowing jurors to apply whatever they believe to be the common definition of a term, results in a statute that fails to sufficiently channel a sentencer's discretion in violation of the constitution.

In *Jurek,* the Texas special issue system survived a facial attack made on vagueness grounds. In *Penry I*, the Supreme Court found that the Texas system was unconstitutional only as it applied to the facts of that case. A few years later, in *Johnson v. Texas* and *Graham v. Collins*, (1993) the Supreme Court rejected "as applied" claims that record evidence of youthfulness required a separate vehicle for consideration of that mitigating factor for its mitigating effect. Jurors are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200 (1987). Petitioner argues that a reviewing court must conclude that the sentencing jurors in his case considered his mitigation evidence in the way that *Johnson v. Texas* and

*Graham v. Collins* said they would, as factors tending to show that he would not be a continuing threat to society.  Since the jury returned an affirmative finding on the future dangerousness special issue, this Court must presume that the jury rejected Petitioner's argument that his tendencies toward criminal acts of violence would diminish during incarceration, such that he would not qualify as a continuing threat to society.  The Court should note that a finding of future dangerousness is a punishment phase aggravator in Texas, one that must be established before the jury considers mitigating circumstances. *Blue v. State* 125 S.W.3d 491 (Tex. Crim. App. 2003), *cert. denied*, U.S.L.W. (October 4, 2004) (No. 03-10832).  Thus, Petitioner would not be on Texas' death row but for this finding.

Although the Supreme Court in *Jurek* rejected facial claims that the terms and phrases of the Texas future dangerousness special issue are too vague to support any death sentence, Petitioner will demonstrate that they are nonetheless too vague to support the jury's finding in this case.   Under the present case, it is difficult for the jury to have predicted that Petitioner's juvenile crimes of violence justified labeling him a "continuing threat to society". *See Roper v. Simmons*, 543 U.S. 551 (2005).

Applying the above terms and phrases of the Texas future dangerousness special issue to Petitioner's case is a difficult fit when viewed against the back drop of *Roper*.  In three areas, the *Roper* Court found sufficient evidence that our

225

society views juveniles up to age 18 as less culpable than the average criminal. First, the *Roper* Court noted that a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. *Id.* It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior. Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Review 339 (1992). *Id.* The *Roper* Court found a second area of difference, that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. *Eddings*, supra, at 115 (Youth is more than a chronological fact).

The *Roper* Court identified a third broad difference. The character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. *Id.* Citing, generally E. Erikson, Identity: Youth and Crisis (1968).

The *Roper* Court found these differences sufficient to render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. *Roper, supra, citing* Thompson, *supra*, at 835 (plurality opinion). Their own vulnerability and comparative lack of

control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. *Id. (citing) Stanford v. Kentucky*, 492 U. S., at 395 (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor s character deficiencies will be reformed. Indeed, [t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. *Roper*, citing *Johnson v. Texas*, supra, at 368; *see also* Steinberg & Scott, supra. at 1014 ( For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood).

Without a proper definition of the phrase "continuing threat to society, a juror that is inclined to find future dangerousness may not be looking far enough into the future to give proper consideration to Petitioner's juvenile crimes. He can literally find a threat continuing if he believes it will last five minutes, five hours or

five days.  On the other hand, a juror who would be inclined to decline to find future dangerousness does not have any place to hang his hat on the barebones instructions the State court issued him to follow.

Moreover, the use of the undefined terms of the future dangerousness question as a way of establishing an aggravating factor offends the principles of *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  Aggravating factors must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder." On their face, and as applied, aggravating circumstances must permit the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not."  In *Maynard v. Cartwright*, *supra*, the Supreme Court unanimously set out the legal principles which control vagueness claims directed at an aggravator.  In addressing the validity of a death sentence based solely on the statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," the *Maynard* court reasoned that an Eighth Amendment vagueness challenge to an aggravating factor in a capital case may not be analyzed under the "as-applied" approach used in vagueness challenges to criminal statutes under the Due Process Clause. 486 U.S. at 361.

An Eighth Amendment challenge requires this Court to conduct its review in several steps.  First, evaluate the challenged aggravating circumstance on its face,

228

entirely apart from the facts of the particular case in which it was applied.   An overbroad aggravating circumstance vests in sentencing courts the "open-ended discretion" to impose the death penalty which the Supreme Court condemned in *Furman v. Georgia*. Where a death sentence is imposed under a system that permits unbridled discretion, the State may not save the sentence by demonstrating that the outcome would have been the same even if the sentencer's discretion had been properly narrowed and guided.

