IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| ROSENDO RODRIGUEZ, III | § | |
| Petitioner, | § | |
| | § | |
| V. | § | Civil Action No. 5:13-CV-233-C |
| | § | |
| LORIE DAVIS, Director, Texas | § | DEATH PENALTY CASE |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Rosendo Rodriguez, III ("Rodriguez") petitions for a writ of habeas corpus under 28 U.S.C.

§ 2254, contending that his state conviction and death sentence are unconstitutional. The Court held

a hearing at which both parties appeared and presented argument. Having considered the parties'

arguments, as well as the pleadings, the state court records, and the relevant law, the Court denies

the petition and dismisses this action with prejudice.

### SUMMARY OF THE CASE

#### I.  Pretrial

On September 13, 2005, workers using heavy equipment to spread and compact garbage in

a Lubbock city landfill found the body of Summer Baldwin in a suitcase. Baldwin, a prostitute, had

been a witness in a federal counterfeiting case, which triggered FBI involvement in the investigation

of her death. Financial records obtained via federal grand jury subpoena revealed that Rodriguez's

debit card was used to purchase an identical suitcase at Walmart the day before. The store's surveillance

video showed that Rodriguez matched the description of the man last seen with Baldwin alive. Hotel

and bank records indicated that Rodriguez's debit card was also used to rent a hotel room in Lubbock

under the name "Thomas" Rodriguez. Based on the foregoing information, Rodriguez was arrested at his parents' home in San Antonio.

Rodriguez retained Albert Rodriguez ("Albert") as counsel. Albert is not related to Rodriguez but was an acquaintance of Rodriguez's father, a well-known criminal defense attorney from Wichita Falls. Three weeks after his arrest, Rodriguez gave a recorded statement to the police, with Albert present, admitting that he had engaged in consensual sex with Baldwin but killed her in self-defense after she attacked him with a knife. The ongoing police investigation also linked Rodriguez to the disappearance of 16-year-old Joanna Rogers, who had been missing for more than a year.

In the summer of 2006, Rodriguez negotiated a plea bargain with the assistance of new counsel, Jeff Blackburn. Rodriguez agreed to plead guilty to Baldwin's murder and disclose his involvement in Rogers's murder. If his information could be corroborated by the recovery of Rogers's body, the State would reduce the capital murder charge to murder, offer a sentence of life imprisonment, and grant Rodriguez immunity from prosecution for Rogers's murder. Rodriguez confessed to Rogers's murder, and her body, like Baldwin's, was found in a suitcase in the Lubbock city landfill.

The plea agreement did not go forward as planned, however. On the scheduled day in October of 2006, Mr. Blackburn regretfully informed the trial court of a bizarre series of events, the likes of which he had never encountered in his law practice. For the preceding twenty-four hours, Rodriguez had maintained that he did not understand anything he was being told. Rodriguez told the trial judge he did not understand his questions. As a result, the plea did not go forward, Mr. Blackburn withdrew from the case, and the State gave notice of its intent to seek the death penalty. Richard Wardroup and Fred Stangl were appointed as new counsel. The trial court granted a change of venue because

of publicity surrounding the search for Rogers's body; in March of 2008, the parties proceeded to trial.

## II. Trial

The prosecution alleged two different theories of capital murder: (1) intentionally or knowingly causing Baldwin's death while in the course of committing or attempting to commit aggravated sexual assault, and (2) intentionally or knowingly causing the death of more than one person in the same criminal transaction, specifically, Baldwin and her child in utero. *See* Tex. Penal Code Ann. § 19.03(a)(2), (7).[1] The State presented evidence showing that Rodriguez had been in Lubbock for training with the United States Marine Corps Reserve when he picked up Baldwin in the early morning hours of September 12, 2005, and took her to his hotel room where he beat, strangled, and sexually assaulted her. He then purchased the suitcase, placed her body in it, and threw it in a dumpster. The defense argued that the sex was consensual, that Rodriguez had no knowledge of the pregnancy, and that his Marine combat instincts took over and he killed Baldwin accidentally in self-defense after she wielded a knife at him. The jury returned separate guilty verdicts on each theory.

At the punishment phase, the State introduced evidence of five other sexual assaults committed by Rodriguez and a misdemeanor theft charge for which he had served probation. The jurors received evidence connecting Rodriguez to the disappearance of Rogers, but they did not receive his confession to her murder. The defense introduced evidence and argument that Rodriguez could safely serve a life sentence in prison, that Rodriguez was a respectful, intelligent person, and that Rodriguez grew up in a home with an abusive, domineering, alcoholic father. The jury answered two special issues

---

[1] All cites to the Texas statute are to those then in effect, unless otherwise noted.

3

in a way that required a death sentence under Texas law. *See* Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1) and (e)(1).

### III. Post-conviction proceedings

The trial judge appointed attorney J.R. Wall on direct appeal and Paul Mansur as state habeas counsel. Mr. Wall filed a motion for new trial that the trial court denied after a live hearing, and then filed a brief raising forty-two claims on appeal. The Texas Court of Criminal Appeals ("CCA") affirmed the conviction. *Rodriguez v. State*, No. AP-75901, 2011 WL 1196871, at *1 (Tex. Crim. App. May 4, 2011) (not designated for publication), *cert. denied*, 132 S. Ct. 814 (2011).

Mr. Mansur filed a state habeas application raising twenty-one grounds for relief. After a six-day hearing, the convicting court made written findings and conclusions recommending that relief be denied. The CCA reviewed the record, adopted the lower court's findings and conclusions, and denied habeas relief. *Ex parte Rodriguez*, No. WR-78127-01, 2013 WL 1920737, at *1 (Tex. Crim. App. May 8, 2013). Rodriguez then filed his amended federal petition raising twenty-six claims for relief. All but one of these claims has been adjudicated on the merits in state court.

### AEDPA STANDARD OF REVIEW

A claim adjudicated on the merits in state court may not be relitigated in federal habeas court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* § 2254(d);[2] *Harrington v. Richter*, 562 U.S. 86, 100 (2011). These determinations are limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170,

---

[2] All subsequent references to § 2254 are to 28 U.S.C. § 2254.

181 (2011). For purposes of § 2254(d)(1), "clearly established federal law" is the Supreme Court precedent that existed when the state conviction became final. *Williams v. Taylor*, 529 U.S. 362, 379-80 (2000). A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from the relevant precedent and arrives at a different result. *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams*, 529 U.S. 406). A state court decision is based on an "unreasonable application" of such law when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of the case. *Id.* at 901-02. The decision must be "objectively unreasonable," not merely wrong, and even "clear error" will not suffice. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

Factual "determinations" in a state court decision are presumed correct, and a petitioner bears the burden of rebutting them by clear and convincing evidence. § 2254(e)(1); *see Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); § 2254(d)(2).

Congress meant these conditions to be difficult to meet, and they stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 562 U.S. at 102. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

## CLAIM 1: ASSISTANCE OF TRIAL COUNSEL

Rodriguez asserts that trial counsel were ineffective for failing to conduct a more thorough mitigation investigation, present more incidents of abuse and family dysfunction, investigate his father's medical and mental-health records, and present non-family witnesses to corroborate the family's testimony about his father's abuse, alcoholism, and mental health issues. Respondent contends the state habeas court reasonably rejected this claim after a lengthy hearing.

### I. *Strickland v. Washington*

The clearly established law for ineffective-assistance claims begins with *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. *Id.* at 687-88. A petitioner must also demonstrate prejudice, meaning a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors the result of the proceeding would have been different. *Id.* at 694.

Regarding the duty to investigate, strategic decisions made by counsel following a thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Id.* at 690. "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. When assessing possible prejudice from an allegedly deficient sentencing investigation, the reviewing court reweighs the evidence in aggravation against the totality of available mitigating evidence and determines whether there is a probability, sufficient to undermine confidence in the outcome, that the jury would have assessed a life sentence. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

In addressing the claims against trial counsel, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether trial counsel's performance fell below the *Strickland* standard. *Richter*, 562 U.S. at 101. This review is "doubly deferential," meaning the Court takes a "highly deferential" look at counsel's performance through the "deferential lens of § 2254(d)." *Pinholster*, 563 U.S. at 190. Rodriguez must therefore demonstrate it was unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of competence and (2) that he failed to undermine confidence in the jury's sentence of death. *See id.*

## II. Background facts

### A. Aggravating evidence at 2008 trial

The aggravating evidence in this case shows that Rodriguez, acting alone, planned to commit a murder while in Lubbock. He reserved a room under a different name at a hotel separate from the rest of his unit. (32 RR 300, 314; 34 RR 76.)[3] He rented the truck that he used to pick up Baldwin. (32 RR 211, 232.) According to his recorded confession, he first picked up Baldwin on Saturday when he saw her on the road, distressed from a domestic altercation. He took her to his hotel room so she could clean up and then he took her home. (34 RR 41-44; SX 253 (DVD recording), time stamp 00:10:28 - 00:17:30.) The following night, he again saw her walking down the road and offered her a ride. This time, he took her to his hotel room and sexually assaulted her vaginally and anally, causing injuries to her thighs, her urethra, her cervix, and anal and vaginal areas. (35 RR 46-52; 7 SHRR 91[4]; SX 253 time stamp 00:23:43 - 00:33:21.) He beat her, causing fifty-plus areas of blunt-force

---

[3] The reporter's record from trial is cited RR, preceded by volume number and followed by page number. The clerk's record from trial is likewise cited CR. The state habeas reporter's record is SHRR; the state habeas clerk's record is SHCR. SX refers to State trial exhibits; DX refers to defense trial exhibits.