Secondly, even if the text of a statutory aggravating circumstance does not provide meaningful guidance to a capital sentencing jury, such an aggravating circumstance can nevertheless support a death sentence if the state courts have narrowed its scope to a constitutionally sufficient degree.   Finally, the reviewing court must determine whether such a narrowing construction actually guided the sentencing jury in the case under review.

The Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness."   If the aggravating circumstance at issue is invalid for reasons such as these, due process of law requires that the jury's decision to impose death be set aside. *Id.*   Petitioner argues that, in the case of an offender with a predominately juvenile record at the time of their capital offense permits jurors to return an affirmative finding of future dangerousness because of

the frailties of youth. The refusal to define terms offended the principles *Maynard v. Cartright*, supra.

Petitioner's jury likely considered youthfulness—a classic mitigating circumstance--under the future dangerousness special issue as illustrated in *Johnson v. Texas* and *Graham v. Collins*. Reasonable jurors would likely regard the more specific inquiry to supplant the more general language of the mitigation inquiry.  The failure to define terms so as to require that the "continuing threat" to actually continue over a substantial period of time in incarceration had the practical effect of preventing or impairing the jurors' full consideration of youthfulness for its mitigating effect.

This offends the constitutional principles recognized in *Nelson v. Quarterman*, supra and the Supreme Court cases cited therein.  The important principle that Petitioner takes from *Nelson*, supra is that a capital sentencing system must permit full consideration of the capital defendant's mitigation case for its mitigating effect. Texas, by taking the positions that it did in *Johnson v. Texas* and *Graham v. Collins*, has elected to handle youthfulness with its future dangerousness special issue.  That issue, without proper definition of terms, is not, post-*Nelson*, adequate to meet the demands of the capital sentencing jurisprudence of the Fifth Circuit or the Supreme Court.

For several reasons, Texas cannot take resort in its so-called *Penry* issue.

First, the most reasonable reading of the charge given to Petitioner's jury is that youthfulness is to be considered in the future dangerousness inquiry. Without some sort of encouragement to re-visit that issue in the mitigation inquiry, there is no reason to believe that the jurors believed they could again consider Petitioner's age at the time of his prior criminal conduct. Even if they did think so, youthfulness is the sort of circumstance that many jurors will not regard as reducing moral blameworthiness.

For evidence of the tendency of many reasonable people to disregard or greatly discount youthfulness as a reason to grant mercy in capital cases, we need look no further than the vigorous dissents in *Roper v. Simmons*. Texas jurors are much more likely to think like the dissenters, Justices Scalia, Thomas, Reinquist and O'Connor did. Not many Texas jurors will think like Justices Kennedy, Ginsburg, Souter, Breyer and Stevens, who made the majority in *Roper*. Petitioner argues that the punishment charge was constitutionally flawed for failure to define these terms under the principles of *Maynard v. Cartright* and *Eddings*, supra.

### GROUND FOR REVIEW TWENTY-FOUR:

THE TRIAL COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY FAILING TO INSTRUCT THE JURY THAT THE A "NO" VOTE BY A SINGLE JURY MEMBER WOULD RESULT IN A LIFE SENTENCE INSTEAD OF DEATH DESPITE THE STATUTORY REQUIREMENT OF 10 VOTES FOR A "NO"

ANSWER TO ARTICLE 37.071 § 2(B)(1) OR FOR A "YES" VOTE TO ARTICLE 37.071 § 2(E).

Trial counsel filed a pretrial motion to declare Article 37.071 § 2(b)(1) unconstitutional (CR 2/568). The trial court denied the requested relief (RR 38/4). In response to the Supreme Court decision in *Penry I*, the Texas legislature provided for a special inquiry into mitigating circumstances. Instead of just taking the straightforward step of enacting a special issue in the terms suggested by *Lockett v. Ohio* and progeny, the legislature engrafted a series of amendments that serve to diminish, or even outright defeat the ability of Texas sentencing jurors to fully consider and give mitigating effect to the capital defendant's mitigation case. This claim is directed at the portion of the Texas statute that ostensibly requires ten jurors to return a life verdict based on mitigating circumstances, but secretly, so far as the jury is concerned, allows for a life verdict in the event of a single holdout juror for life.

Petitioner argues that this particular crippling amendment is analogous to the similarly crippling "nullification instruction" that has recently been condemned in several Supreme Court cases6 and in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), (en banc) cert denied *Quarterman v. Nelson*, 127 S.Ct. 2974, 75 USLW 3512, 75 USLW 3674, 75 USLW 3678 (U.S. Jun 18, 2007) (NO. 06-1254). At

---

6 See *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001)(Penry II); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007); *Brewer v. Quarterman*, 550 U.S. 286, 127 S. Ct. 1706, 167 L. Ed. 2d 622 (2007); *Smith v. Texas*, 550 U .S. 297, 127 S. Ct. 1686, 167 L. Ed. 2d 632 (2007).

trial, Petitioner timely and properly complained about this feature of the Texas mitigation inquiry by written motion. The trial court denied his motion and request for jury instructions to cure the constitutional defects outlined in the motion just before the charge was read to the jury.