[4] The pagination for 7 SHRR, 8 SHRR, and 9 SHRR is the .pdf pagination, as the pages in these exhibit volumes are not numbered.

injury, then strangled her and left her in the hotel room while he went out to purchase a suitcase and disposable gloves. (33 RR 128; SX 250; SX 253, time stamp 00:33:30 - 00:40:22.) Although he had received CPR training as a Marine, he did not attempt to revive Baldwin. (SX 253, time stamp 00:42:40 - 00:43:40.) He stuffed her naked body in a suitcase and threw it in a trash dumpster. He threw her wallet in a different dumpster and separately disposed of her clothing, as well as a bloody bedsheet and towels. (SX 253, time stamp 00:46:34 - 00:52:44; 32 RR 98-99; 33 RR 6-7.) He slept, ate a meal, and watched a movie in the same hotel room. He checked out the following day. (32 RR 318-19; 34 RR 18; SX 253, time stamp 00:54:26 - 00:55:48.) Laboratory tests connected both Rodriguez and Baldwin to DNA on a latex glove found in a hotel trash can, and Rodriguez could not be excluded as a contributor of sperm found on an anal swab taken at autopsy. (34 RR 147-49, 159.)

On his way home from Lubbock, Rodriguez texted a smiling picture of himself to a woman with the caption, "I miss you and love you tons." (35 RR 178.) Three days after the murder, Rodriguez had used his computer to search for single women on social websites. (37 RR 148-55.) Computer and telephone records also connected Rodriguez to the 2004 disappearance of Joanna Rogers. (37 RR 122-28, 143-47.)

After his arrest, Rodriguez insisted his counsel provide to police two knives that he had taken from Baldwin and had kept in a backpack in his parents' home. He also insisted counsel arrange an interview with the police so that he could give a statement asserting he had acted in self-defense. (40 RR 23-26, 28, 33.) Subsequent trial testimony showed, however, that Baldwin sustained injuries vastly inconsistent with the simple "chokehold" story that Rodriguez told to the police. Testimony also showed that Rodriguez had sustained no injuries consistent with defending himself against a knife attack. (34 RR 23-24; 35 RR 59-60, 67.)

8

Five women testified at sentencing that they were sexually assaulted by Rodriguez, sometimes more than once, while in high school or college. One of these victims suffered from cystic fibrosis and testified Rodriguez was the only boy she had dated in high school, although he dated other girls. They were both sixteen years old. She did not report the rapes out of fear and because he would cry, apologize, and charm her into staying with him. (37 RR 20, 28.) Another victim, whom Rodriguez had recruited into his Catholic college fraternity, testified that he offered to take her home from a party after she drank too much alcohol. He raped her in her dorm room and told her not to tell anyone or she would not be allowed to join the fraternity. She found out later that he had given her a sexually transmitted disease. (37 RR 38-43, 46.) Another fraternity pledge recruited by Rodriguez testified that he sometimes forced her to have aggressive sex during their relationship and would become a "scary, controlling kind of evil person." He told her not to tell anyone about their relationship or she would get kicked out of the fraternity, and she was afraid to break up with him. (37 RR 59-65.) Another fraternity pledge testified that she had a relationship with Rodriguez, and he told her to keep it a secret or they would get in trouble with the fraternity. She found out he was dating other people, however, and when she confronted him about it, he raped her. It was her one and only sexual experience before she married. (37 RR 82- 87.) The fifth rape victim was a 16-year-old girl. She met Rodriguez, who was twenty-three, at the photography shop where he worked. He asked for her telephone number and then called her, asking if he could visit. She agreed. That night, Rodriguez entered her bedroom through a window and raped her. She reported the rape to police, but the police believed she was "slutty" to allow people through her bedroom window, and her mother told the police not to ruin Rodriguez's life over a misunderstanding. (37 RR 101-05.)

On the weekend before Baldwin's murder, Rodriguez had spent time with friends from college who would later testify about his magnetic personality, his cocky arrogance, and his ability to easily attract girls and have meaningless sex. (32 RR 155, 168, 177, 187-89). Rodriguez told them false stories about serving in the war in Iraq, sleeping with Iraqi girls, and shooting an Iraqi boy who had tried to kill him. (32 RR 153-54, 174.)

## B. Mitigation evidence at 2008 trial

Trial counsel presented twelve witnesses at the sentencing phase. Thelia Chaffin testified that she worked for eighteen years as a paralegal for Rodriguez's father ("Rosendo") and watched Rodriguez grow up. She described him as a mature, well-behaved, gentlemanly young child and a respectful teenager. She testified the Rodriguez family was "a loving family that did everything together" and denied seeing any abuse in the home, but she admitted that Rosendo "sometimes drank to excess." (37 RR 186-94.) Gene Douglass was a long-time family friend who met Rosendo in the Air Force before they attended law school. Douglass saw Rodriguez weekly from about the age of one until he attended junior high school. He described Rodriguez as extremely courteous and polite, appropriate and respectful towards his sisters and his mother, with a well-mannered ability to speak to adults. But Douglass agreed he had no reason to know what went on in the family "behind closed doors." (37 RR 196-204.) Barbara Perkins was a host-parent to a girl from Germany who dated Rodriguez for a period of time. Perkins testified that Rodriguez treated the girl very well and generally followed Perkins' house rules on dating. She described Rodriguez as very respectful and never inappropriate. (37 RR 204-18.)

Dr. Ana Rodriguez, the oldest sister of Rosendo, testified that she has been a part of Rodriguez's life since his birth and that he spent summers at her condominium on South Padre Island. She described

10

him as loving and playful and a joy to have around.  Ana described her work as a counselor-educator and senior administrator at a large Texas university.  Based on that experience, she thought Rodriguez had the greatest potential of all the cousins, and she believed he could have been the first Hispanic President of the United States.  He was intelligent, expressive, respectful, good-looking, and a critical thinker, with tremendous social and verbal skills.  (37 RR 219-30.)

Rodriguez's father, Rosendo, testified that he obtained his law licensed in 1977 but closed his practice in 2004 due to disability.  He and his wife of thirty-seven years had three children: Sofia, Olivia, and then Rodriguez, who was 28 years old at the time of trial.  Rosendo described Rodriguez as a courteous, rambunctious, intelligent child who played soccer and football and helped run cattle on his grandfather's ranch.  Rosendo showed family photographs and described family trips.  He said Rodriguez had a normal social life in high school, was fairly popular, and expressed a desire to attend the United States Naval Academy, but his grades were not good enough.  Rosendo admitted there was a time when he was a "very bad alcoholic," which he attributed to the stress of practicing law. He said, "I am ashamed to say that I drank everything I could get my hands on," and he admitted that his drinking bred stupidity and violence towards his wife and daughters.  He stated that he was violent towards his son only once, when Rodriguez was about fifteen or sixteen.  Rosendo was very ashamed of his behavior and said he had not taken a drink in about ten years, and the violence stopped.  He did not know how his son may have been affected by his violence. (37 RR 308-25.)

Rodriguez's oldest sister, Sofia, testified she is the Director of Student Diversity Relations at Texas Tech University.  She described her father as a domineering, violent man when he drank and said she tried to protect her brother and sister when they were growing up.  Their mother bore the brunt of the violence.  Rosendo also had a lot of guns and machetes all over the house, and he

once threatened their mother with a machete. Their father told Rodriguez not to cry because "only putas ["bitches"] cry," and told Rodriguez to be loyal, not like his sisters and stupid mother. Sofia knew her father loved her, but he valued boys more, and her brother was the "apple of his eye." For Sofia and Olivia, "there was no pleasing him." Sofia said they could not tell anybody about the fear they lived in because nobody would have believed them. Her father was connected with "very high people" and "very low people" in the community, and she knew their mother would have been killed. Sofia said that Rosendo's testimony describing only two or three incidents of violence was inaccurate because he had been so intoxicated he "couldn't remember what the hell he was doing." She described a particular incident that occurred when Rodriguez was an infant and she had to put Olivia, then a toddler, out of a bedroom window until their father's law partner, Hank Anderson, arrived and took them home for the night. Sofia said there were many other incidents throughout her life that were comparable to the "window incident." (37 RR 327-43.)

Rodriguez's mother, Lupe, testified that her son was respectful with adults, full of energy, and enjoyed sports. She described a family trip to Bill Clinton's first inaugural ball and showed pictures of Rodriguez's common-law wife and 6-year-old son, Rosendo IV. Lupe also described a time when her husband, Rosendo, would drink every day and be violent: he would punch her, slam her against a brick wall, grab her by the neck, throw her down, and kick her. The children saw quite of a bit of this violence, and she believed it showed them that she had no value. She agreed with Sofia that if Rosendo testified he was violent only two or three times, it was because he was drunk and could not remember accurately. (37 RR 344-53.)

Gisenia Abad identified herself as Rodriguez's common-law wife. She testified that they lived together in 2001 and had a child nine months later. She is completely in love with Rodriguez and

described him as a caring, attentive father, although Rodriguez was not faithful to her and chose to move on. Abad told the jury she wants her son to know his father. (37 RR 362-72.)

The defense presented additional testimony from two detention officers who described Rodriguez's lack of disciplinary incidents and his respectful and helpful behavior while in jail. (37 RR 163, 174-80.) A prison classification expert, S.O. Woods, also testified extensively for the defense about the circumstances and privileges of the various inmate classifications. Woods testified that an estimated 80% of inmates do well in prison and that Rodriguez's good behavior in jail was the best predictor of his future behavior in prison. (37 RR 250-307.) Finally, Pastor Raul Hernandez, a former educator and Vietnam veteran, testified about Rodriguez's religious transformation while incarcerated. (37 RR 356-60.)