Trial counsel argued that the 12-10 rule of Article 37.0711, section 3(a)(d)(2), which requires ten votes for the jury to return a negative answer to the first or second special issue and at least ten votes for the jury to return an affirmative answer to the second special issue, violates the Eighth and Fourteenth Amendments to the United States Constitution. Texas courts have repeatedly rejected identical claims. Citing *Johnson v. State*, 68 S.W.3d 644, 656 (Tex. Crim. App. 2002); *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000), cert. denied, 531 U.S. 1128 (2001); *Chamberlain*, 998 S.W.2d at 238. The Fifth Circuit has also rejected attacks on the Texas 12-10 rule. See *Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir. 2000).

The Fifth Circuit has also held that any ruling that "the 12-10 rule" violated the federal Constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and therefore could not form the basis for federal habeas-corpus relief. See *Hughes v. Dretke*, 412 F.3d 582 (5th Cir.2005); *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir.1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir.1993).

Petitioner argues that the precedential value of the Fifth Circuit cases cited above has diminished in light of the *en banc* ruling in *Nelson v. Quarterman*, supra, which simply followed and enforced the principles of *Penry II*. Petitioner takes from the *Penry II* line of cases the principle that a capital sentencing system must afford the sentencing jurors a vehicle with which to give full consideration and full mitigating effect to a capital defendant's mitigation case.

When the Texas 12-10 rule is viewed against this principle, the conclusion is inescapable that the 12-10 rule must give way to *Nelson* and the cases upon which it relies. It is beyond serious dispute that this rule is designed to discourage lone or minority jurors from holding to their convictions, and to encourage them to "cave in" and join the majority to form a unanimous verdict. Further, this end is accomplished by withholding material facts from the minority jurors. This introduces an element of dishonesty into the capital sentencing process. A jury system that operates dishonestly commands little of the respect for the law that is essential for accurate fact-finding and proper sentencing decisions.

This odd and frankly dishonest feature of the Texas 12-10 rule bears great similarity to the former "nullification instruction" condemned in *Penry II* and progeny. The trouble with the nullification instruction as a vehicle for handling mitigating circumstances was that, in a fairly wide range of circumstances, it required jurors who were sworn to return a true verdict according to the law and

the evidence, to disregard that oath, and sign a false verdict in order to give effect to record evidence of mitigating circumstances. The 12-10 rule also encourages jurors to lie about their true response to the special issue, and to sign a false verdict form in order to go along with the majority on the jury.  Further, the 12-10 rule explicitly requires the judge and the attorneys to withhold material information; that a failure to reach a unanimous verdict amounts to a life verdict after all. Thus the common thread that runs within the nullification instruction and the 12-10 rule is reliance on the jurors' violation of their oaths to produce a verdict.

The 12-10 rule is actually somewhat worse because it not only encourages jurors to violate their oaths, it also requires officers of the court and the court itself to withhold from the jurors the truth about how the system actually works. Petitioner argues that the 12-10 rule is another one of the Texas crippling amendments that destroyed or greatly diminished the ability of his sentencing jury to fully consider and give effect to his mitigation case. The crippling of the statutory vehicle for the consideration of mitigating circumstances has placed the jury charge before this Court in a posture very similar to the one before the Supreme Court in *Penry I*: childhood abuse and mental health evidence cannot be fully considered or given effect in the deliberation or future dangerousness special issues. A properly functioning mitigation inquiry is required to meet the demands of *Penry I*.  The Supreme Court has never issued an opinion that approves the

235

present Texas capital sentencing system that was overhauled in the wake of *Penry I*. Thus, the controlling principles of capital sentencing law are those laid down in *Furman*, supra. requiring the discretion of the jury to be properly guided by the trial court.   As justice Rehnquist put it in *Boyde v. California*, 494 U.S. 370 (1990),"... States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." Id., citing *Franklin v. Lynaugh*, 487 U. S. 164, 487 U. S. 181 (1988) (plurality opinion).

The encouragement of dishonesty on the part of jurors, judges and lawyers hardly qualifies as an effort to achieve rationality and equity in capital sentencing. Instead, it offends the principles of rational guided discretion announced in *Furman*, and confirmed in *Penry I*. The refusal by the Texas CCA to remove this crippling amendment from its capital sentencing system was objectively unreasonable. The writ must issue.