### C. Mitigation evidence at 2012 state habeas hearing

At the state habeas hearing, Rodriguez presented additional testimony from three trial witnesses: his mother, Lupe; his aunt Dr. Ana Rodriguez; and Thelia Chaffin. Lupe expanded on her trial testimony with additional details about her husband's abuse and drinking, specifically, the worsening progression after law school, the amount and type of liquor he drank, and the frequency of the abuse (three or four times a week or every day that he would drink). She also said Rosendo disciplined the children by lining them up against the wall and yelling, pointing, slapping, and humiliating them. She said Rosendo verbally abused and hit Rodriguez with his hand and a belt from age two to age eighteen. Although Rodriguez was the apple of his father's eye, this favoritism led to high expectations and great disappointment when expectations were not met. Lupe testified about the following specific instances of abuse: (1) the first time Rosendo abused her, when she was pregnant with Olivia, in the presence of a couple named Tony and Irma; (2) another occasion when she was pregnant with

13

Rodriguez; (3) the "after-dance/baseball bat" incident where Rosendo pushed her against a brick wall and Rodriguez, who was thirteen, hit his father with a plastic baseball bat; (4) the "downtown Wichita Falls incident," when Rodriguez was two or three, where Rosendo hit her while she was driving because he did not like her haircut; (5) the "Alice incident" when Rodriguez was twelve or thirteen, where Rosendo assaulted Lupe at the home of his sister, Becky Palacios; (6) the "red light incident" when Rodriguez was twelve, where Rosendo hit Lupe while she was driving and she contemplated running a red light to attract the attention of a police car, but Rosendo told her the officer was his client; (7) the "quinceañera incident," when Rodriguez was eleven, where Rosendo attacked her after they were accidentally locked out of their home, and his sister Ana intervened; (8) the "hotel incident" when Rodriguez was five, after which Lupe secretly took the children to a hotel for the night, only to be found by Rosendo the next morning; and (9) a "gun incident" where Rosendo pointed a gun at her head and said, "Say hello to Jesus for me." Lupe also described threatening phone calls they received three or four times a year from Rosendo's criminal clients. Rosendo showed them all how to protect themselves with guns, which he kept all over the house. Lupe said they were involved in a car accident in 1997 which caused Rosendo's health to decline, and Rosendo stopped drinking in 1998, about the time Rodriguez graduated from high school. Rosendo was diagnosed with bipolar disorder in 2007 and died in 2011 at the age of 62. Lupe said Rosendo had depression toward the end of his life, as did his father and her father. (2 SHRR 7-156.)

Dr. Ana Rodriguez testified at the hearing that her brother, Rosendo, was an outstanding father, physically affectionate with everybody, and caring and protective of his wife. He was the authority figure, decision maker, and protector, while Lupe took care of the home, looked after the children, and was subservient to her husband. Rosendo had a strong, loving relationship with his son, who

14

was the apple of his eye. Rosendo had high expectations for Rodriguez and set strict rules for his

children's education, like their own father did. Ana testified at the hearing that she saw Rosendo drunk

in public one time, at Sofia's quinceañera party. Lupe called her after that, concerned about Rosendo's

drinking. Ana said Rosendo eventually stopped drinking "cold turkey." Ana said Rosendo became

depressed when their father died in 1989 and when their brother died in 1999. Their brother and their

father both exhibited signs of depression during their lives, as did four uncles, who also drank alcohol.

She had a cousin who died of alcohol-related disease. Ana stated that Rosendo began taking pain

medication after the 1997 car accident. He was diagnosed with bipolar disorder in 2007 and was

committed to a mental hospital. He took his medication erratically and was often in a stupor or asleep.

This behavior worsened as the trial approached but, at the trial itself, he was more conscious of what

he was doing. (4 SHRR 12-124.)

Chaffin testified at the hearing that her trial testimony focused on Rodriguez rather than Rosendo,

her boss. She then offered details about her experience working for Rosendo, who was a well known

and respected criminal defense attorney. She described him as abusive and said she felt like a "battered

spouse." She had no personal knowledge, however, of any abuse in the home. (3 SHRR 5-81).

Rodriguez also presented hearing testimony from witnesses who had not testified at the trial,

specifically, his sister Olivia, his cousin Ana Maria Salazar, his aunt Becky Palacios, and his father's

legal assistant, Patrice Franklin. Olivia testified about the following instances of abuse: (1) the window

incident, (2) the Alice incident, (3) the hotel incident, (4) the quinceañera incident, and (5) a "spanking

incident" where her father left bruises on her that her mother was nonchalant about. Olivia said her

father hit, punched, and kicked her mother when he was both drunk and sober. He verbally abused

his wife and children, including Rodriguez, whom he physically abused him from age three to age

sixteen. Rodriguez was the favored child, however, and Olivia and Sofia were treated worse. Olivia stated that she asked all four of her aunts for help but no one intervened. Olivia was frightened by her father's association with some of his criminal clients and described incidents of vandalism and gunshots fired at their house, although she did not connect these with any client. Olivia mentioned her parents' car accident in 1997, her father's weight gain, the decline of his law practice, and foreclosure of the family home, after which her parents moved into her apartment in San Antonio. She confirmed her father's bipolar disorder and medication abuse that resulted in a psychiatric hospital stay because he had "passed out" in the car-pool line waiting to pick up her daughter at school. Olivia said her father had told her that if she wanted to be involved in her brother's defense, she had to go through him, and Olivia denied making an "end run" around her father in this regard. (2 SHRR 157-270.)

Ana Maria Salazar is Rodriguez's first cousin and eleven years older than him. Salazar described Rosendo as a very loving uncle who was kind and protective when sober but aggressive, volatile, and abusive when intoxicated. Olivia received the brunt of abuse, while Rodriguez was his pride and joy. Salazar described a "gun incident" that occurred when she was visiting her cousins during which she located a gun under Rosendo's bed and hid it from him. She testified about the quinceañera incident as well. She opined that depression runs in their family and gave examples. (3 SHRR 82-124.)

Salazar's mother, Becky Palacios, testified that she is three years older than Rosendo. When Rodriguez was born, she considered him to be "her" baby and described him as funny, loving, polite, and very intelligent. Palacios's husband collected change in a jar that was a college fund for Rodriguez to attend Harvard. Palacios also described two incidents of violence: (1) the Alice incident, which happened in her home; and (2) a "curfew incident," where Rosendo grabbed Sofia and tried to kick

her when she came home past her curfew. Palacios said she had brief conversations with her sister-in-law, Lupe, about her marriage, but Lupe never really asked for help and the children never spoke to Palacios about abuse. Palacios thinks depression runs in their family and she gave examples. She also testified that her brothers and her uncles drank a lot, but not her father. She did not see that Rodriguez had any problems with alcohol. (3 SHRR 126-72.)

The last habeas witness was Patrice Franklin, who worked as a legal assistant for Rosendo for eight months in 2000. Rosendo hired her and Mary Brittain on the same day, and they both quit on the same day. Franklin described Rosendo as controlling, intimidating, and yelling all the time. He often paged her for no good reason. She worked every weekend, and he paid her less than the salary they had agreed upon. She said Rosendo told her he was the head of the Mexican Mafia. Everyday, he would show her a gun that he carried with a wad of cash in a pink shopping bag, and tell her, "Say hello to my little friend," which he thought was funny. He also gave her cash to pay his personal bills and the payroll. She testified that Rodriguez came into the office several times and received money, but Rosendo expressed anger and disgust at his son every time he came in. Rodriguez was tearful and intimated and did not speak back. (4 SHRR 125-72.)

Rodriguez submitted affidavits from Mary Brittain, Steve Garza, and Rosendo.[5] Brittain's affidavit asserts that Rosendo was an abusive, out-of-control boss with a terrible temper. She believed he was on drugs, and she overheard him say he was a member of the Mexican Mafia. He always carried a lot of cash, and there was one room in the office that stayed padlocked, where men would drop off paper bags almost daily. Brittain never met Rosendo's wife or children, but she believed his household must have been a nightmare. (1 SHCR 328-33.)

_____

[5] Rosendo was deceased at the time of the state habeas hearing.

17

Steve Garza is the father of Olivia's second child. Among other things, Garza's affidavit described Rosendo's controlling and abusive behavior with Olivia. In Garza's opinion, Rosendo did not show respect to any woman, and Rodriguez demonstrated the same disrespect to his mother and "women in general." Garza stated Rosendo abused pain medication, borrowed Garza's pain medication, and spent huge sums of money buying medication on the street. (3 SHCR 755-59.)

In his affidavit, Rosendo stated that he copied his father's trait of demanding that his children excel in school. He described the male culture when he was growing up as self-centered, and he described a long history of disrespect and abuse toward women in the family. He said his father was verbally abusive toward his mother and delighted in making her feel inferior. He believed he passed on these same traits to his son by abusing Lupe. Rosendo stated he was a heavy drinker until 1998, which exacerbated his violent behavior. But he believed his behavior was also a symptom of bipolar disorder, which was diagnosed in 2007 (about two years after the Baldwin murder and a year before trial). He said Rodriguez's trial counsel did not question him about this diagnosis. (1 SHRR 241.)

The state habeas court also considered the 2012 deposition of Hank Anderson, Rosendo's former law partner who had retrieved Lupe and the children after the window incident. (7 SHRR 103 (Exhibit 18).) Anderson stated in his deposition that their law partnership split in 1996. He said Rosendo was very "macho" around his family and ruled with an iron fist, sometimes cordial, sometimes gruff. Anderson did not suspect physical abuse but would not be too surprised if Lupe said there was. Rosendo behaved the same way with his secretary to a certain extent, but Anderson never felt like he had to intervene. He described Rosendo's professional behavior as verbally forceful, not abusive, although he admitted there was one client who had complained that Rosendo had been verbally abusive, demanding, and disrespectful to her. Anderson said that Rosendo insisted his clients comply with

18

payment schedules and meet deadlines for providing evidence and that his style of practicing law matched his personality. During their partnership, he and Rosendo both carried pistols for protection and occasionally went out for drinks. Anderson described three clients who met with Rosendo behind closed doors about once a month for no apparent reason, which made Anderson uneasy. After their partnership dissolved, he heard rumors from an unknown source that Rosendo was associated with the Mexican Mafia. He could not say whether this was true, but Rosendo once told him that if he needed something to "happen" to a divorce client's belligerent husband, he could get it done. Anderson also agreed, however, that Rosendo would not have knowingly associated his family with drug dealers. (7 SHRR 103-66.)

Finally, at the habeas hearing, the State offered over 800 pages of Rosendo's medical and mental-health records. (8 SHRR, 9 SHRR). The state habeas court denied the claim that counsel was ineffective, based largely on credibility assessments of the habeas evidence.