### GROUND FOR REVIEW TWENTY-FIVE:

THE TRIAL COURT VIOLATED THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY DENYING PETITIONER'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE RIGHT TO FINANCIAL PRIVACY ACT, 12 U.S.C. § 3401.

Summer Baldwin's body was discovered in a black suitcase that was dumped at the City to Lubbock landfill (RR 2/61).  Investigators later traced

the suitcase back to one recently sold at a Lubbock Walmart (RR 2/63). Investigators were able to obtain the debt card number associated with the purchase of this suitcase.  The issuing bank provided investigators with the name and location of an out-of-state bank, Pacific Marine Credit Union, that issued the debit card (RR 2/178).   Pacific Marine, however, refused to release the identity of the card holder without a proper subpoena (RR 2/201) (CR 1/233).   Lubbock Police investigators sought the assistance of the Lubbock FBI in obtaining a federal subpoena (RR 2/199).

The FBI thereafter served Pacific Marine with a grand jury subpoena requesting the name and address of the debit cardholder account.  The FBI confirmed that Appellant was the account holder and shared this information with the Lubbock Police in connection with the Summer Baldwin case (RR 2/17). Lubbock Police used this information to obtain a number of search warrants that ultimately linked Petitioner to the purchase of the suitcase and to Baldwin's death. Without the disclosure of this otherwise privileged financial information, there would have been no link between Petitioner and Baldwin's murder.

Petitioner's trial counsel filed a Motion to Suppress the search warrants alleging that all evidence gathered by law enforcement should be suppressed because his identity was obtained in violation of the federal

Right to Financial Privacy Act (CR 2/648).

Rodriguez argues that the complained-of evidence should have been excluded under Texas' exclusionary rule, Article 38.23. Article 38.23, which pertains to evidence that is "obtained ... in violation of any provisions or laws ... of the United States of America." The RFPA restricts the federal government's ability to obtain access to an individual's financial records. Fed. R. Crim. P. 6(e)(3)(A)(ii). When such records are sought in connection with a federal grand jury proceeding, the effect of the RFPA is to bring them under the secrecy safeguards of grand jury proceedings generally. Rule 6(e) of the Federal Rules of Criminal Procedure authorizes the disclosure of grand jury matters to any government personnel, including those of a state or state subdivision, that a government attorney considers necessary to assist in performing the duty to enforce federal criminal law. Essentially, Petitioner maintained that the transfer of this information from federal authorities to Lubbock authorities was unlawful.

The trial court denied relief finding that Lubbock authorities lawfully obtained this information under Rule 6(e) because they were assisting an assistant U.S. attorney in the investigation of a federal crime and the Lubbock authorities' use of the financial information to obtain search and arrest warrants, even if in violation of the RFPA's provisions, does not vitiate the status of such evidence as having been legally obtained (RR 32/7) (CR 2/631).

The trial court's findings and conclusions are contrary to and involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Moreover, the trial court's findings in conclusions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d)(2). Accordingly, Petitioner is entitled to federal habeas relief as to this claim.

## CONCLUSION

As this petition demonstrates, Petitioner Rodriguez' rights under the federal constitution were violated, unremedied by the Texas courts.

## RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.   Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Sparks to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.     Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Petitioner be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.     Issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.     In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be relieved of his unconstitutional sentences;

6.   Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Petitioner RODRIGUEZ asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Rodriguez from custody, or alternatively, to reverse Petitioner's conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

*Seth Kretzer*

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)
seth@kretzerfirm.com

Carlo D'Angelo, P.C.
Attorney at Law
100 East Ferguson, Suite 1210
Tyler, Texas 75702
903.595.6776
903.407.4119 Fax

carlo@dangelolegal.com


By:    /s/ Carlo D'Angelo
       Carlo D'Angelo
       Texas Bar No. 24052664

       COURT APPOINTED LAWYERS FOR
       PETITIONER ROSENDO RODRIGUEZ


### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of Habeas Corpus was served on all counsel of record by filing on the ECF System on this 5th day of May, 2014.

I also certify that a paper copy was served on Rosendo Rodriguez, III TDCJ No.: 00999534, at the following address, by U.S. Mail:

Polunsky Unit
3872 FM 350 South
Livingston, Texas 77351

_____
Seth Kretzer

### VERIFICATION

As a representative for the petitioner, I verify that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street; Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)
seth@kretzerfirm.com


Carlo D'Angelo, P.C.
Attorney at Law
100 East Ferguson, Suite 1210
Tyler, Texas 75702
903.595.6776
903.407.4119 Fax
carlo@dangelolegal.com


By:   /s/ Carlo D'Angelo
      Carlo D'Angelo
      Texas Bar No. 24052664