### III. Failure to apply first prong of *Strickland* to each habeas witness

Initially, Rodriguez complains that the state court failed to apply the first prong of *Strickland* to each hearing witness. (Pet. 35, 68, 80, 89, 94, 95.) After discussing evidence from both the trial and the habeas hearing, however, the trial court judge, who was also the habeas judge, found no deficiency under *Strickland*. (5 SHRR 91.) This Court reviews for reasonableness the state court's *decision*, not the written opinion explaining that decision. *Matamoros v. Stephens*, 783 F.3d 212, 220 (5th Cir. 2015); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (noting that federal courts review for reasonableness the state court's ultimate decision not every jot of its reasoning). Further, a presumption of correctness attaches "not only to explicit findings of fact, but also to the unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*,

434 F.3d 782, 788 (5th Cir. 2005)(citing *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)). The state court's failure to express its findings for each individual witness does not therefore remove Rodriguez's burden to establish the unreasonableness of the state court's ultimate decision under § 2254, nor does it demonstrate that the ruling was unreasonable.

### IV. The state court's credibility determinations

Rodriguez next challenges the credibility assessments of Lupe, Olivia, Salazar, and Chaffin (Pet. 49, 62, 94), the state court's resolution of conflicting information from Anderson, Chaffin, and Franklin (Pet. 102), and the state court's failure to consider Garza's affidavit. (Pet. 94.) In reviewing such factual determinations, the Court is mindful that Rodriguez's mere disagreement with the state court's choice of who and what to believe does not demonstrate unreasonableness. *See Orman v. Cain*, 228 F.3d 616, 619 (5th Cir. 2000). Rodriguez bears the burden of rebutting the state court's factual findings by clear and convincing evidence. § 2254(e)(1); *Titlow*, 134 S. Ct. at 15. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

### A. Lupe Rodriguez

The state court found Lupe not credible because her children believed their mother exaggerated and confused events and because Lupe's testimony lacked details, conflicted with the testimony of her daughters, and became more detailed after cross-examination was completed. (5 SHRR 69.) The record supports these findings.

Lupe's children believed Lupe "tends toward the extravagant" and was prone to exaggerating and even confusing her stories (5 SHRR 138; 7 SHRR 78), and her testimony supports their assessment. Lupe's version of the quinceañera incident, for example, places her as the central target of her husband's

violence and ends with her rolling down the lawn in her "beautiful blue formal" dress and hitting her head on a bird bath. Ana testified, on the other hand, that Rosendo directed all of his anger towards her (Ana) for "old hurts" and that it had "nothing to do with Lupe." (2 SHRR 56; 4 SHRR 54-58, 108.) Lupe also testified that her son was present at the quinceañera incident, while Ana said the only people there were herself, her sister Dolores, Lupe, and Rosendo. (2 SHRR 57; 4 SHRR 108.) Lupe's version of the Alice incident was also the most violent, describing how her husband hit her, slapped her, slapped Rodriguez, pushed Sofia and pushed Salazar, after which "everybody jumped in" and the only thing that stopped Rosendo from grabbing her throat was the intervention of Rosendo's brother and nephew. (2 SHRR 116-22.) Lupe's version conflicts with Olivia's, who stated that she awoke to yelling and saw her father push Sofia out of their parents' bedroom. She said there was screaming and yelling behind the closed door until Rosendo was persuaded to open it, at which time Lupe ran out of the bedroom and hid under a couch. (2 SHRR 175-78.) And Palacios's description of the same event, which occurred in her own home, was even more contrasting. Palaciox said Rosendo tried to beat up Lupe in the kitchen with the children present, and Palacios sent Lupe into the bedroom. (3 SHRR 131-35.)

The court's finding that Lupe lacked credibility is also supported by the fact that Lupe reported dramatic events that were not corroborated by Olivia even though they could have been, like the after-dance/baseball bat incident when Olivia would have been sixteen years old, and the red light incident when Olivia would have been fifteen years old. (2 SHRR 25, 53-55.) Lupe also failed to testify about events, such as the gun incident described by Salazar and the curfew incident reported by Palacios, even though both reportedly occurred in her home. (3 SHRR 96-99, 142.) Further, Lupe did not testify about the Alice incident until redirect examination, after a lunch break, at which time she also described

more dramatic and severe threats from Rosendo's clients, including a time when Rosendo made Rodriguez search their house with guns drawn. (2 SHRR 113, 116-22, 127-29.) When challenged by the prosecutor about the change in the tone of her testimony, Lupe admitted she had spent the lunch break with her daughter but denied they discussed the case. (2 SHRR 148-50.) Nevertheless, Lupe's response to these questions triggered rehabilitation attempts by habeas counsel on re-direct examination. (2 SHRR 154-56.) Finally, Lupe admitted in her testimony that she would lie for her son and was eager to offer examples of lies she told to her husband, although she clarified that she was not lying in her testimony. (2 SHRR 141-42.)

### B. Olivia Rodriguez

The state court found Olivia lacked credibility because details in her testimony were not corroborated by any other witness, and she failed to report things that both Sofia and Lupe reported. (5 SHCR 1474.) This assessment is supported by the record.

For example, Olivia testified that their father beat the children and beat Rodriguez from age three to age sixteen, and that she asked all of her aunts for help, to no avail. (2 SHRR 184-88, 190-91.) Her older sister Sofia, notably absent from the habeas hearing, did not describe any physical abuse of the children in her trial testimony. (37 RR 328-40.) And the two aunts who testified at the hearing, Dr. Ana Rodriguez and Becky Palacios, denied that the children ever asked for help from abuse. (3 SHRR 141; 4 SHRR 102-04.) The court could assign considerable weight the aunts' testimony because they had careers that would have given them some expertise (and responsibility) in recognizing and reporting signs of abuse. Ana is a retired university professor with a doctorate in guidance counseling education and received recognition for her work as a teacher of guidance counselors. (4 SHRR 14, 95.) Palacios is a retired educator who had been a high school teacher, a vice principal, a principal,

a director of secondary education, and an assistant superintendent for her school district. (3 SHRR 126.)

Olivia's testimony about the time she spent with the mitigation specialist, Rob Cowie, to prepare for trial conflicted with Cowie's testimony, his report, and emails among the trial team. (2 SHRR 164-65, 233-34; 7 SHRR 64, 90, 92.) The record also refutes Olivia's testimony that she never attempted an "end run" around her father (2 SHRR 234) and suggests she was not as isolated from trial counsel as her testimony implied. For example, Cowie's mitigation report states that Olivia told them her father was directly responsible for the failed guilty plea in October of 2006, and she suggested strategies to get the family to support another plea agreement. (7 SHRR 72.)

Olivia also testified about a time her father left bruises on her legs that her mother ignored. (2 SHRR 186.) Lupe did not corroborate the bruise story, however. Olivia also did not mention the after-dance/baseball bat incident that her mother described, even though Olivia would have been sixteen years old. (2 SHRR 25.) Also, Olivia testified about the quinceañera incident as if she were there, which conflicted with Ana's testimony about who was present. (4 SHRR 108.) The state court reasonably found that Olivia's willingness to report on this incident cast serious doubt on her credibility. (5 SHCR 1492.)

Olivia's testimony was also inherently contradictory. On direct-examination, she blamed her father for giving her brother a "negative viewpoint of women in general." (2 SHRR 205.) Almost immediately afterwards, she readily agreed on cross-examination that her brother was kind, thoughtful, respectful, even solicitous to her and Sofia and the women in the family. She described him as respectful to the girls he dated and the women in their father's office. She was in disbelief about the murder, and agreed that all she had ever seen in her brother was a respectful, loving person who began to stand

up to their father's abuse. (2 SHRR 209-210, 235.) Finally, Olivia admitted during her testimony that she called her brother at the jail and told him they were all going to come to the habeas hearing and "kick butt" for him, suggesting a willingness to exaggerate the truth. (2 SHRR 248-49.)

### C.  Ana Maria Salazar

The state court found Rodriguez's older cousin, Salazar, was not credible because she described events that other witnesses who would have been there did not mention, her testimony conflicted with other witnesses in significant respects, and she failed to mention a key incident that occurred in her home. (5 SHCR 1473-74.) This reasoning is supported in the record.

The Alice incident described by Lupe and Palacios (Salazar's mother) purportedly occurred in Salazar's home during a weekend celebration of Salazar's college graduation. Lupe even testified that Salazar called Rosendo's brother, the chief of police, for help. (2 SHRR 120.) Yet Salazar failed to mention this event in her testimony. Salazar also testified about the quinceañera incident as if she were there, stating that she ran outside when she heard her mother yell, and then ran back inside the house. (3 SHRR 104.) But the triggering event for Rosendo's behavior on this occasion was that the family was locked out of their house. (2 SHRR 56; 4 SHRR 54.) Therefore, Salazar could not have run in and out of the house as she described. And, as already noted, Salazar and Palacios were not there, according to Ana. (4 SHRR 108.) Palacios, in fact, stayed at a hotel for the event and expressed no knowledge of the quinceañera incident, even though she had attended the party. (3 SHRR 167.)

Finally, Salazar testified about a gun incident in the Rodriguez home when she was nineteen, during which Lupe and Rosendo had a fight and she hid a gun from Rosendo. (3 SHRR 96-99.) Although she testified that she called her mother and her aunt Ana from a telephone in Sofia's room

during this traumatic event (3 SHRR 97) Palacios, Ana, and Lupe did not discuss this event during their testimony.

### D.  Chaffin, Franklin, and Anderson

At the hearing, Rodriguez offered testimony from Franklin and Chaffin, both of whom described Rosendo as an abusive employer who engaged in shady business practices and was possibly involved in the drug trade and Mexican Mafia. Rodriguez also offered the deposition of Rosendo's former law partner, Hank Anderson (6 SHRR 288), which characterized Rosendo's behavior at work as verbally forceful and grandiose, but not abusive. Anderson suggested Rosendo's behavior matched his personality and was at times appropriate to the situation. (7 SHRR 11, 14, 32-33, 48-49, 55, 60.) Anderson also did not think Rosendo would knowingly associate his family with drug dealers. (7 SHRR 164.) Rodriguez now challenges the state court's resolution of the conflicts between these, his own witnesses.

The state court's decision not to credit Chaffin's hearing testimony is supported in the record. (5 SHCR 1476-77.) Chaffin equated her work experience as Rosendo's paralegal with that of a "battered spouse," but this conflicted significantly with her position at the time of trial that Rosendo was a "kind and good man." (7 SHRR 79.) The state court found that Chaffin's change in testimony could possibly be explained by her opposition to the death penalty on religious grounds, which is supported by her testimony. (3 SHRR 76.) Her assertion that she tolerated eighteen years of abuse also tended to conflict with the fact that their families vacationed together in Cancun after fifteen years of employment, that Chaffin's son was an escort for Olivia's quinceañera, and that Chaffin held positions of leadership in her community, her church, and a real estate investment business. (3 SHRR 11, 43, 52-54, 59.)

The state court's credibility determination regarding Franklin is also supported. Even from a cold record, her testimony sounds exaggerated and dramatic rather than factual. Franklin admitted she had no knowledge of how Rodriguez was raised, but explained that she is a writer and her testimony is basically an extrapolation from having worked for Rosendo for eight months and having seen Rodriguez visibly shaken in his father's presence one or two times. (4 SHRR 160-62.) Franklin dramatically described being stalked and harassed by Rosendo after she quit her employment such that she filed a complaint with the police. But she could not produce the police report and admitted she had also accused another attorney, unrelated to this case, of stalking her. (4 SHRR 127, 157-58, 163-64.) Franklin testified that Rosendo called his daughter, Olivia, "damaged goods" because she "got pregnant in high school"; however, Olivia actually became pregnant in college. (2 SHRR 210-11; 3 SHRR 65; 4 SHRR 143.) The trial court could also reasonably conclude that Franklin was biased against Rosendo based on the litigation that followed her separation from the job and her obtaining a judgment against him for back wages that was never satisfied. (1 SHCR 330; 4 SHRR 126-29.)

The state court's decision to credit Anderson's description of the work environment rather than Franklin and Chaffin's is also supported by the fact that Chaffin and Franklin's testimony could have been corroborated by long-term employees who were not called to testify. These people included Claudia McDaniel, who worked for three years, Charlene "Sam" Beauchump, who worked for eighteen years, and associate counsel Dave Phillips, who worked for ten years. (2 SHRR 97, 100; 3 SHRR 41, 68.)

E. Failure to consider Steve Garza's affidavit

Rodriguez challenges the state court's failure to consider the affidavit of Garza, the father of Olivia's second child. (*See* 3 SHCR 709 n.4 and 755). The convicting court's written recommendation notes that Garza's affidavit was filed and that he did not testify. It does not discuss the contents of the affidavit. (5 SHCR 1471.) The Court assumes Rodriguez is correct that the state court gave this affidavit no weight.

The Court first observes that reliance on a paper record without live testimony does not preclude the AEDPA presumption of correctness that attaches to state court findings. *See Morrow v. Dretke*, 367 F.3d 309, 315 (2004). Further, it is not unreasonable to give less weight to an affidavit, as compared to witnesses who have been tested on cross-examination. Most importantly, however, Garza had no first-hand knowledge of Rodriguez's formative years. Garza only met Olivia in 2004, when Rodriguez was twenty-four. Garza's affidavit focuses on Rosendo's disrespectful, controlling treatment of Lupe and Olivia, his abuse of pain medication, and his subsequent financial troubles. The affidavit does not even state whether these events occurred before or after Rodriguez's arrest, which was a known stressor for Rosendo. Garza's affidavit mentions Rodriguez only once, stating that Rodriguez learned from his father to treat his mother and women in general with disrespect. (3 SHCR 757.) But Garza's opinion in this regard is refuted by Rodriguez's testifying witnesses: Lupe had no knowledge of her son ever being physically, sexually, or verbally abusive with any woman or girl. (2 SHRR 65, 72-73.) Olivia described her brother as kind, thoughtful, respectful, and solicitous to her and Sofia and the women in the family, and respectful to the girls he dated and the women in their father's office. (2 SHRR 209-210, 235.) Ana testified that she had never seen her nephew be violent or disrespectful to any girl or woman. (4 SHRR 95.) Given that Garza did not know Rodriguez during his formative

years and gave information that contradicted helpful testimony from his mother, sister, and aunt, the state court's alleged failure to consider his affidavit does not undermine the reasonableness of its ruling.

In sum, Rodriguez fails to present clear and convincing evidence to rebut the state court credibility findings regarding Lupe, Olivia, Salazar, Chaffin, Franklin, and Garza. On the contrary, the record aptly demonstrates that the credibility decisions were not unreasonable and supports the state court's conclusion that Rodriguez's "family members did as much to damage or cast doubt upon other family members' testimony, and on non-family-member witnesses' testimony, as they did to confirm, verify, support, or add weight to the other witnesses' testimony." (5 SHCR 1490-91.)

## V. Trial counsel's mitigation investigation and strategy

Rodriguez contends that trial counsel's investigation was deficient because counsel failed to collect Rosendo's medical records, failed to sufficiently prepare the witnesses, failed to find witnesses to corroborate the abuse, and failed to connect the impact of Rosendo's violent and abusive behavior to Rodriguez's criminal conduct. (Pet. 31, 35, 107-109, 119.) The expanse of trial counsel's mitigation effort can be gleaned from the trial court clerk's record, emails between the trial team, and the habeas testimony of Wardoup, Stangl, and their mitigation specialist Rob Cowie, all summarized very briefly below.

The clerk's record shows that Wardroup and Stangl together billed 532.6 hours of out-of-court time in this case. (1 CR 230, 314, 318, 341; 2 CR 80, 89, 110, 195, 210.) Cowie was appointed as a mitigation investigator nine days after Wardroup was appointed. (1 CR 42, 44.) A separate investigator, Todd Kurlander, was the fact investigator. (1 CR 41.) Emails show that the defense contacted neuropsychologist Daneen Milam and psychiatrist Susan Stone. (7 SHRR 61, 92.) They retained forensic pathologist, Dr. Norton. (7 SHRR 91.)

Emails sent between the defense team members show that, one year before trial, Cowie knew specific details of the "long-term, physical abuse of Lupe." (7 SHRR 86.) In his lengthy testimony at the state habeas hearing, Cowie described his experience conducting mitigation investigations in federal cases and the fact that he is also an attorney. Cowie testified that Rosendo was initially friendly and open, if not very forthcoming with details of his abuse. Cowie had a two-and-a-half hour conversation with Lupe alone and found her friendly and open. He described Sofia as strong-willed and more open to discussing the abuse, while Olivia was "fairly open." He interviewed Gene Douglass and had brief contact with Dr. Ana Rodriguez. He did not talk to Palacios or her daughter, Salazar. He spoke with Garza and Anderson, but neither of them wanted to be involved in the case. Cowie interviewed Lupe's family. Cowie spoke to two prison classification experts and tried unsuccessfully to locate Franklin. Overall, Cowie directed the use of his resources towards stories and people within the Rodriguez home. He believed the nuclear family kept some details to themselves that they revealed only later in their habeas testimony. Rodriguez himself was not open about the abuse and provided very little information. (5 SHRR 59-247; 6 SHRR 6-132.)

Cowie's thirty-seven-page "working" mitigation report sheds additional light on his efforts. (7 SHRR 48-97.) It shows that Cowie spoke to Rodriguez's preschool teacher, four college acquaintances, a high school coach, Barbara and Bobby Perkins, Gesenia Abad's mother, Thelia Chaffin, two detention officers at the jail, the jail librarian, and a contact at the Naval Academy. At least three women who knew Rodriguez in college refused to speak to Cowie. Cowie's report separately addresses Rodriguez's educational history, the medical and mental health history of Rodriguez and his family, his work history, romantic relationships, legal history (including jail behavior), and his social history; it includes Cowie's general thoughts and theories for the case and "to do" lists that Cowie constantly

29

updated. (5 SHRR 112.) The report addresses the family history of depression, Rosendo's bipolar disorder and depression, Rosendo's tyrannical behavior, and Rosendo's alcohol and pain-medication abuse, including illegally purchasing Vicodan. The report discusses the cultural issues of their "traditionally Hispanic family," which relegated women to a lesser role in the extreme.

Wardroup also testified. He had nearly thirty years of capital trial, appellate, and habeas experience in state and federal court when he was appointed to represent Rodriguez. Wardroup said Rosendo wanted his legal views known, and he spent time building a rapport with Rosendo because Rosendo had been dissatisfied with the previous attorneys. Wardroup knew Rosendo attempted to control their access to Lupe and Olivia, but Wardroup denied allowing Rosendo to dictate their investigation. Wardoup said his trial strategy was to focus the jury on what Rosendo did at home, not at the office, and he intentionally did not present evidence that did not directly involve Rodriguez. Wardroup asserted that much of what the habeas witnesses testified to, including child abuse, could have been presented if he had known about it, but neither the witnesses nor his client told him about it. Wardroup believed the defense team did a competent job trying to meet the aspirational bar guidelines for mitigation investigations. While other witnesses could have provided more information that Rosendo had a temper and controlling nature and was an alcoholic, he said the jury heard this information on a limited basis. Wardoup would have liked to have put on the evidence he heard in the hearing and admitted there is a chance he did not ask every question he could have asked of a witness. He maintained that this was probably true in every case he tried. (6 SHRR 135-288.)

A. Counsel's collection of medical records

Rodriguez first challenges counsel's investigation for failing to collect Rosendo's medical records. Although Cowie asked for and received releases for Rosendo's medical records, he did not

collect them. (6 SHRR 28-30.) The state court noted that while Rodriguez included selected excerpts of the medical records with his habeas application, it was the State, not Rodriguez, who offered the records at the habeas hearing. (5 SHCR 1469; 6 SHRR 290-91.) Because the medical records as submitted by the State contained generally unhelpful information for the defense, and because Rodriguez himself had no significant evidence of mental health issues, illness, or disorder (despite having funding for such), the state court found that Rodriguez was not prejudiced by the medical records' absence. (5 SHCR 1495.)

Rodriguez now argues that these records, which his habeas counsel did not deem worthy of offering in support of his habeas application, should have been offered by trial counsel because they would have presented a full picture of Rosendo's mental illness and substance abuse history, demonstrating just how Rodriguez "was impacted by his father's abuse." (Pet. 31.) As observed by the state court, however, the records do not show Rodriguez was impacted by his father's abuse. The records focus on Rosendo's health, not Rodriguez's. While a parent's mental health history may be relevant to a defendant's mental status when mental illness is a disputed theory at trial, that was not the chosen strategy in this case and there is otherwise no support for it. Wardroup knew Rosendo was diagnosed with bipolar disorder in 2007 but had no evidence that Rosendo's prior bad behavior had been driven by anything other than alcohol abuse. (6 SHRR 186.) Furthermore, the medical records were created between 2002 and 2011, when Rodriguez was an adult between the ages of 22 and 31. (2 SHRR 7; 8 SHRR; 9 SHRR.) They depict Rosendo's physical and mental health well after his active alcoholic phase; some even post-date the 2008 trial and would have been unavailable to trial counsel.

31

Therapy notes from 2007 in the medical records contain the damaging fact that Rodriguez was charged with the murder of *two* women at two separate times, which the jury never knew about. (9 SHRR 403.) Notes from 2008 indicate Rosendo had four siblings with "no psychiatric illnesses," "has good emotional support by wife of 37 years," and has a history of physically abusing his wife by "slapping her a couple of times," all of which tend to downplay the themes of family mental illness and domestic abuse. (9 SHRR 11, 192.) The records also demonstrate Rosendo's belief that his son had a "promiscuity problem" from an early age. (9 SHCR 354.)

Rodriguez's contention that his father's mental health and physical ailments had significant mitigating value is not well-taken. The state court could reasonably conclude the records were of questionable relevance and contained potentially harmful information. The state court could reasonably conclude that the jury would have viewed such a foray into Rosendo's medical history as a blatant attempt to play on their emotions, since these records had no obvious connection to Rodriguez's childhood and upbringing. Rodriguez does not demonstrate that it was unreasonable for the state court to conclude that this claim fails to undermine confidence in the jury's punishment verdict.

### B. Counsel's preparation of the witnesses

Rodriguez contends counsel spent an inadequate amount of time preparing witnesses to testify. (Pet. 35.) He suggests that the increased reports of abuse, including child abuse, from the habeas witnesses was due to trial counsel's inability to surmount Rosendo's efforts to control access to Lupe and Olivia. (Pet. 47, 61-62.) Respondent asserts that the state court's ruling was reasonable in this regard because Wardroup and Cowie both testified that the witnesses, including their client, simply did not tell them the full extent of the violent behavior described in the habeas hearing despite opportunities to do so.

The record shows that the trial team knew they had to work around Rosendo to get information from Lupe and Olivia, partly due to Rosendo's controlling personality, partly because his generation of Hispanic culture was patriarchal, and partly because he was a lawyer who wanted his thoughts known. (6 SHRR 179, 182, 233.)  Wardroup and Cowie clearly understood the need to "accept every call you can or return the call as fast as you can," build a rapport with the family, conduct multiple, short interviews under comfortable circumstances, and surmount Rosendo's "dominance patterns" (although Cowie ultimately did not think he was successful). (6 SHRR 102-04, 120, 131, 178, 183, 189; 7 SHRR 76.)  Cowie emphasized to the family the importance of sharing information. (6 SHRR 64.)  Cowie enlisted the assistance of Danalynn Recer, an attorney/mitigation specialist like himself, when Rosendo became hostile about their focus on a negotiated plea. (5 SHRR 63, 189, 193; 6 SHRR 99-100.) Rodriguez's father, who was well versed in criminal law, was simply not forthcoming with details of his abusive behavior. (6 SHRR 69.)

Cowie interviewed Lupe and Olivia independently, away from Rosendo. (5 SHRR 174-75, 223; 6 SHRR 58-59.)  He described Sofia as very cooperative and forthcoming, Lupe more limited, and Olivia as cooperative but concerned about whether her father would know what she said. (6 SHRR 64-65.)  Cowie said Rodriguez was intelligent and articulate and knew the importance of mitigation information to his defense.  Despite being told the importance of such information for mitigation, Rodriguez was also not forthcoming. (6 SHRR 82-84, 282.)  The family, including Rodriguez, told Cowie that the family's child discipline was basically normal and more psychological than physical with regard to Rodriguez. (6 SHRR 75.)  Cowie's impression was that the nuclear family kept many of the details to themselves. (6 SHRR 55.)  He suspected Lupe was withholding details even though she was open and "bubbly"—unlike a person who has been abused. (5 SHRR 176; 6 SHRR 111.)

Wardroup agreed that every family member who testified at the hearing was very supportive at trial and willing to do anything they could to assist. (6 SHRR 284.) Wardroup visited Rosendo and Lupe at their home to see how they interacted and whether Rosendo was controlling her. (6 SHRR 189.) Wardroup had a good working relationship with Rodriguez, who initially denied any "intrafamily" abuse and ultimately said very little about it. (6 SHRR 249-50.) The rest of the family, including Sofia, denied assaultive behavior toward the children, although Rosendo admitted to slapping his daughters once. (6 SHRR 208-09.) Other than the machete story that Sofia volunteered to the jury (37 RR 330), Wardroup never received information about any threats made by Rosendo with a machete or gun. (6 SHRR 181-82.) Olivia said she feared her father, but never related all the information in her habeas affidavit or testimony. (6 SHRR 253.)

As for Olivia, the trial team had doubts about her ability to communicate to a jury and sensed she was overwhelmed, guarded, withdrawn, and taking her father's anxiety medication. (6 SHRR 57-59, 72, 104-05, 237, 239-40.) These doubts were confirmed by the fact that she cried throughout her habeas testimony, found it very difficult to share information about her family life with strangers, and had problems with the law and a suicide attempt after the trial. (2 SHRR 267-68; 4 SHRR 124.) In the end, however, Olivia could not have testified because she did not return to the courthouse after the guilty verdict. (2 SHRR 168.)

This record shows counsel recognized and made reasonable efforts to surmount the family's reluctance to share information about abuse. Counsel is not deficient for failing to discover mitigation evidence that the defendant and his family failed to disclose when asked. *See, e.g., Johnson v. Cockrell*, 306 F.3d 249, 252-53 (5th Cir. 2002) (noting that the Fifth Circuit has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail

34

to disclose).  Therefore, Rodriguez's claim of insufficient preparation of the witnesses does not undermine the reasonableness of the state court ruling.

### C.  Counsel's lack of corroborating witnesses

Rodriguez complains of counsel's failure to corroborate Rosendo's abuse with testimony from non-family members.  He asserts that if counsel had done so, the prosecution would not have been able to question the lack of corroboration and the jury would not have been persuaded by the State's argument that other people have had worse childhoods than Rodriguez.  (Pet. 118-19.)

Ineffective-assistance claims based on the failure to call witnesses must show that the witnesses' testimony would have been favorable and that the witnesses would have testified at trial.  *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  The non-family members who provided information at the habeas hearing were Chaffin, Franklin, Brittain, Garza, and Anderson.  Garza and Anderson did not want to assist the trial team.  (6 SHRR 19-22).  Moreover, Anderson did not socialize much with the family, did not remain friendly with Rosendo after their partnership split up, and did not know Rodriguez very well.  (7 SHRR 140, 145, 150.) And, as discussed earlier, Garza did not meet the family until Rodriguez was twenty-four years old.  Thus, Anderson and Garza had little or nothing to offer regarding Rodriguez's upbringing. The same can be said for Franklin and Brittain who only worked for Rosendo for eight months in 2000, when Rodriguez was twenty.  (4 SHRR 139.)  Furthermore, Cowie could not locate Franklin (6 SHRR 89), and Chaffin did testify at the trial.  (5 SHCR 1473, 1476-77.)

To the extent these witnesses could provide information, it was about Rosendo's behavior at work.  This information did not support Wardroup's chosen strategy to have the jury focus on things

that happened in the family home. (6 SHRR 207.) Wardroup wanted to keep the jury's focus on Rodriguez by generally presenting events that Rodriguez himself witnessed. (6 SHRR 245.)

The same can be said for Salazar and Palacios, distant relatives whom Cowie did not seek to interview. (5 SHRR 209; 6 SHRR 9.) Cowie stated that he did not believe he had the resources to travel to Alice where they lived, and he focused his resources on stories from people who were in the home at the time. (6 SHRR 94.) Both Salazar and her mother, Palacios, visited the Rodriguez family sporadically, on holidays and special occasions. Salazar estimated they visited about ten times. (3 SHRR 90-91, 138-39, 157.) Palacios said her brother's family visited once a year (but not every year) and that she visited them less than seven or eight times. (3 SHRR 129.) Trial counsel could reasonably decide not to expend time and resources tracking down people who did not have regular contact with the family. *See Richter*, 562 U.S. at 107-08 (holding that an attorney need not pursue an investigation that would be fruitless and counsel is entitled to formulate a reasonable strategy that balances limited resources in accord with effective trial tactics and strategies).

Wardroup chose to present testimony from non-family member Gene Douglass, an attorney and a long-time family friend who is married to a former judge. He met Rosendo in the Air Force and their children were playmates. He knew Rodriguez well as a child and last saw him in 2004. (37 RR 196-201.) Wardroup also called Thelia Chaffin, a paralegal who worked for Rosendo for eighteen years and saw Rodriguez grow up. Their families vacationed together and were "very" close. (37 RR 187- 90.) Counsel presented testimony from Dr. Ana Rodriguez, the family matriarch, who was a counselor educator and senior level administrator at a university and spent weeks every summer with her nieces and nephews on the coast. (37 RR 223, 225.) Abad, the mother of Rodriguez's child, is a psychiatric caseworker at state agency for people with intellectual and developmental disabilities

and mental illness, adding significant weight to her good opinion of Rodriguez as a father. (37 RR 362.) Barbara Perkins was a licensed master social worker and certified juvenile probation officer. Her assessment of Rodriguez as respectful and polite and compliant with her house rules on dating carried significant mitigating potential, given that the five rapes he committed were all within dating or social relationships. (37 RR 206.) Pastor Raul Hernandez was a distant cousin to Rodriguez, but also an educator for thirty-three years and a Vietnam veteran. (37 RR 354-56.) These witnesses were apparently chosen for who they were as well as what they could say about the family and Rodriguez in particular. The witnesses presented at the habeas hearing, on the other hand, were apparently selected under a dubious "more is better" philosophy, with no regard for the facts that their testimony (1) focused not on Rodriguez but on his father and (2) conflicted in many significant details.

Wardroup was not ineffective for failing to present testimony from witnesses who refused to be involved, from witnesses who had little knowledge of the nuclear family, or from witnesses who lived far away and had little to contribute to the story of Rodriguez's daily life. *See id.* (holding that trial counsel were entitled to avoid activities that distract from more important duties, formulate a strategy that was reasonable at the time, and balance limited resources in accord with effective trial tactics and strategies); *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980) (holding that counsel is not required to "pursue every path until it bears fruit or until all conceivable hope withers"). Rodriguez fails to show that the state court's ruling regarding counsel's choice of witnesses was unreasonable.

### D. Counsel's strategy to connect childhood abuse to criminal conduct

Rodriguez next contends trial counsel failed to connect his father's violent and abusive behavior to his own criminal conduct and demonstrate in a compelling manner the impact it must have had

on him. He asserts the habeas evidence would have conveyed what it was like to live in the Rodriguez household, and how alcohol, violence, and mental illness affected his development. (Pet. 108-09.)

On the whole, however, the habeas evidence does not make the direct connection Rodriguez suggests. While Olivia and Garza surmised that Rosendo taught Rodriguez to "disrespect" women, this does not begin to explain violent rape and murder. Further, Olivia contradicted her testimony in this regard almost immediately after she said it. (2 SHRR 209-10, 235.) Other habeas witnesses described Rodriguez as loving, thoughtful, intelligent, polite, and respectful to everyone. (2 SHRR 65 (Lupe); 3 SHRR 85 (Salazar), 149 (Palacios); 4 SHRR 95 (Ana).) Neither Ana nor Lupe could identify one occasion where Rodriguez was abusive to a girl or woman. (2 SHRR 67; 4 SHRR 95.) Palacios also testified that Rodriguez did not have an alcohol problem. (3 SHRR 161.) Palacios was not even familiar with Rosendo's drinking when Rodriguez was growing up. (3 SHRR 130.) And Ana described her brother as an "outstanding father" who did everything to give his children the best opportunity for a better life, saying, "[H]e loved them more than he loved life itself." (4 SHRR 28.) The habeas testimony does not show that Rosendo's abuse and alcoholism caused Rodriguez to commit rape and murder.

To the extent Rodriguez suggests counsel should have made this argument to the jury, Wardroup did so to a reasonable extent. Wardroup elicited testimony from Lupe that she observed behaviors in her children indicating they had been affected by the abuse she received. (37 RR 352.) Wardroup asked the jury to give effect "to the home that Rosendo Rodriguez grew up in" and consider as mitigation the fact that Rodriguez was said to have always shown respect to all people. (38 RR 30.) Wardroup presented expert testimony that Rodriguez could successfully serve a life sentence because he was intelligent, polite, respectful, had no disciplinary problems in jail, follows orders, and was

38

helpful to the detention officers. (37 RR 162-63, 174-75, 271-72.) Rodriguez argues now that counsel should have presented more evidence of abuse to more strongly correlate his criminal behavior to his upbringing. But this strategy is no more reasonable than the one counsel chose. The presentation of a defendant's troubled background to explain his ingrained disrespect for women and his violent behavior towards them can have the harmful effect of showing the defendant's tendency to commit dangerous acts in the future. *See, e.g., Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1244 (2013) (concluding that counsel's decision to not offer evidence of a defendant's troubled, impoverished, and disadvantaged background was reasonable because the evidence could suggest he was a product of his environment and therefore likely to be dangerous in the future). Such a strategy would have likely undermined Wardroup's argument that, despite his childhood, Rodriguez was capable of respecting authority and following orders in prison.

The concern that a jury would view this evidence as more aggravating than mitigating is especially valid here because Rodriguez enjoyed the support of an extended and close family, was well-provided for, received the benefits of great wealth and privilege, and was sent to college with the hope that he would be president one day. And, whatever the mitigating impact of his abusive childhood, it would have been further diminished by the fact that Sofia and Olivia were raised in the same environment, by all accounts received more abuse than their brother, and managed to make different life choices. *See Guevara v. Stephens*, 577 F. App'x 364, 369 (5th Cir. 2014) (per curiam) (holding that any information about Guevara's difficult life in El Salvador would have been undermined by, among other things, his brother's clean record despite their shared childhood). Lupe, Sofia, Ana, and Salazar all described Rodriguez as the apple of his father's eye or his "pride and joy" while Sofia and Salazar said the girls suffered more abuse. (2 SHRR 81; 3 SHRR 90; 4 SHRR 30; 37 RR 330-33.)

39

This is not a case where trial counsel overlooked abusive conduct, mental illness, and alcoholism in Rosendo. Wardroup did present evidence that Rosendo was an abusive alcoholic, and he argued those facts in mitigation. Counsel learned this information from people who knew Rodriguez best— Sofia, Lupe, Olivia, Rosendo, and Rodriguez himself, to a limited extent. At the time of trial, these same people would have known all the additional details that were presented at the habeas hearing, and yet they chose not to divulge them until after the death sentence was imposed. As noted, counsel is not responsible for introducing mitigation evidence that the client and other witnesses fail to disclose. *See Johnson*, 306 F.3d at 252-53. At its core, this claim comes down to matters of degree: Did counsel talk to enough witnesses about abuse? Did counsel interview the family members enough times under the ideal circumstances? Did counsel extract enough details of the defendant's upbringing? Such matters of degree risk incorporating the "distorting effects of hindsight" and are accordingly "less susceptible to judicial second-guessing." *See Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)). Rodriguez has not demonstrated it was unreasonable for the CCA to conclude that he did not overcome the strong presumption of counsel's competence.

## VI. No *Strickland* Prejudice

Rodriguez makes a global challenge to the state court's prejudice determination under *Strickland*. (Pet. 116-24.) In its answer, Respondent argues that the aggravating evidence is overwhelming, that the jury heard some evidence of Rodriguez's abusive childhood, and that the additional evidence offered at the habeas hearing was not compelling enough to undermine confidence in the sentencing verdict.

The state court described habeas counsel's effort as a nonsensical attempt to establish that Rosendo's high expectations and strict oversight of a son with such promise was somehow mitigating,

40

despite Rodriguez having had a privileged upbringing, being blessed with involved parents, doting

sisters, aunts, and cousins, being supported by ample monetary and other resources, and having all

manner of personal and familial support. (5 SHCR 1495.) The state court reasoned that such

information is "not the sort of thing that reasonable jurors would weigh on the mitigation side of the

ledger." (5 SHCR 1496.) The court concluded that Rosendo's mental health issues did not suggest

mitigation because, despite having funding for a psychologist, there was no substantial evidence that

Rodriguez suffered from any mental disorder. The court likewise found no evidence that Rodriguez

was an alcoholic or had been disrespectful or violent with women (other than his victims) such that

these attributes of his father would be seen as mitigating. When balanced against Rodriguez's well-

established history of predatory sexual abuse of women, his callous murder of Baldwin and the

calculated manner in which he disposed of her body, along with his connection to the disappearance

of Rogers, the state court concluded that the habeas evidence did not establish a reasonable probability

of prejudice. (5 SHCR 1496-97.)

As previously addressed, there is no evidence in the record that Rodriguez has a mental disorder,

had a problem with alcohol, or (excluding his crimes) was anything but respectful to women and people

in general. The fact that his father exhibited contrary traits is of limited mitigating value because

Rodriguez did not manifest those traits. In fact, Olivia's testimony implies that their father's behavior

had the opposite effect on Rodriguez because he eventually learned to stand up to his father and to

treat women with great respect. (2 SHRR 209-10, 223-24, 248.) As noted previously, the mitigating

impact of abuse evidence is further reduced by the fact that Rosendo was the apple of his father's

eye and was treated better than his siblings, neither of whom had committed murder. *See Guevara*,

577 F. App'x at 369. Childhood abuse evidence also has limited mitigating value where, as here,

the defendant does not take responsibility for his criminal behavior. In other words, a theory that the defendant's father modeled behavior that was disrespectful and abusive to women would have little impact where the defendant maintains that he had consensual sexual relations with a woman and killed her by accident.

Furthermore, the testimony among the habeas witnesses is rife with conflict that the prosecution was able to exploit. As noted, Ana described Rosendo as "an outstanding father," who was "always caring and protective" of his wife and had beautiful things to say about her. (4 SHRR 28.) She found the suggestion that her brother was a drug dealer "abominable," and the suggestion that he was in the Mexican Mafia "ridiculous." She disagreed that he treated women as second-class citizens. (4 SHRR 104-05.) Ana and her sister, Palacios, both testified that domestic violence towards women was not part of the family history. (3 SHRR 160; 4 SHRR 94-95.) In fact, all four of Rosendo's sisters were valedictorians in high school because, according to Palacios, their father believed "education was the great equalizer," and he did not want his children to suffer like he did. (3 SHRR 160; 4 SHRR 87.) Among Rosendo's sisters were Ana, the retired university professor with a doctorate degree in guidance counseling education and a UT Fellow for Academic Affairs (4 SHRR 14); Maria Elaina, a registered nurse with a master's degree in counseling (4 SHRR 85); Palacios, a retired assistant school superintendent with two master's degrees (3 SHRR 128-29); and Dolores, a former police officer and retired federal probation officer with a degree in criminal justice (4 SHRR 87). This legacy is at odds with the assertions in Rosendo's affidavit that "[t]here is a long history of disrespect and abuse toward women in my family" by his father and grandfather, that his father "delighted in making [his] mother feel inferior" and "did not care about his wife and children's feelings." (1 SHCR 241 ¶ 5, 242 ¶ 9-11.)

Ana and Palacios also said that their nieces and nephews never cried out or asked for help, contrary to Olivia's testimony that she did so. (2 RR 241-42; 3 RR 141, 102-03.) Any reasonable jury could conclude from the array of education, law enforcement, and health workers in Rodriguez's life that the significant abuse described by Lupe, Olivia, and, to some degree, Salazar, would have been noticed if it were in fact true. Olivia even offered that her Aunt Dolores (the former police officer and probation officer) had lived with them for a period of time and witnessed the abuse, yet Dolores was noticeably absent from the hearing. (2 SHRR 240.)

Rodriguez also asserts he was prejudiced because, if the jury had received the habeas evidence, the prosecution would not have been able to question the lack of corroboration from sources outside the family and the jury would not have been persuaded by the State's argument that other people have had worse childhoods than Rodriguez. (Pet. 118-19.) The Court observes that the abuser, Rosendo, admitted his abuse before the jury. (37 RR 321.) Although Rosendo only admitted to a few instances of abuse, his wife and daughter clarified that the abuse happened "many times," and Rosendo simply did not remember it because he was so intoxicated. (37 RR 329, 335-36, 351-52.) Under these circumstances, the need for corroboration outside the family is reduced. Although the habeas hearing included detailed instances of abuse from the family members, it conflicted in damaging ways, as discussed, and the non-family witnesses such as Garza, Anderson, Franklin, Brittain, and Chaffin, had little knowledge, if any, of life within the nuclear family.

The record also does not support the argument that the habeas evidence would have prevented the jury from accepting the State's argument that other people have had worse childhoods. The habeas testimony contains many examples of Rodriguez's privileged upbringing, including travel and educational opportunities that many jurors probably would not see in their lifetime. According to

43

Lupe, Rosendo loved her and adored the children and was a completely different person when he was not drinking. She said there were "a lot [of] real good times" and spontaneously described a trip to Las Vegas. (2 SHRR 36, 133-34.) They took vacations at least once a year and sent Olivia to Europe for her high school graduation. (2 SHRR 125.) They attended both inaugurations for President Bill Clinton. (2 SHRR 125.) Even Olivia testified her father was not bad all the time, and he "absolutely" could be loving and caring. She and her mother described living in a house with five bedrooms, a basketball court, a pool, and a huge yard with twenty-two pecan trees. Her parents owned a second home and each child had their own car. (2 SHRR 93, 205, 226, 250, 257; 3 SHRR 143.) Although Rosendo kept guns all over the house, he showed his family how to protect themselves with the guns, which belies the suggestion that Rosendo used guns to perpetuate abuse and violence. (2 SHRR129.) Chaffin testified that Rosendo was a generous and complimentary boss and gave her credit for her work. (3 SHRR 49.) Both Lupe and Ana also testified that Rosendo was surprisingly very supportive of Olivia when she became pregnant in college. (2 SHRR 108-09; 4 SHRR 66). Salazar had fond memories of her Uncle Rosendo; she had a close relationship with him and said he was very loving, kind, and protective. (3 SHRR 85-86.) She was envious of her cousins who "never went without." (3 SHRR 86.) Rosendo's medical records suggest that his decision to stop drinking "cold turkey" was motivated by his love for his wife. (9 SHRR 191.) Rodriguez was popular in high school, attended college, and joined a fraternity. His parents would visit him once or twice a month and bring groceries for Rodriguez and his college friends. (4 SHRR 83.)

This record certainly does not refute the argument that other people have had worse childhoods. Moreover, the aggravating evidence in this case is overwhelming. Acting alone, Rodriguez carefully planned Baldwin's murder to avoid detection. He rented the truck he used, checked into a hotel under

a different name, and disposed of Baldwin's clothes and identifying information separate from her body. The facts of the crime are especially heinous: (1) he sexually assaulted Baldwin with such violence that she would not have been able to walk, and sometime during the assault he strangled and beat her; (2) he then calmly purchased a suitcase and gloves, cleaned up the room, and dumped her in a trash can; (3) showing an utter lack of conscience, he watched a movie, ate a meal, and slept in the same room; and (4) he snapped a smiling picture of himself upon leaving town and began an apparent search for more victims when he arrived home. But for the fact that a landfill worker happened to see the suitcase pop open, Baldwin's murder would likely have gone unsolved, as did Rogers' disappearance before her. In addition to this, the punishment testimony showed that Rodriguez was a serial rapist beginning from the age of sixteen. The rapes were all committed in the course of a dating or otherwise trusting social relationship, and Rodriguez had convinced all but one of his victims not to report what had happened.

In sum, the details of abuse and the family history conflicted in many ways, while other evidence emphasized that Rodriguez had a privileged life and every opportunity to make better choices. The new mitigating evidence would barely have altered the "sentencing profile" presented to the jury and may have even been harmful. *See Strickland*, 466 U.S. at 700. Rodriguez fails to demonstrate that it was unreasonable for the CCA to conclude that he had failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 563 U.S. at 190.

## VII.  Additional arguments regarding state court's credibility decisions

Rodriguez contends the state court did not fully adjudicate this claim because it "effectively saw no mitigation value in anything" he offered in state habeas proceedings and did not make a finding under the first prong of *Strickland*. (Pet. 124-25.) The record does not support this assessment. The

state court found that various witnesses presented by Rodriguez were not credible "because of a seeming

willingness to be led to say whatever Applicant's habeas team sought to obtain from them" and alter

their stories to "fit the needs of the moment." (5 SHCR 1489.) Nevertheless, the state court found

that Ana and Palacios were "credible in most respects" (5 SHCR 1491), and the state court found

that certain specific incidents of violence did occur, but that not all reports of each event were credible.

(5 SHCR 1486-89.) Contrary to Rodriguez's suggestion, therefore, the state court did not discount

all of his evidence. The fact of the matter is, Rodriguez presented testimony from his aunts which

failed to support the picture that the habeas team tried to paint regarding Rosendo's behavior and a

paternal legacy of violence and abuse.

Further, the state court made a deficiency determination under *Strickland* as follows:

> The Court finds that trial counsel reasonably chose from the best witnesses available at that time to try to present a complete picture of Applicant's life, upbringing, home life, and environmental factors throughout his life. *Trial counsel were not deficient for failing* to present unstable, uncertain, questionable witnesses who could not be depended upon to withstand the ordeal of testifying and to stick with the evidence without volunteering information, contradicting other witnesses, contradicting their own prior statements, and from volunteering potentially detrimental matters far beyond the question posed. But, even if trial counsel might have been judged to be more reasonable by putting on *all* witnesses regardless of other considerations, i.e., just to put it all on and hope for the best with several of those witnesses, *it was not an unreasonable trial strategy* to put the best witnesses forward and to focus on events Applicant experienced firsthand, rather than matters that happened in Applicant's father's law practice, which nothing shows Applicant was even aware of.

(5 SHCR 1497) (emphasis added.) Before making the above conclusions and recommending that

relief be denied, the convicting court identified this claim as one of insufficient "investigation" as

well as the insufficient "presentation" of evidence. (5 SHCR 1469.) While the written ruling is not

a model of clarity, as discussed in further detail below, this Court's function is to determine the

reasonableness of the ruling, not grade the state court's papers. *Santellan*, 271 F.3d at 193. The Court

rejects the argument that the state court did not make a ruling under *Strickland's* first prong.

In his Reply, Rodriguez presents additional attempts to avoid the unfavorable credibility

determinations made by the state trial judge. He complains the state court's decision is both contrary

to and an unreasonable application of clearly established law in *Porter v. McCollum*, 558 U.S. 30

(2009), and *Wiggins v. Smith*, 539 U.S. 510 (2003), because

1.  In holding that trial counsel "reasonably discontinued the mitigation investigation," the state court completely discounted the mitigation value of the habeas evidence and failed to consider whether the known evidence of "Rodriguez's horrific upbringing" would have led a reasonable attorney to investigate further. (Reply 3-5.)

2.  In finding no prejudice, the state court failed to consider the "totality of the evidence" because it did not consider or unreasonably discounted the habeas evidence and did not weigh the habeas evidence against what the jury heard. (Reply 6-7.)

3.  In finding no prejudice, the state court unreasonably screened mitigation evidence from its analysis in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004). (Reply 7-9.)

At the outset, the record does not support the declaration that Wardroup overlooked evidence

of Rodriguez's "horrific upbringing." Assuming all of the habeas evidence is true, it included incidents

of abuse similar in character to what the jury heard at trial, involving battery, verbal abuse, and

controlling or demeaning behavior directed toward Lupe. The evidence also included incidents against

the children, including (1) disciplining the children by lining them up against the wall and yelling,

pointing, slapping, and humiliating them; (2) hitting Rodriguez with his hand and a belt from age

two to age eighteen (per Lupe) or from age three to age sixteen (per Olivia); and (3) leaving bruises

on Olivia's buttocks and legs that her mother ignored. But the habeas witnesses also agreed that

Rosendo loved his wife and children, that Rodriguez was the apple of his father's eye, and that the

47

family enjoyed good times, great wealth, educational opportunities, and travel. This upbringing, while not ideal, can hardly be deemed "horrific." *Cf. Wiggins*, 539 U.S. at 535 (reciting "powerful" overlooked mitigation evidence of (1) severe privation and abuse while in the care of an alcoholic, absentee mother; (2) physical torment, sexual molestation, and repeated rape while in foster care; (3) periods of homelessness and hunger; and (4) diminished mental capacities).

The record also does not support the assertion that the state court failed to consider the totality of the evidence. In making its findings and conclusions, the trial court judge relied upon documents filed with the clerk, the reporter's record of the trial and the motion for new trial proceedings, and "all habeas-related testimony (whether made by live testimony in court or by deposition), affidavit testimony, [and] other non-testimonial and documentary evidence." (5 SHCR 1417.) The state court discussed the habeas evidence in detail, comparing it to other evidence in the record. (5 SHCR 1469-94.) The state court then held that there was no *Strickland* prejudice. In doing so, the court balanced the questionable hearing evidence against Rodriguez's "well-established history of predatory sexual abuse of women," his calculated and callous murder of Baldwin, and his association with the disappearance of Joanna Rogers. (5 SHCR 1495-96.) The state court next concluded, as discussed above, that counsel was not deficient. (5 SHCR 1497.) The CCA denied relief based upon theses findings and conclusions, as well as its own review of the case.

This case is not like *Porter*, in which the Supreme Court held that the state court's determination of "no prejudice" was unreasonable because the jury heard almost nothing in the way of mitigation and the state habeas court "either did not consider or unreasonably discounted the mitigation evidence." *Id.* at 41-42. Porter's mitigation evidence consisted of mental health issues, combat service in Korea, and childhood abuse. Unlike this case, the discussion in *Porter* did not involve determinations of

48